UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
METRO-GOLDWYN-MAYER STUDIOS INC.,                 :

                                    Plaintiff,    :

                                                        07 Civ. 2918 (DAB)
                    -against-                     :
                                                        (ECF Case)
TPS GESTION, S.A., TPS SOCIÉTÉ EN NOM             :
COLLECTIF, CANAL+ FRANCE S.A., and
GROUPE CANAL+ S.A.,                               :

                                    Defendants.   :
------------------------------------------------------------------------x

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS

**MANATT PHELPS & PHILLIPS, LLP**
7 Times Square
New York, New York 10036
(212) 790-4500

Attorneys for Defendants

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................. 1

The Complaint ............................................................................................................. 2

    A.    The Parties ................................................................................................ 3

        1.    Plaintiff ....................................................................................... 3

        2.    Defendants ................................................................................... 3

    B.    The Agreement .......................................................................................... 4

    C.    The Amendment ........................................................................................ 5

    D.    The Contemplated Merger ........................................................................ 6

    E.    MGM's Attempt To Extend The Term Of The Agreement In The Absence Of A Merger ................................................ 7

    F.    The Transaction Between TPS SNC And Canal+ ................................... 7

    G.    MGM's Delay In Commencing This Action ........................................... 7

I    THE COMPLAINT SHOULD BE DISMISSED AS AGAINST THE NON-SIGNATORY DEFENDANTS PURSUANT TO RULE 12(B)(2) ...................... 9

    A.    The Forum Selection Clause Does Not Confer Personal Jurisdiction Over Non-Signatories To The Agreement. ........................................... 9

    B.    Rule 4(k) Provides No Basis For Personal Jurisdiction Over Foreign Entities Not Subject To Jurisdiction In New York. ........................... 12

    C.    Article 15 Of The French Civil Code Provides For A Privilege Of Jurisdiction Over French Entities ..................................................... 15

II    THE BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) ........................................................................ 15

    A. The Complaint Does Not State A Claim For Breach Of Contract ............................ 15

    B. MGM Is Not Entitled To The Equitable Remedy Of Specific Performance ............. 19

III    THE TORTIOUS INTERFERENCE WITH CONTRACT CLAIM SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) .................................... 22

IV    MGM SHOULD NOT BE AFFORDED LEAVE TO REPLEAD ................................ 25

Conclusion .................................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## Federal Cases

APA Excelsior III L.P. v. Premier Technologies, Inc.,
   49 F. Supp. 2d 664 (S.D.N.Y. 1999)........................................................ 10

Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,
   No. 04 Civ. 10014, 2006 WL 1493132 (S.D.N.Y. May 31, 2006)........................ 20

Asahi Metal Indus., Co., v. Super. Ct. of Cal.,
   480 U.S. 102 (1987)........................................................................ 8

Bell Atlantic v. Twombly,
   __ U.S. __, 127 S. Ct. 1955 (May 21, 2007) ..................................... 9, 22

City of Peru v. Bouvier Hydropwer, Inc.,
   No. 00 Civ. 1179, 2001 WL 59036 (N.D. Ill. Jan. 19, 2001) ......................... 10

Conopco Inc. v. Campbell Soup Co.,
   95 F.3d 187 (2d Cir. 1996).................................................................. 20

Dayhoff Inc. v. H.J. Heinz Co.,
   86 F.3d 1287 (3d Cir. 1996)................................................................ 10

DeJesus v. Sears, Roebuck & Co., Inc.,
   87 F.3d 65 (2d Cir. 1996)................................................................... 24

Giannone v. Deutsche Bank Securities, Inc.,
   392 F. Supp. 2d 576 (S.D.N.Y. 2005).................................................... 25

In Re Drexel Burnham Lambert Group, Inc.,
   157 B.R. 532 (S.D.N.Y. Bankr. 1993).................................................... 21

Jacob Gold Realty Inc. v. Sckoczylas,
   186 Misc. 2d 612 (Sup. Ct. N.Y. County 2000) ....................................... 19

Jungmann & Co. v. Atterbury Bros.,
   249 N.Y. 119 (1928) ....................................................................... 18

Landoil Resources Corp. v. Alexander & Alexander Srvcs., Inc.,
   918 F.2d 1039 (2d Cir. 1991).............................................................. 13

Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.,
   No. 95 Civ. 8450, 1996 WL 732634,
   (S.D.N.Y. Dec. 19, 1996)................................................................. 22

TABLE OF AUTHORITIES

Page

Lucente v. International Business Machines Corp.,
   310 F.3d 243 (2d Cir. 2002).................................................................. 20

Maritime Insur. Co. Ltd. v. M/V "Sea Harmony",
   No. 97 Civ. 3818, 1998 WL 214777
   (S.D.N.Y. May 1, 1998)....................................................................... 11

Masefield AG v. Colonial Oil Industries,
   No. 05 Civ. 2231, 2006 WL 346178
   (S.D.N.Y. Feb. 15, 2006) ............................................................... 23, 24

Net2Globe Int'l, Inc. v. Time Warner Telecom of New York,
   273 F.Supp. 436 (S.D.N.Y. 2003) ...................................................... 24

New Era Pub. Int'l, Aps. v. Henry Holt & Co., Inc.,
   873 F.2d 576 (2d Cir. 1989)................................................................ 21

Panacea Solutions, Inc. v. Roll,
   No. 05 Civ. 10089, 2006 WL 3096022
   (S.D.N.Y. Oct. 31, 2006) .................................................................... 15

Sparks Tune-Up Ctrs., Inc. v. Strong,
   No. 92 Civ. 5902, 1994 WL 188211
   (N.D. Ill. May 12, 1994) ..................................................................... 10

The American Fabrics Co. v. Lace Art, Inc.,
   291 F. Supp. 589 (S.D.N.Y. 1968) ..................................................... 21

Tycon Tower I Inv. Ltd. Partnership v. John Burgee Architects,
   No. 95 Civ. 6951, 1999 WL 676007
   (S.D.N.Y. Aug. 31, 1999) ................................................................... 16

Weisberg v. Smith,
   473 F. Supp. 2d 604 (S.D.N.Y. 2007)................................................. 14

Yung v. Lee,
   No. 00 Civ. 3965, 2002 WL 31008970
   (S.D.N.Y. Sept. 5, 2002)..................................................................... 10

State Cases

Alvord and Swift v. Stewart M. Muller Constr. Co.,
   46 N.Y.2d 276 (1978) ......................................................................... 23

Collins v. E-Magine LLC,
   291 A.D.2d 350 (1st Dep't 2002) ....................................................... 24

# TABLE OF AUTHORITIES

<u>Page</u>

Fidelity New York FSB v. Madden,
212 A.D.2d 572 (2d Dep't 1995) ......................................................................... 19

Foster v. Churchill,
87 N.Y.2d 744 (1996) ................................................................................... 22, 23

General Bldg. Contractors Of New York State, Inc. v. Egan,
106 A.D.2d 688 (3d Dep't 1984) ......................................................................... 21

Jacobs v. Lewis,
261 A.D.2d 127 (1st Dep't 1999) ......................................................................... 16

Kaminski v. United Parcel Serv.,
120 A.D.2d 409 (1st Dep't 1986) ......................................................................... 22

LeBlanc v. Security Servs. Unit Employees,
278 A.D.2d 732 (3d Dep't 2000) ......................................................................... 16

Maxton Bldrs. v. Lo Galvo,
68 N.Y.2d 373 (1986) ......................................................................................... 18

Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,
86 N.Y.2d 685 (1995) ......................................................................................... 17

Piazza v. Sutherland,
53 Misc. 2d 726 (Sup. Ct. Suffolk
County 1967) ..................................................................................................... 19

Tauber v. Bankers Trust Co.,
230 A.D.2d 312 (1st Dep't 1997) ......................................................................... 19

WMW Machinery Co., Inc. v. Koerber AG,
240 A.D. 2d 400 (2d Dep't 1997) ......................................................................... 23

### Foreign Cases

Lyon Court of Appeal, March 14, 1960
in <u>JurisClasseur Procédure Civile, Fascicule 40 n°21</u> ....................................... 11

Paris Court of Appeal, <u>1ème Chambre</u>, October 11, 2004, n°93.21374 ....................................... 11

### Statutes And Rules

CPLR 301 ............................................................................................................. 12, 13

# TABLE OF AUTHORITIES

<u>Page</u>

CPLR 302....................................................................................................... 13, 14, 15

CPLR 302(a) ...................................................................................................... 13, 14

CPLR 302(a)(1) .......................................................................................................... 14

CPLR 302(a)(2) .......................................................................................................... 15

CPLR 302(a)(3) .......................................................................................................... 15

CPLR 302(a)(4) .......................................................................................................... 14

Fed. R. Civ. P., Rule 4(k)..................................................................... 9, 12, 14, 15

Fed. R. Civ. P., Rule 12(b)(2)......................................................................... 1, 8

Fed. R. Civ. P., Rule 12(b)(6)..................................................................... 1, 8, 9

Fed. R. Civ. P., Rule 15(a).................................................................................... 25

## <u>Other Authorities</u>

2 Moore's Federal Practice § 12.31[4] (3d ed. 2006) ................................ 9

2 Weinstein, Korn & Miller,
  <u>New York Civil Practice</u> ¶ 301.10 (2d ed. 2006)..................................... 12

13 Williston On Contracts, § 38:6
  (4th ed. 2006) ....................................................................................... 16

Article 15 of the French Civil Code.................................................................. 15

Restatement Of The Law 2d Contracts,
  vol. 2 § 225(1) (1981) ........................................................................ 16

Defendants TPS Gestion, S.A. ("TPS Gestion"), TPS Société En Nom Collectif ("TPS SNC"), Canal+ France S.A. ("Canal+ France"), and Groupe Canal+ S.A. ("Groupe Canal+") move, pursuant to Rules 12(b)(2) and 12(b)(6), Fed. R. Civ. P., to dismiss plaintiff's complaint on the grounds that there is a lack of personal jurisdiction and that the complaint fails to state a claim for relief. Defendants submit this memorandum, together with the accompanying affidavit of Lauren Reiter Brody ("Brody Aff.") and declarations of Jean-François Meaudre, Chief Executive Officer of TPS Gestion ("Meaudre Decl."), Bertrand Meheut, President of the Executive Board of Canal+ France ("Meheut Decl. I"), and Bertrand Meheut, President of the Executive Board of Groupe Canal+ ("Meheut Decl. II"), in support of their motion.

<u>Preliminary Statement</u>

This action represents an effort by a major motion picture studio, Metro-Goldwyn-Mayer Studios Inc. ("MGM"), to obtain contract terms to which it has no right. The facts of this case -- which are admitted in the complaint -- demonstrate that MGM has no claim.

In 1996, MGM and a French satellite television network, TPS SNC, entered into a contract (the "Agreement") whereby MGM licensed to TPS SNC certain of its films and television programs for broadcast in exchange for licensing fees. TPS SNC fully performed its obligations under the Agreement, and MGM does not allege to the contrary. Indeed, MGM was so satisfied with the deal that, in 1999, it entered into an amendment (the "Amendment") extending the Agreement for an additional five years -- until December 31, 2006.

In January 2006, TPS SNC and Groupe Canal+, the owner of a competing television network in France, announced plans to merge their satellite television businesses. This turn of events was not unexpected, and the parties addressed the possibility in the Amendment. Thus, the Amendment permitted MGM further to extend the Agreement "[i]n the event (and only in such event) of a Merger, consolidation, or reorganization between TPS [SNC] and Canal+ which

results in a unified holding, whether direct or indirect, in the hands of a single entity or group of shareholders, of the Premium Pay TV Service of Canal+ . . . and the Premium Pay TV Service of TPS [SNC]".  As MGM admits, the merger was not consummated until 2007.  By that time, the Agreement, together with the conditional right to extend as set forth in the Amendment, had expired.

Nonetheless, and even though MGM knew full well there was no merger that resulted in a unified holding on or before December 31, 2006, it pretended to exercise its right to extend. TPS promptly and repeatedly advised MGM that the conditions precedent to an extension had not occurred.  MGM did not take any legal action, but instead delayed until April 2007 to file this complaint.

MGM now asserts claims for breach of contract and tortious interference with contract, seeking the extraordinary equitable remedy of specific performance as well as compensatory and punitive damages.  It also names as defendants French entities that are not parties to the Agreement and that have no contacts whatsoever with the State of New York.  As demonstrated below, the complaint should be dismissed for lack of personal jurisdiction and failure to state a claim.

Accordingly, this motion should be granted in its entirety.

<u>The Complaint</u>

This motion is based, in part, on the complaint's failure to state a claim.  Therefore, for purposes of this motion only, the factual allegations of the complaint are assumed to be true.[1]

The allegations of the complaint pertinent to this motion are summarized below.[2]

---

[1]    A copy of the complaint ("Compl.") is annexed to the Brody affidavit as Exhibit 1.

[2]    In fact, defendants deny, and if necessary, will vigorously contest, the charges in the complaint.

A.    The Parties.

1.    Plaintiff.

Plaintiff MGM is alleged to be (i) a motion picture studio which owns a library of films and television programs, and (ii) a Delaware corporation with its principal place of business in California (Compl. ¶¶ 1, 10, 17).

2.    Defendants.

Defendant TPS SNC is alleged to be (i) a satellite television network which provides pay television and pay-per-view services in France and other French-speaking areas, and (ii) an "unlimited liability business entity organized under the laws of France" with its principal place of business in France (Compl. ¶¶ 1, 11).

Defendant TPS Gestion is alleged to be (i) the owner of "100% of the shares of TPS SNC", and (ii) "a joint stock company organized under the laws of France" with its principal place of business in France (Compl. ¶ 11).

Defendant Canal+ France is alleged to be (i) the owner of "100% of the shares of [a French satellite television provider] CANALSAT", and (ii) "a joint stock company organized under the laws of France" with its principal place of business in France (Compl. ¶¶ 16, 12).

Defendant Groupe Canal+ is alleged to be (i) the owner of "a direct controlling interest in Canal+ France, and an indirect controlling interest in CANALSAT, TPS Gestion and TPS SNC", and a (ii) "joint stock company organized under the laws of France" with its principal place of business in France (Compl. ¶ 13).

None of the defendants is alleged to have an office, transact business, or own property in the State of New York.  The sole contact with New York alleged in the complaint is a choice of law and forum selection clause in the Agreement.  TPS Gestion, Canal+ France, and Group Canal+ (the "Non-Signatory Defendants") are not parties to the Agreement, and have no ties to

the State of New York.  They do not have any employees or agents in New York, are not registered or licensed to do business in New York, do not transact business in New York, do not purchase or lease goods or services in New York, do not sell or rent goods or services to customers in New York, do not have accounts with banks or financial institutions in New York, do not maintain an office in New York, and do not pay taxes in New York.  They do not use the New York courts, and have never been involved in any litigation in New York.  They do not own, use or possess any real property in New York.  (Compl. ¶¶ 15-16; Ex. 1: Overall Agreement § 11; Meaudre Decl. ¶¶ 3-12; Meheut Decl. I ¶¶ 3-12; Meheut Decl. II ¶¶ 3-12).

B.    The Agreement.

In 1996, MGM and TPS SNC entered into the Agreement, with annexes that are a part thereof (Compl. Ex. 1).

1.    The licensing provisions. -- Pursuant to the Agreement, MGM licensed to TPS SNC certain of its films and television programs for broadcast, on what is commonly referred to in the entertainment industry as an "output" basis, in exchange for licensing fees.  A critical element of the deal was that TPS SNC receive fresh output, i.e., recently-released films and television programs at the earliest time at which they could be aired in the licensed media for certain limited windows of time (Compl. ¶¶ 2, 28, 29; Ex. 1: Annex A § 11.2).

2.    The choice of law and forum selection provision. -- The Agreement provides that the contract "will be governed in all respects by the laws of the State of New York" (Compl. Ex. 1: Overall Agreement § 11).  It also provides that, "Each of the parties hereby irrevocably and unconditionally submits itself and its property in any legal action or proceeding relating to this Agreement . . . or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Courts of New York (whether State or Federal)" (id.; emphasis added).

The parties to the Agreement are MGM and TPS SNC (id. at p. 3).

3.     The Agreement's term, and the extension thereof in the event of a merger. -- The Agreement provides for an initial term of five years, from January 1, 1997 through December 31, 2001 (the "Initial Term").  In certain specified circumstances, either MGM or TPS SNC could elect to extend the Initial Term for an additional five years (the "Extended Term").  (Compl. ¶ 29; Ex. 1: Annex A § 9).

A merger involving TPS SNC is one of the circumstances that would entitle MGM to such an extension.  Thus, the Agreement provides:

> [I]n the event that [TPS SNC] is the subject of a Merger during the Initial Term (regardless of whether such a Merger is consummated during the Initial Term) with an entity or an Affiliate of any entity, provided that such entity or Affiliate is unaffiliated to the current shareholders of TPS, which is in the business of operating or Controlling any digital television distribution platform, [MGM] shall have the right in its sole election to extend the Initial Term for an Extended Term.

(Compl. ¶ 33; Ex. 1: Annex A § 9(c)).

"Merger" is defined as:

> any sale of assets or shares, joint venture, distribution or liquidation, contribution, merger, licensing arrangement, joint marketing or cooperative arrangement or agreement that has the effect of directly or indirectly transferring from [TPS SNC] to any other entity which is in the business of operating a digital platform all or a significant interest in or control of TPS or its major assets.

(Compl. ¶ 34; Ex. 1: Annex A, p. 17).

TPS SNC was not "the subject of a Merger during the Initial Term" (Compl. Ex. 1: Annex A § 9(c)).

C.     The Amendment.

On July 9, 1999, MGM and TPS SNC entered into the Amendment.  The Amendment supplants certain of the provisions in the Agreement.  It states, "Except for the specific provisions which have been amended herein, all other terms and conditions shall remain

unchanged.  In the event of any conflict between the terms, conditions, and provisions of this Amendment and the Agreement, the terms, conditions, and provisions of this Amendment shall prevail" (Compl. ¶ 36; Ex. 2 § 4 (emphasis added)).

The Amendment begins by changing the term of the Agreement.  The term is extended for an additional five years -- from January 1, 2002 until December 31, 2006 (Compl. ¶ 36; Ex. 2 § I.1).

The Amendment then changes the nature of the transaction which would permit a further extension of the term.  It provides that:

> In the event (and only in such event) of a Merger, consolidation, or reorganization between TPS and Canal+ which results in a unified holding, whether direct or indirect, in the hands of a single entity or group of shareholders, of the Premium Pay TV Service of Canal+ . . . and the Premium Pay TV Service of TPS SNC. . ., and/or any multiplexes thereof existing at the time of such Merger, consolidation or reorganization, MGM shall have the right to extend the Term of Annex A for an additional five (5) Years beyond the Extended Term thereof.

(Compl. ¶ 37; Ex. 2 § I.2 (emphasis added); see also id. at § II.2).  Thus, the Amendment narrows the triggering event.  It requires that TPS SNC merge with a Canal+ entity, and it is no longer sufficient that TPS SNC merge with any "entity . . . which is in the business of operating or Controlling any digital television distribution platform", as set forth in the Agreement (Compl. Ex. 1: Annex A § 9(c).  The Amendment also requires that the merger result in a single unified holding, and it is no longer sufficient that TPS SNC is the "subject of a merger" that may be "consummated" at a later time, as set forth in the Agreement (id.).

D.    The Contemplated Merger.

In January 2006, TPS SNC and Groupe Canal+ "announced they had signed an 'industrial agreement' under which the satellite television operations of TPS SNC and CANALSAT would be combined [and] shares of TPS SNC would be transferred to a new entity" (Compl. ¶ 40).  The contemplated transaction required approval from the French Ministry of the

Economy, which was not granted until August 31, 2006.  The decision of the French Ministry of

the Economy was not definitive since third parties were still allowed to file an appeal before the

French Administrative Supreme Court, known as "Consiel d'Etat", and did not become final

until 2007.  The transaction was not consummated in 2006 for this and other reasons.  (Compl.

¶¶ 40-41).

E.    MGM's Attempt To Extend The Term Of
      The Agreement In The Absence Of A Merger.

      In September 2006, and even though it was well-aware that no merger resulting in a

unified holding had occurred, MGM wrote a letter to TPS SNC purporting to extend the term of

the Agreement for five additional years (Compl. Ex. 3).  TPS SNC advised MGM that it was not

entitled to extend the term and explained that the conditions precedent to an extension had not

occurred (Compl. Exs. 4, 6, 8).  Nevertheless, and even though there had been no merger, MGM

wrote another letter in December 2006, again pretending to extend the term of the Agreement

(Compl. Ex. 9).  (Compl. ¶¶ 47-53).

F.    The Transaction Between TPS SNC And Canal+.

      On January 4, 2007, the transaction agreements between TPS SNC and Canal+ were

signed.  MGM was notified of this event, and also advised that it had no right to revive the

Agreement after it had expired.  (Compl. ¶ 59; Ex. 10).[3]

G.    MGM's Delay In Commencing This Action.

      MGM delayed, and did not commence an action or assert any claim,

      *      in September 2006, when MGM claimed it was entitled to extend the Agreement

(Compl. ¶ 47; Ex. 3);

      *      in October 2006, when TPS SNC informed MGM that it had no such entitlement

_____

[3]    As noted above (see p. 2, supra), the allegations of the complaint are accepted for purposes of this motion only.
       In fact, a fully-completed merger resulting in a unified holding has not yet occurred.

(id. ¶ 48; Ex. 4);

        *      in November 2006, when TPS SNC "reiterated" such position (id. ¶ 50; Ex. 6),

and it was announced that the contemplated transaction would not occur in 2006 (id. ¶ 59);

        *      in December 2006, when TPS SNC "again denied" the occurrence of conditions

precedent to MGM's right to extend the Agreement (id. ¶ 52; Ex. 8);

        *      in January 2007, when the agreements were signed (id. ¶ 59); and

        *      in February 2007, when TPS SNC again advised "that there is no extension of the

Agreement" (id. ¶ 54; Ex. 10).

        Rather, MGM waited until April 2007 (id. at p. 23).

Argument

        As set forth below, the complaint should be dismissed for lack of personal jurisdiction

and failure to state a claim.

        A complaint should be dismissed pursuant to Rule 12(b)(2), Fed. R. Civ. P., if there is no

personal jurisdiction over the defendant.  The Supreme Court has instructed that courts must be

particularly cautious in asserting personal jurisdiction over foreign entities because of "the

unique burdens placed upon one who must defend oneself in a foreign legal system [which] have

significant weight in assessing the reasonableness of stretching the long arm of personal

jurisdiction over national borders".  Asahi Metal Indus., Co., v. Super. Ct. of Cal., 480 U.S. 102,

114 (1987).  Here, there are simply no grounds for subjecting the Non-Signatory Defendants to

jurisdiction in New York.  Accordingly, they should be dismissed from this action.  See Point I,

infra.

        A complaint should be dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P., if it does not

state a claim.  The Supreme Court has recently made clear that, "[w]hile a complaint attacked by

a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do". <u>Bell Atlantic v. Twombly</u>, __ U.S.__, 127 S. Ct. 1955, 1964 (May 21, 2007). Here, the complaint purports to assert two claims, breach of contract and tortious interference with contract. Both claims are unsupported -- indeed, negated -- by the factual allegations of the complaint and the documents it annexes. Accordingly, the complaint should be dismissed with prejudice. <u>See</u> Points II-IV, <u>infra</u>.

# I

## THE COMPLAINT SHOULD BE DISMISSED AS AGAINST THE NON-SIGNATORY DEFENDANTS PURSUANT TO RULE 12(B)(2)

As the complaint acknowledges, all of the defendants are organized under the laws of France and have their principal places of business in France (Compl. ¶¶ 11-13). It is a matter of hornbook law that "[t]he party asserting personal jurisdiction has the burden of proving its existence if challenged". 2 Moore's Federal Practice § 12.31[4] at 12-48 (3d ed. 2006). Here, MGM purports to assert personal jurisdiction over each of the defendants pursuant to a forum selection clause in the Agreement and Rule 4(k), Fed. R. Civ. P. (Compl. ¶ 16). As shown below, there is no basis for personal jurisdiction over the Non-Signatory Defendants because they are not parties to the Agreement, or subject to jurisdiction in New York.

A.    The Forum Selection Clause Does Not Confer Personal
       Jurisdiction Over Non-Signatories To The Agreement.

The Agreement provides that "[e]ach of the <u>parties</u> hereby irrevocably and unconditionally submits itself . . . to the exclusive jurisdiction of the Courts of New York" (Compl. Ex. 1 § 11 (emphasis added)). TPS SNC is the only defendant that is a party to the

Agreement.

Time and again, courts have refused to subject a non-signatory to litigation in a forum to which it did not agree.  As this Court has unequivocally held, "[p]laintiff's argument that a forum selection clause in a purchase agreement between Plaintiff and the defaulting Defendant ITNG somehow binds the other non-party Defendants is specious".  <u>Yung v. Lee</u>, No. 00 Civ. 3965, 2002 WL 31008970 at *2, n.2 (S.D.N.Y. Sept. 5, 2002) (Batts, J.).  <u>See also</u> <u>APA Excelsior III L.P. v. Premier Technologies, Inc.</u>, 49 F. Supp. 2d 664, 671 (S.D.N.Y. 1999) ("The forum selection clause is not dispositive in the present action.  First, it is unclear whether Plaintiffs are able to invoke the forum selection clause against defendants.  None of the plaintiffs was a party to the Merger Agreement and only one defendant was . . . The forum selection clause expressly states that it applies to 'each of the parties hereto'"); <u>City of Peru v. Bouvier Hydropwer, Inc.</u>, No. 00 Civ. 1179, 2001 WL 59036 at *1 (N.D. Ill. Jan. 19, 2001) ("Here, the City was not a party to the contract and thus did not agree to litigate disputes arising out of it in Pennsylvania.  Defendants can point to no case in which a non-party was compelled to litigate its claim in a jurisdiction identified in a forum selection clause, which he did not agree to or bargain for.  I decline to enforce the forum selection clause against the City"); <u>Dayhoff Inc. v. H.J. Heinz Co.</u>, 86 F.3d 1287, 1296 (3d Cir. 1996) ("We agree that . . . forum selection clause in 1990 Distribution Agreement can be enforced only by the signatories"); <u>Sparks Tune-Up Ctrs., Inc. v. Strong</u>, No. 92 Civ. 5902, 1994 WL 188211 at *5 (N.D. Ill. May 12, 1994) ("[Non-signatories] neither bargained for nor agreed upon the forum selection clause contained in the [  ] Franchise Agreement . . . [T]he plaintiffs have failed to cite to any case in which a non-party 'transaction participant' to a contract was actually held 'subject to' the contract's forum selection clause

which the non-party resisted").[4]

This is especially so because the Non-Signatory Defendants had no relationship with TPS SNC at the time the forum selection clause was agreed to, such that they could foreseeably expect to be bound by it.  See Maritime Insur. Co. Ltd. v. M/V "Sea Harmony", No. 97 Civ. 3818, 1998 WL 214777 at *2 (S.D.N.Y. May 1, 1998) (refusing to enforce forum selection clause against non-signatory which could not have foreseen being bound).  As the complaint alleges, Groupe Canal+ was the owner of CANALSAT (Compl. ¶ 39), which was a fierce competitor of TPS SNC when the Agreement was executed (id. at ¶¶ 20-23).  It is inconceivable that Groupe Canal+ could have had any relationship to the signatory, TPS SNC, let alone one that would bind it to its competitor's contract.

Canal+ France did not exist at the time of the Agreement.  See Compl. ¶ 43(d) ("TF1, M6 and Groupe Canal+ undertook corporate restructuring necessary to the consummation of the merger, which included . . . [c]ontribution of most of Groupe Canal+'s assets, including CANALSAT, to a new entity known as Canal+ France").  TPS Gestion had no ownership interest in TPS SNC at the time of the Agreement.  See Ex. 1: Overall Agreement at p. 1 ("MGM is entering into this Agreement in reliance upon the current ownership structure of TPS at the time of execution of this Agreement which consists of TF1, Compagnie Luxembourgeoise de Teledifusion, M6, France Television, Lyonnaise des Eaux and France Telecom").  Obviously, these defendants could not have agreed to submit to jurisdiction in New York either.

Nor do allegations regarding the present ownership structure of TPS SNC provide a basis to enforce the Agreement's forum selection clause against the Non-Signatory Defendants.

---

[4]   The same is true under French law, which holds that a jurisdictional clause in an agreement does not bind third parties who did not consent to such a clause.  See Paris Court of Appeal, 1ème Chambre, October 11, 2004, n°93.21374; Lyon Court of Appeal, March 14, 1960 in JurisClasseur Procédure Civile, Fascicule 40 n°21. Thus, the Non-Signatory Defendants object to jurisdiction under French law as well as, and retain all rights available to them in their home forum of France.

According to MGM, Canal+ France currently owns 100% of the stock of TPS Gestion, which in turn owns 100% of the stock of TPS SNC (Compl. ¶ 11). However, in the context of the enforcement of forum selection clauses, "there is no more reason to disregard the corporate structure with respect to such claims as there would be to disregard it with respect to other legal matters". <u>Dayhoff</u>, 86 F.3d at 1297. The Court should reject MGM's ploy to obscure the corporate distinctions between the defendants, and blur the relevant time frames. The forum selection clause in the Agreement cannot be enforced against the Non-Signatory Defendants.

B.    Rule 4(k) Provides No Basis For Personal Jurisdiction Over
      <u>Foreign Entities Not Subject To Jurisdiction In New York.</u>

MGM also relies upon Rule 4(k), Fed. R. Civ. P. , to assert personal jurisdiction over the Non-Signatory Defendants, but this effort fails as well. Rule 4(k) provides that a federal court may exercise personal jurisdiction only against parties that "could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located". The complaint does not allege that the Non-Signatory Defendants are subject to jurisdiction in the State of New York. To the contrary, it acknowledges that they are French entities doing business in France (Compl. ¶¶ 11-13).

CPLR 301 provides that, "A court may exercise jurisdiction over such persons, property or status as might have been exercised heretofore", <u>i.e.</u>, before adoption of the CPLR in 1963. Thus, "CPLR 301 carried forward four bases of jurisdiction: (1) service on the defendant or the defendant's agent while physically present in New York; (2) 'doing business' in New York of a sufficient volume and quality to give rise to an inference of continuous presence in New York; (3) use of New York courts; and (4) the presence of the defendant's property in New York". 2 Weinstein, Korn & Miller, <u>New York Civil Practice</u> ¶ 301.10 at 3-24 to 3-25 (2d ed. 2006). The complaint does not allege any of these bases, and none apply.

Service of the complaint was made in France (Meaudre Decl. ¶ 2; Meheut Decl. I ¶ 2; Meheut Decl. II ¶ 2). The Non-Signatory Defendants are not present in New York. They do not have any employees or agents in New York, are not registered or licensed to do business in New York, do not transact business in New York or with individuals in New York, do not purchase or lease goods or services in New York, do not sell or rent goods or services to customers in New York, do not have accounts with banks or financial institutions in New York, do not maintain an office in New York, and do not pay taxes in New York (Meaudre Decl. ¶¶ 3-10; Meheut Decl. I ¶¶ 3-10; Meheut Decl. II ¶¶ 3-10). They do not use the New York courts, and have never been involved in any litigation in New York (Meaudre Decl. ¶ 11; Meheut Decl. I ¶ 11; Meheut Decl. II ¶ 11). Finally, they have no property in New York (Meaudre Decl. ¶ 12; Meheut Decl. I ¶ 12; Meheut Decl. II ¶ 12). CPLR 301 plainly is not satisfied since the Non-Signatory Defendants have no contacts with New York. See Landoil Resources Corp. v. Alexander & Alexander Srvcs., Inc., 918 F.2d 1039, 1045 (2d Cir. 1991) (holding that the defendant was not subject to jurisdiction in New York as it had no office in the state and no contacts sufficient "to establish the systematic and continuous presence within the state that New York law requires").

The complaint does not allege any of the grounds for personal jurisdiction contained in New York's long-arm statute, CPLR 302(a), either. The statute provides, in relevant part, that a foreign defendant is subject to jurisdiction in New York only if it commits one of the following acts giving rise to the cause of action: "(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . . or (3) commits a tortious act without the state causing injury to person or property within the state . . . or (4) owns, uses or possesses any real property situated within the state". CPLR 302(a) ("Personal jurisdiction by acts of non-domiciliaries").

The complaint does not, as it could not, allege that any of the Non-Signatory Defendants "transacts business" or "owns, uses or possesses any real property" in New York.  As noted above, they do not.  <u>See</u> Meaudre Decl. ¶¶ 5, 9, 12; Meheut Decl. I ¶¶ 5, 9, 12; Meheut Decl. II ¶¶ 5, 9, 12.  Furthermore, the subject of this action, whether MGM could extend the term of the Agreement in the absence of a merger resulting in a unified holding, concerns business transactions in France.  CPLR 302(a)(1) and (4) are therefore inapplicable, and cannot provide a basis for personal jurisdiction under Rule 4(k).  <u>See</u> <u>Weisberg v. Smith</u>, 473 F. Supp. 2d 604 (S.D.N.Y. 2007) (granting motion to dismiss for lack of personal jurisdiction under CPLR 302 where plaintiff failed to allege that claim arose from non-domiciliary's transaction of business in state of New York).

The complaint also does not allege that a tortious act was committed in New York or outside New York that caused injury within the state.  <u>See</u> CPLR 302(a)(2), (3).  There is no tort claim whatsoever against Canal+ France or TPS Gestion.  MGM's tortious interference with contract claim relates solely to events that are alleged to have occurred in France (Compl. ¶¶ 58-59).  For example, the complaint alleges that TPS SNC and CANALSAT sought authorization of the merger in France and that the French Ministry of the Economy issued an approval (Compl. ¶ 41).  The alleged "corporate restructuring" of the French companies occurred in France (Compl. ¶ 43).  Groupe Canal+ allegedly "exercised control" over TPS SNC by appointing its own manager (<u>i.e.</u>, the manager of a French company) as "directeur général délégué" of TPS SNC, another French company (Compl. ¶¶ 11, 44).  The so-called "joint marketing and cooperative arrangements" involved sharing programming between TPS SNC and CANALSAT, which are both located in France (Compl. ¶¶ 45-46).  In addition, the complaint does not, and cannot, allege that these actions, each of which occurred outside of New York, injured a New

York resident because MGM is a corporation organized under the laws of Delaware, with its

principal place of business in California (Compl. ¶ 10).  Consequently, CPLR 302(a)(2) and (3)

are inapplicable as well, and cannot provide a basis for personal jurisdiction under Rule 4(k).

See Panacea Solutions, Inc. v. Roll, No. 05 Civ. 10089, 2006 WL 3096022 (S.D.N.Y. Oct. 31,

2006) (granting motion to dismiss for lack of personal jurisdiction under CPLR 302 where

plaintiff failed to allege that non-domiciliary defendant committed tort in New York or that

plaintiff was a New York resident).

C.    Article 15 Of The French Civil Code Provides For
      A Privilege Of Jurisdiction Over French Entities.

Article 15 of the French Civil Code provides that "French persons may be called before a

court of France for obligations contracted by them in a foreign country, even with an alien".

Thus, a French entity that has not signed a contract containing a forum selection clause cannot be

sued before the foreign forum, and it would offend French law to permit such a suit.  As stated

above, the Non-Signatory Defendants did not sign the Agreement.

Accordingly, the complaint should be dismissed as against the Non-Signatory

Defendants.

## II

### THE BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED
### PURSUANT TO RULE 12(B)(6)

The complaint asserts a claim for breach of the Agreement against TPS SNC, TPS

Gestion, and Canal+ France.  This claim should be dismissed because it does not state a claim

and the equitable remedy sought, specific performance, is not available to MGM.

A.    The Complaint Does Not State A Claim For Breach Of Contract.

The breach of contract claim is negated by the plain language of the Amendment, the

complaint itself, and controlling law. As such, it is defective as a matter of law.

As an initial matter, MGM cannot proceed with a breach of contract claim against TPS Gestion and Canal+ France, which are not parties to the Agreement, because there is no privity of contract. The law is clear on this point. See, e.g., Jacobs v. Lewis, 261 A.D.2d 127, 127 (1st Dep't 1999) ("The motion court properly found, plaintiffs' conclusory assertions to the contrary notwithstanding, that defendant Lewis was not a party to and, accordingly, was not bound by the subject contract"); LeBlanc v. Security Servs. Unit Employees, 278 A.D.2d 732, 733 (3d Dep't 2000) ("The breach of contract claims are based on the collective bargaining agreement between the State and defendant to which plaintiffs are not parties. Thus, plaintiffs lack privity and may not assert contractual claims based on the collective bargaining agreement"); see also Tycon Tower I Inv. Ltd. Partnership v. John Burgee Architects, No. 95 Civ. 6951, 1999 WL 676007 at *7 (S.D.N.Y. Aug. 31, 1999) (Batts, J.) (Alleged creditor "could not remedy the lack of privity that served as grounds for dismissing the state court breach of contract claim").

MGM does not state a claim against TPS SNC either. It is a basic principle of contract law that, "[p]erformance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused". Restatement Of The Law 2d Contracts, vol. 2 § 225(1) (1981). It is equally axiomatic that express conditions must be literally performed. See 13 Williston On Contracts, § 38:6 (4th ed. 2006) ("[C]onditions which are either express or implied in fact must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions").

Here, there is no question that the occurrence of a transaction, i.e., a merger between TPS SNC and a Canal+ entity that results in a unified holding of their respective Pay TV Services, as set forth in the Amendment, is an express condition precedent to MGM's right to extend the

Agreement.  The Amendment -- which supersedes and narrows the condition precedent set forth

in the Agreement (Compl. Ex. 1: Annex A § 9(c)) -- is unambiguous and predicates MGM's

extension right on this end result, not on any of the intermediate steps along the way (id.).

Moreover, the language of the Amendment, "in the event (and only in such event)", is

unmistakable in restricting the exercise right to this precise condition (Compl. Ex. 2 § I.2).

There is no question, and MGM concedes, that there was no transaction until January 4, 2007

(Compl. ¶¶ 58-59).  See also Compl. Ex. 9, p. 2 (MGM admits in December 2006 that "the TPS

and Canal Plus merger is complete in all relevant respects except for formal consummation")

(emphasis added).  MGM's conditional right to extend had already expired by that time.

     MGM's attempt to extend the Agreement in 2006, before a merger resulting in a unified

holding, has no effect as a matter of law.  The complaint alleges that steps were taken in 2006 in

contemplation of a merger but admits that the transaction was not formally approved and the

agreements were not signed until 2007 (Compl. ¶¶ 41-46, 59).  This is fatal to MGM's claim.

The New York Court of Appeals has made clear that substantial performance of a condition

precedent is not the same as, and does not constitute, actual fulfillment of that condition.  In

Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691 (1995), the

Court held that where a contract contains an express condition precedent, it must be complied

with strictly and literally.  The contract at issue in that case "unambiguously establishes an

express condition precedent rather than a promise, as the parties employed the unmistakable

language of condition ('if,' 'unless and until')".  Id. at 691.  The language in the Amendment is

even stronger: "in the event (and only in such event)" (Compl. Ex. 2 § I.2).  Hence, "[t]here is no

doubt of the parties' intent and no occasion for interpreting the terms of the . . . agreement other

than as written".  Oppenheimer, 86 N.Y.2d at 691.  Indeed, the New York Court of Appeals

noted that its case law is "consistent" in requiring literal -- not substantial -- compliance with conditions precedent.  Id. at 693-94, citing Maxton Bldrs. v. Lo Galvo, 68 N.Y.2d 373 (1986) (holding that contractual provision requiring written notice was not satisfied by oral notice, even if timely given); Jungmann & Co. v. Atterbury Bros., 249 N.Y. 119 (1928) (holding that contractual provision requiring immediate notice of shipment of a product was not satisfied by sending letters instead of cable).

In addition, the change in the language of the condition precedent further shows that the parties intended a fully consummated transaction resulting in a unified holding as a prerequisite to the extension right.  In the Agreement, all that was required was that TPS SNC be "the subject of a Merger during the Initial Term (regardless of whether such Merger is consummated during or after the Initial Term)" (Compl. Ex. 1: Annex A § 9(c)).  By using such express language, the parties clearly demonstrated that they recognized the distinction between the initiation of a "Merger process" (i.e., "being the subject of a Merger") and its consummation.  Thus, it was sufficient to fulfill the condition precedent under the Agreement that TPS SNC be subject to some very broadly defined cooperative effort or consolidation, and that such arrangement need not be consummated so as to produce a completed transfer of ownership or control.  However, when the parties subsequently entered into the Amendment, which superseded the Agreement (see Compl. Ex. 2 § 4), they did not utilize the prior language, whereby a mere unconsummated arrangement sufficed to trigger the extension right.  Instead, they selected language for the condition precedent that mandated "a Merger, consolidation or reorganization . . .  which results in a unified holding . . . in the hands of a single entity or group of shareholders, of the Premium Pay TV Service of Canal+ . . . and the Premium Pay TV Service of TPS SNC" (Compl. Ex. 2 § I.2(a) (emphasis added)).  The choice of the parties to embrace this very different language in

the Amendment, when they knew how to express the earlier condition precedent so as not to require a completed transaction, shows their intent that an unconsummated transaction would not meet the condition precedent.  See Fidelity New York FSB v. Madden, 212 A.D.2d 572, 573 (2d Dep't 1995) ("[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein"); Jacob Gold Realty Inc. v. Sckoczylas, 186 Misc. 2d 612, 613 (Sup. Ct. N.Y. County 2000) ("[T]he lower court properly dismissed the complaint since where there is a conflict between the old language and the new, the new terms control").

MGM's characterization of the conditional right to extend as an "option" also demonstrates that it has no claim (see Compl. ¶ 5).  It has been held that:

> The law is clear that when a person accepts an option he or she is required to perform in accordance with the terms of the option agreement.  The general principles governing option agreements require that their provisions be complied with strictly in the manner and within the time specified.

Tauber v. Bankers Trust Co., 230 A.D.2d 312, 319 (1st Dep't 1997).  See also Piazza v. Sutherland, 53 Misc. 2d 726, 730 (Sup. Ct. Suffolk County 1967) ("There is only one way in which an option can be exercised, in strict compliance with its terms, and not otherwise").  MGM plainly was not entitled to exercise an option to extend the Agreement when its terms, as set forth in the Amendment, had not been met.

Therefore the complaint does not state a claim for breach of contract.

B.    MGM Is Not Entitled To The Equitable Remedy Of Specific Performance.

The complaint begins by alleging that "[t]his is an action for specific performance of an Agreement"  (Compl. ¶ 1).  As shown below, MGM is not entitled to this remedy.

First, "before the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice".  Lucente v. International Business Machines

Corp., 310 F.3d 243, 262 (2d Cir. 2002) (dismissing claim for specific performance).  The complaint does not even purport to allege any of this, and as a result, MGM is not entitled to specific performance.  See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, No. 04 Civ. 10014, 2006 WL 1493132 at *8 (S.D.N.Y. May 31, 2006) ("[S]pecific performance will not be ordered where money damages would be adequate to protect the expectation interest of the injured party").

Second, specific performance is subject to equitable defenses, including laches.  Laches bars an equitable claim where a plaintiff is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant.  Thus, laches applies where: (1) the plaintiff knew of the defendant's alleged misconduct, (2) the plaintiff inexcusably delayed in taking action, and (3) the defendant was prejudiced by the delay. See Conopco Inc. v. Campbell Soup Co., 95 F.3d 187 (2d Cir. 1996).

Here, MGM asserts that, "in January 2006, it was announced that the operations of TPS would be combined with the operations of CANALSAT" (Compl. ¶ 6); that as a result, "TPS became the subject of a 'Merger' as defined in the Agreement and MGM became entitled to exercise its Options" (Compl. ¶ 7); that MGM purported to exercise on September 28, 2006 (id.); and that TPS SNC "refused to recognize the validity of MGM's exercise of its Options" (Compl. ¶ 8).  Indeed, MGM admits that TPS SNC responded with a letter dated October 10, 2006 in which it stated that a merger had not taken place (Compl. ¶ 48; Ex. 4).  TPS SNC was consistent in this position and reiterated it to MGM in correspondence, which MGM annexes to the complaint.  See Exs. 6, 8, 10.  Thus, MGM asserts that it was aware of the merger plans as early as January 2006, it was entitled to extend the Agreement in September 2006, and it knew within a matter of a few days that TPS SNC had not accepted its attempt to exercise.  Nevertheless, it

delayed six months -- until April 2007 -- before commencing an action for equitable relief.  This delay is inexcusable.  See In Re Drexel Burnham Lambert Group, Inc., 157 B.R. 532, 539 (S.D.N.Y. Bankr. 1993) (holding that laches barred claim where "[creditor] waited a further period of six months after the well-publicized notice of the completion and consummation of the bankruptcy reorganization plan before moving to present a late proof of claim . . . [Creditor] has failed to proffer any reasonable excuse for its lackadaisical behavior");  General Bldg. Contractors Of New York State, Inc. v. Egan, 106 A.D.2d 688, 690 (3d Dep't 1984) (holding that laches barred claim where "despite awareness of the short-term, exigent nature of the projects, petitioners permitted over six months to elapse between the time of the last judgment appealed from . . . and the filing of their briefs . . . Under the circumstances, this delay is unallowable").

TPS SNC has suffered prejudice from the delay.  The films and television programs MGM seeks to license are wasting assets that have value only insofar as they are current and can be aired during limited windows of time (Compl. ¶ 2).  TPS SNC consistently made its position clear to MGM in letters sent months ago (Compl. Exs. 4, 6, 8, 10), yet MGM made no effort whatsoever to obtain equitable relief.   MGM's delay precludes it from doing so now.  See The American Fabrics Co. v. Lace Art, Inc., 291 F. Supp. 589, 592 (S.D.N.Y. 1968) ("[T]he equities lie against plaintiff because of the delay in instituting the suit and in bringing the motion.  The complaint was filed some seven months after the defendants were first apprised of the alleged infringement by mail . . . The fact that the selling life of this design is short compounds the difficulties experienced by the court in understanding these delays"); see also New Era Pub. Int'l, Aps. v. Henry Holt & Co., Inc., 873 F.2d 576, 584 (2d Cir. 1989) (holding that laches bars equitable relief where plaintiff delayed in instituting action after receiving letter in which

defendant stated that "it had no interest in cooperating with [plaintiff] or in entering into discussions").

Accordingly, the breach of contract claim should be dismissed.

III

THE TORTIOUS INTERFERENCE WITH CONTRACT CLAIM SHOULD
BE DISMISSED PURSUANT TO RULE 12(B)(6)

The complaint asserts a claim against Groupe Canal+ for tortious interference with contract. This claim is also defective as a matter of law.

Tortious interference with contract requires (1) the existence of a valid contract, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procuring of the breach, and (4) damages. Foster v. Churchill, 87 N.Y.2d 744, 749-750 (1996). As demonstrated above (see Point II, supra), the complaint fails to state a claim for breach of contract and therefore there can be no claim for tortious interference. See Kaminski v. United Parcel Serv., 120 A.D.2d 409, 412 (1st Dep't 1986) (holding that there is no tortious interference claim in absence of breach of contract).

However, even if there is a claim for breach of contract (and there is not), the complaint still fails to state any claim for tortious interference. It is telling that the purported tortious acts are speculative and alleged entirely "upon information and belief" (Compl. ¶¶ 56-58). Such flimsy and "[c]onclusory pleadings 'on information and belief' are inadequate as a matter of law". Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc., No. 95 Civ. 8450, 1996 WL 732634, at *5 (S.D.N.Y. Dec. 19, 1996) (dismissing cause of action against a defendant when the complaint contained conclusory and unsupported allegations based "upon information and belief"); see also Bell Atlantic, 127 S. Ct. at 1965 ("Factual allegations must be enough to raise a right to relief above the speculative level").

Even if taken at face value, the complaint fails to allege that Groupe Canal+ intentionally procured a breach of the Agreement.  "The interference must be intentional, not merely negligent or incidental to some other, lawful, purpose".  Alvord and Swift v. Stewart M. Muller Constr. Co., 46 N.Y.2d 276, 281 (1978).  Under New York law, "economic interest is a defense to an action for tortious interference with a contract unless there is a showing of malice or illegality".  Foster, 87 N.Y.2d at 750.

Here, the complaint alleges that Group Canal+ acted in its own economic interest:

> The TPS-CANALSAT merger gave Groupe Canal+ a monopoly position in the French satellite television market.  Upon information and belief, it planned to exploit its new market power by demanding that American motion picture studios that had previously held output contracts with TPS or CANALSAT renegotiate those contracts before the end of their terms and accept new contracts with shorter terms and lower license fees.

(Compl. ¶ 56).  In WMW Machinery Co., Inc. v. Koerber AG, 240 A.D. 2d 400 (2d Dep't 1997), the Court examined very similar conduct in the context of a merger and found that it constituted a valid exercise of economic interest.  There, the plaintiff, a distributor, had an exclusive distribution contract with a manufacturing company.  The manufacturer was acquired during the period of the contract, and the acquiring company promptly terminated the distribution contract for financial reasons, an action the Court upheld as "clearly economically justified".  Id. at 401.  Accepting MGM's allegations as true, Groupe Canal+'s purported "procurement" of TPS SNC's alleged breach was done only to protect its economic interest in obtaining acceptable licensing terms.  A simple "desire for economic profit," cannot sustain a claim for tortious interference with contract.  See Masefield AG v. Colonial Oil Industries, No. 05 Civ. 2231, 2006 WL 346178, at *6 (S.D.N.Y. Feb. 15, 2006) (dismissing claim for tortious interference with contract where parent company allegedly "pressured" subsidiary to cancel oil distribution contract in order to take advantage of rising oil prices); Net2Globe Int'l, Inc. v. Time Warner Telecom of

New York, 273 F.Supp. 2d at 436, 462-463 (S.D.N.Y. 2003) (dismissing claim for tortious interference with contract where discontinuation of telephone service contract was economically justified because contract had become unprofitable for defendant).

In light of Groupe Canal+'s alleged economic interest in the Agreement, MGM bears the burden of showing that Groupe Canal+"was motivated by malice" or that its actions "involved criminal or fraudulent conduct". Net2Globe Int'l, 273 F. Supp. 2d at 462. The complaint does not demonstrate either malice or illegality, and makes only conclusory allegations (Compl. ¶ 74). Devoid of any factual support, this assertion is meaningless and cannot support MGM's tortious interference claim. See Masefield, 2006 WL 346178, at *4 ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)"), quoting DeJesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996).

Nor can MGM ascribe a sinister motive to Groupe Canal+ by raising the specter of its desire to "exploit" its alleged "monopoly position" since the French Ministry of the Economy approved the merger (Compl. ¶¶ 41, 56). Therefore, there can be no "illegality" as a matter of law. Foster, 87 N.Y.2d at 750. The assertion that Groupe Canal+ acted "without due regard to MGM's rights" is irrelevant because MGM does not and cannot allege that Groupe Canal+ owed MGM any duty to protect its purported "rights". See Collins v. E-Magine LLC, 291 A.D.2d 350, 351 (1st Dep't 2002) (dismissing claim for tortious interference with contract in absence of any indication that "any legal duty independent of the allegedly breached contract has been violated").

MGM's demand for punitive damages on the tortious interference claim fails as a matter of law for this reason as well. See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 67 A.D.2d 658, 659 (1st Dep't 1979) (dismissing claim for punitive damages for tortious

interference in the absence of "actual malice or ill will", where "defendant's motive was to secure an advantageous business relationship for itself").

Accordingly, the tortious interference with contract claim should be dismissed.

IV

MGM SHOULD NOT BE AFFORDED LEAVE TO REPLEAD

It is clear from the four corners of the complaint and the documents it annexes that MGM has no claim for breach of contract, tortious interference with contract or anything else. Consequently, leave to amend the complaint should not be afforded because any such amendment would be unavailing.  Leave to amend is properly denied pursuant to Rule 15(a), Fed. R. Civ. P., where any amendment would be futile.  See Giannone v. Deutsche Bank Securities, Inc., 392 F. Supp. 2d 576, 593 (S.D.N.Y. 2005) (denying leave to amend breach of contract claim on grounds of futility).

Accordingly, the complaint should be dismissed with prejudice.

Conclusion

For the foregoing reasons, defendants' motion should be granted in its entirety, and the complaint should be dismissed with prejudice.

MANATT PHELPS & PHILLIPS, LLP


By:    s/Lauren Reiter Brody
       Lauren Reiter Brody (LB 4151)
       7 Times Square
       New York, New York 10036
       (212) 790-4500
       Attorneys for Defendants