EXHIBIT 1

Andrew L. Deutsch (AD 5782)
Joseph C. Gioconda (JG 4716)
Monica Petraglia McCabe (MG 5853)
Anne Hardcastle (AH 3274)
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York 10020
Attorneys for Plaintiff Metro-Goldwyn-Mayer
Studios Inc.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x

METRO-GOLDWYN-MAYER STUDIOS
INC.,

               Plaintiff,

      -against-

TPS GESTION, S.A., TPS SOCIÉTÉ EN NOM
COLLECTIF, CANAL + FRANCE S.A., and
GROUPE CANAL + S.A.

               Defendants.

------------------------------------------- x

JUDGE BATTS

07 CV 2918

07 CV. _____ ( )

**COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff, Metro-Goldwyn-Mayer Studios Inc. ("**MGM**"), by its attorneys, DLA Piper US

LLP, for its complaint against defendants TPS Gestion S.A. ("**TPS Gestion**"), TPS Société en

Nom Collectif ("**TPS SNC**") (TPS Gestion and TPS SNC are collectively referred to herein as

"**TPS**", unless separate mention is required), Canal + France S.A. ("**Canal+ France**"), and

Groupe Canal+ S.A. ("**Groupe Canal+**"), alleges as follows:

**Nature of The Action**

     1.    This is an action for specific performance of an Agreement, dated as of November

15, 1996 and subsequently amended by an Amendment to Agreement dated as of July 9, 1999

("**First Amendment**") and a Second Amendment to Agreement dated as of June 16, 2006 (the Agreement with its annexes and the Amendments to the Agreement are collectively referred to herein as the "**Agreement**").   The parties to the Agreement are MGM, the motion picture studio, and TPS, previously one of the two French satellite television networks providing pay television ("**Pay TV**") and pay-per-view ("**PPV**") services in France, French overseas departments and territories, and French-speaking portions of other countries (the "**Territory**").   Alternatively, MGM seeks compensatory damages for breach of the Agreement by TPS, Canal+ France and any successor-in-interest to TPS, and compensatory and punitive damages from Groupe Canal+ for tortiously interfering with the Agreement.

2.      Under three "annexes" which were part of the Agreement (the "**Annexes**"), MGM licensed to TPS Pay TV and PPV rights, exclusive for the Territory, for certain recent theatrically-released movies and made-for-television movies (called "output" in the industry), as well as certain television series and library movies, in return for payment of license fees.   French regulations and industry requirements limit the PPV and Pay TV televising of recent theatrically-released movies and made-for-television movies to defined "windows" of time, which are measured from the theatrical release or video release of each movie.    The Agreement and its Annexes were structured to meet these regulations and requirements.    Each Annex provided that during a specified period of time (known in the industry as an "output term"), MGM was to provide TPS with MGM's output of recent theatrically-released movies and made-for-television movies, according to contractually-defined "availability" criteria.   TPS was then entitled to transmit these movies on the TPS platform during specified PPV and Pay TV windows, and was obligated to pay license fees to MGM calculated according to contractual formulas.

3.      Each of the Annexes had a first output term (called an **"Initial Term"** in each Annex), which ran for five years.  The Agreement and Annexes were structured so that after the end of the Initial Term for each Annex (unless the Initial Term was extended by agreement of the parties or by exercise by MGM of an option to extend), while TPS would no longer be required to take newly available MGM output, the Annex (and Agreement) would not terminate, and the parties would continue to have important continuing obligations to each other.  For example, after the end of the Initial Term of each Annex, TPS would still be obligated to pay license fees for MGM films and series made available during the Initial Term until the end of the PPV or TV "window" applicable to that product, and MGM would remain obligated to respect TPS' exclusive rights and not license the same product to another platform within the Territory.

4.      The Initial Term of each of the Annexes ran from January 1, 1997 through December 31, 2001.  Under the First Amendment, MGM and TPS extended the Annexes for a second output term (called the **"Extended Term"**), which ran from January 1, 2002 through December 31, 2006.

5.      The Agreement contained a provision that in the event that TPS became the subject of a "Merger" with another digital television provider (with the term "Merger" given a broad contractual definition of "any sale of assets or shares, joint venture, distribution or liquidation, contribution, merger, spinof [sic], licensing arrangement, joint marketing or cooperative arrangement or other agreement that has the effect of directly or indirectly transferring from Licensee to any other entity which is in the business of operating a digital platform all or a significant interest in or control of TPS or its major assets. . . . "), whether or not the "Merger" was consummated during the Initial Term, MGM would have options to extend

output terms of the Annexes (the "**Options**") by an additional five years beyond the end of their current output terms, with an increase in license fees. MGM's Options to extend the output terms of the Annexes were preserved, and indeed expanded, when the parties entered into the First Amendment.

6.    In January 2006, it was announced that the operations of TPS would be combined with the operations of CanalSatellite S.A. ("**CANALSAT**"), the only other satellite television provider in the Territory, and that the combined operations of TPS and CANALSAT would be under the control of Groupe Canal+ or a subsidiary thereof. At that time, CANALSAT was majority-owned by Groupe Canal+. Upon information and belief, TPS and Groupe Canal+ thereafter undertook joint marketing and cooperative arrangements and organizational changes that gave Groupe Canal+ all or a significant interest in or control over TPS and its major assets and a monopoly in French satellite television.

7.    As a result of these and other acts of TPS and Groupe Canal+, TPS became the subject of a "Merger" as defined by the Agreement, and MGM became entitled to exercise its Options. MGM in fact exercised its Options by written notice sent to TPS on September 28, 2006, and thereby extended the output terms of the Annexes for five additional years at higher license fees.

8.    However, TPS refused to recognize the validity of MGM's exercise of its Options and the consequent extension of the output terms of the Annexes. Upon information and belief, Groupe Canal+ caused TPS to take this position, because MGM's exercise of its Options disrupted Groupe Canal+'s plan to compel American motion picture studios to accept short-term, lower-fee agreements with the merged entity. Additionally, Groupe Canal+ and TPS intentionally postponed the formal consummation of the TPS-CANALSAT merger from its

announced date of mid-November 2006 to January 4, 2007, upon information and belief in an attempt to defeat MGM's right to exercise its Options. As explained below, this effort to defeat MGM's rights was legally ineffective, and MGM's exercise of its Options was both timely and valid.

9.     Although MGM has been ready, willing and able to perform its obligations under the extended output terms of the Annexes to the Agreement, TPS and Canal+ France, acting at the direction of Groupe Canal+, have failed and refused to perform their corresponding obligations thereunder, and have thereby breached the Agreement.

**The Parties**

10.     MGM is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 10250 Constellation Blvd., Los Angeles, CA 90067.

11.     Upon information and belief, TPS Gestion is a joint stock company organized under the laws of France, with its principal place of business at 145 Quai de Stalingrad 92130, Issy-les-Moulineaux, France. Upon information and belief, TPS Gestion owns 100% of the shares of TPS SNC, an unlimited liability business entity organized under the laws of France, whose principal place of business is located at 145 Quai de Stalingrad 92130, Issy-les-Moulineaux, France. Upon information and belief, Canal+ France owns 100% of the shares of TPS Gestion. Upon information and belief, TPS SNC and/or TPS Gestion will be merged into an entity directly or indirectly controlled by Groupe Canal+, with that entity to be the surviving entity.

12.     Upon information and belief, Canal+ France is a joint stock company organized under the laws of France, with its principal place of business at 1 Place du Spectacle 92130, Issy-

les-Moulineaux, France.  Upon information and belief, Groupe Canal+ owns 65% of the shares

of Canal+ France.  Upon information and belief, Canal+ France owns 100% of the shares of

CANALSAT.

13.    Upon information and belief, Groupe Canal+ is a joint stock company organized

under the laws of France, with its principal place of business at 1 Place du Spectacle 92130, Issy-

les-Moulineaux, France.  Upon information and belief, Groupe Canal+ owns a direct controlling

interest in Canal+ France, and an indirect controlling interest in CANALSAT, TPS Gestion and

TPS, and directs and controls the business activities of these entities.

**Jurisdiction and Venue**

14.    This Court has subject matter jurisdiction over the claims herein pursuant to 28

U.S.C. § 1332, in that this is an action between citizens of a State and citizens or subjects of a

foreign state, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and

costs, and 28 U.S.C. § 1367.

15.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(d) and Paragraph 11

of the Agreement, which provides that "Each of the parties hereby irrevocably and

unconditionally submits itself and its property in any legal action or proceeding relating to this

Agreement (and any Definitive Agreements that are license agreements). . . to the exclusive

jurisdiction of the Courts of New York (whether State or Federal) or of the United States of

America, agrees that any such action or proceeding may be brought in such courts and waives

any objection that it may now or hereafter have to the venue of any such action or proceeding in

any such court or that such action nor proceeding was brought in an inconvenient court and

agrees not to plead or claim the same."

16.    Jurisdiction over the person of the defendants is proper pursuant to the above-

cited Paragraph 11 of the Agreement and Rule 4(k) of the Federal Rules of Civil Procedure.

**Facts Common To All Claims**

MGM and Output Contracts in the Motion Picture Industry

17.    MGM is an independent, privately-held motion picture, television, home video, and theatrical production and distribution company.  The company owns the world's largest library of modern films, comprising approximately 4,000 titles, and over 10,200 episodes of television programming. Its film library has received 208 Academy Awards, one of the largest award winning collections in the world, and includes numerous successful film franchises, including James Bond, Pink Panther and Rocky.  MGM also releases films under the UA/United Artists brand.

18.    MGM, like other motion picture studios, seeks to monetize the motion pictures it produces or acquires, and its library of films and television series, by licensing those properties for display and transmission in a variety of media, including Pay TV and PPV.  To this end, MGM, like other motion picture studios, enters into agreements throughout the countries of the world with the owners of broadcast, cable, and satellite television networks that operate Pay TV and PPV services.  Pay TV output agreements are generally exclusive; that is, in a country or territory in which there are competing networks that provide Pay TV services, a studio will usually only contract with one such network, and will agree that during the term of the agreement, it will not provide licensed rights in its films and series to the competitor network.

19.    Typically, motion picture studios and networks that operate Pay TV or PPV services enter into output agreements with regard to recent motion pictures.  This means that the network agrees to pay for the rights to transmit any recently-released theatrical or television motion picture where the studio controls the rights in the motion picture for the network's

territory and the motion picture meets certain criteria defined in the relevant contract (for example, certain theatrical release requirements). Output PPV and Pay TV contracts are important to motion picture studios because they guarantee a predictable revenue stream and, by increasing the possibility that more films will turn a profit, provide an incentive to the studios to produce or invest in more films, including films of higher artistic merit but potentially less mass appeal.

TPS's Competitor CANALSAT

20.    Upon information and belief, prior to December 1996, there was only one satellite television platform operating within the Territory: CANALSAT. CANALSAT transmitted programming created by or licensed by Canal+ S.A. ("**Canal+**").

21.    In France, government regulations and industry agreements establish a timetable under which theatrically-released motion pictures may be exploited in other media only after specified periods of time from release have elapsed. As a result, a released motion picture may be exploited in a specific format (such as DVD, video-on-demand, PPV, Pay TV, and free television), only during the time frames, or "windows," applicable to that format.

22.    Upon information and belief, starting in 1992, CANALSAT provided its subscribers with Pay TV services that included channels showing newly-released and "classic" films and television series. Upon information and belief, to obtain content for these channels, CANALSAT entered into exclusive output agreements with several American motion picture studios. MGM was one of these studios. Under these agreements, MGM and, upon information and belief, other American motion picture studios agreed to provide CANALSAT with the rights to transmit their motion pictures in the Territory during the applicable Pay TV "windows."

23.     In April 1996, CANALSAT began providing expanded Pay TV service and a new PPV service (known as "Kiosque") within the Territory via digital satellite transmission.

Formation of The Agreement

24.     In 1996, TPS was formed to operate a digital satellite television service that would compete with CANALSAT within the Territory.  TPS began operations in December 1996.

25.     At the time of its formation, TPS was owned by a consortium of French and Luxemburg media businesses.  In 2002, ownership of TPS was reorganized.  As a result, the publicly-owned media business Groupe TF1 SA ("**TF1**") held 66% of TPS shares and Groupe M6 S.A. ("**M6**") held 34% of TPS shares.  TF1 and M6 both operate over-the-air television networks.

26.     Because of TF1 and M6's ownership of TPS, and because TPS and CANALSAT were competitors within the Territory, until the events described below, the only satellite network that transmitted TF1 and M6 programming within the Territory was the TPS network. Subscribers to CANALSAT could not receive that programming.  Conversely, until the events described below, the only satellite network that transmitted Canal+ programming within the Territory was CANALSAT.  TPS subscribers were not able to receive any CANALSAT transmissions or Canal+ programming.

27.     In 1996, at the time of its formation, TPS needed quality American motion picture and television series content in order to fill its new channels and effectively compete with CANALSAT's new digital service.  TPS approached MGM, whose output agreement with

CANALSAT was about to end, to solicit MGM's willingness to supply content to TPS. Although the ability of the new TPS network to compete against its established competitor was uncertain, MGM ultimately decided to enter into an output agreement with TPS, which would grant TPS rights to transmit both MGM's newly-released motion pictures and selections from MGM's extensive library of classic and made-for-television films and television series. However, as described below, MGM sought and received additional contract rights to protect it against the possibility that TPS would not continue as a competitor to CANALSAT.

28.     The Agreement concluded by MGM and TPS (Exhibit 1) consisted of an "Overall Agreement," which contained general terms and conditions, and five annexes setting forth specific term sheets, denominated "Annex A" through "Annex E." Only "Annex A" (the "Pay TV Output License Term Sheet"). "Annex B" (the "PPV Output License Term Sheet") and "Annex C" (the "MGM Gold Block License Term Sheet"), which are referred to herein as the "**Annexes**," are relevant to this litigation.

29.     Under the Annexes, MGM licensed to TPS the exclusive Pay TV and PPV rights in the Territory for the following output: (a) all recent theatrically-released motion pictures meeting specified criteria whose Territory Pay TV and PPV rights were controlled by MGM or its subsidiaries, and (b) a minimum number of made-for-television movies meeting specified criteria whose Territory Pay TV and PPV rights were controlled by MGM. MGM also licensed to TPS the exclusive Pay TV rights to a minimum number of motion pictures and television movies or television series from the MGM library, to be shown on the TPS network as part of a branded "MGM Gold Block" program. In return, TPS agreed to pay MGM license fees based upon contractually-specified formulas. The Initial Term of each of the Annexes was for five years, starting on January 1, 1997 and running through December 31, 2001.

30.    As alleged in greater detail at paragraph 3 of this Complaint, after the end of the Initial Term of Annexes A and B (unless the output term of the Annex was further extended), TPS would no longer be required to take new MGM output, and, after the end of Annex C, TPS would no longer be required to take MGM library films and series. However, the Agreement and Annexes would not terminate. Rather, the parties would continue to have material obligations thereunder.

31.    The Annexes also contained a variety of conditions under which the first output term (the Initial Term) could be extended for an additional five years, denominated the "Extended Term." The Annexes further provided that "In the event that there is an Extended Term pursuant to the provisions herein, then the terms and conditions contained in this Term Sheet shall apply for such Extended Term." (Annex A, ¶ 9(c); Annex B, ¶7(e)).

"Merger" Provisions of the Agreement

32.    When negotiating the Agreement with TPS, MGM knew that TPS was a startup business, while its competitor, CANALSAT, had been in business for a number of years and was already providing digital satellite service within the Territory. MGM was concerned by the possibility that TPS would not be able to compete effectively, and would be acquired by its larger and older competitor, creating a monopoly of satellite television services in France and adjacent French-speaking territories. MGM believed that if it entered into an exclusive output agreement with TPS, and TPS were later acquired by CANALSAT or an entity controlling CANALSAT, MGM would be frozen out of an output agreement relationship with the successor entity.

33.    In order to protect its long-term interests against such eventualities, MGM insisted that the Agreement contain provisions that would allow MGM to extend the output terms of the

Annexes in the case of an impending acquisition of TPS by a competitor.  To this end, in the

Agreement as signed by TPS and MGM, Paragraph 9(c) of Annex A (which, under Paragraph 9

of Annex C, also controls the agreement term of Annex C), and Paragraph 7(e) of Annex B,

provided:

> Further, notwithstanding anything contained herein to the contrary,
> in the event that Licensee is the subject of a Merger during the
> Initial Term (regardless whether such Merger is consummated
> during or after the Initial Term) with an entity or an Affiliate of an
> entity, provided that such entity or Affiliate is in the business of
> operating or Controlling any digital television distribution
> platform, then Licensor shall have the right in its sole election to
> extend the Initial Term for an Extended Term.  In the event that
> there is an Extended Term pursuant to the provisions herein, then
> the terms and conditions contained in this Term Sheet shall apply
> for such Extended Term.

34.    The term "Merger" was defined in Paragraph 25 of Annex A, and by cross-

reference to that Paragraph in Paragraphs 1.3 of Annex B and Paragraph 3 of Annex C, as:

> [A]ny sale of assets or shares, joint venture, distribution or
> liquidation, contribution, merger, spinof [sic], licensing
> arrangement, joint marketing or cooperative arrangement or other
> agreement that has the effect of directly or indirectly transferring
> from Licensee to any other entity which is in the business of
> operating a digital platform all or a significant interest in or control
> of TPS or its major assets (i.e., the assets which are together
> indispensable for TPS to carry-out its activities as a digital
> platform operator.

35.    MGM and TPS began performance under the Agreement and Annexes on January

1, 1997.

## "Merger" Provisions of the First Amendment

36.    In 1999, MGM and TPS began negotiations for extension of the output terms of

the Annexes.  Ultimately, they entered into the First Amendment (Exhibit 2), which extended the

output terms of the Annexes for an Extended Term of five years, starting on January 1, 2002 and

ending on December 31, 2006. The conditions of the Agreement and Annexes applicable to the Initial Term thus became applicable to the Extended Term.

37.     The First Amendment also expanded MGM's rights in the event of a "Merger." Paragraph I(2)(a) of the First Amendment provided, in relevant part:

> In the event (and only in such event) of a Merger, consolidation, or reorganization between TPS and Canal+ which results in a unified holding, whether direct or indirect, in the hands of a single entity or group of shareholders, of the premium Pay TV service of Canal+. . . and the Premium Pay TV service of TPS presently known as TPS Cinema. . . MGM shall have the right to extend the Term of Annex A for an additional five (5) Years beyond the Extended Term thereof ("Pay Merger Extension").

38.     Paragraph II(2)(a) provided, in relevant part:

> In the event (and only in such event) of a Merger, consolidation, or reorganization between TPS and Canal+ which results in a unified holding, whether direct or indirect, in the hands of a single entity or group of shareholders, of the Canal+ PPV service presently known as "Kiosque". . .and the TPS PPV service presently known as "Multivision". . . MGM shall have the right to extend the Term of Annex B for an additional five (5) Years beyond the Extended Term thereof ("PPV Merger Extension").

The Merger Of TPS and CANALSAT

39.     On December 11, 2005, TF1 and M6, the owners of TPS, and Groupe Canal+, the owner of CANALSAT, announced that they had entered into discussions for a merger of the CANALSAT and TPS operations and acquisition of the shares of TPS by an entity controlled by Groupe Canal+. On December 16, 2005, those parties announced that they had completed negotiations and reached agreement on a merger plan, in which the value of TPS shares was fixed and in which TF1 subsidiaries and M6 would receive a specified minority interest, and Groupe Canal+ a controlling majority interest, in a new entity that would control both CANALSAT and TPS.

40.     In a joint press release issued on January 9, 2006, TF1, M6 and Vivendi Universal (the parent company of Groupe Canal+) announced that they had signed an "industrial agreement" under which the satellite television operations of TPS and CANALSAT would be combined, the shares of TPS would be transferred to a new entity to be formed by and controlled by Groupe Canal+, and in return TF1 subsidiaries and M6 would receive minority share interests in the new entity.  Upon information and belief, completion of this merger was subject to only one external condition: authorization by the French antitrust authorities (the Ministry of the Economy).  The parties stated that they intended the merger of TPS and CANALSAT to be operational by the third or fourth quarter of 2006.

41.     On March 17, 2006, the parties filed for approval of the merger by the Ministry of the Economy.  The Ministry of the Economy announced its authorization of the merger on August 31, 2006.  Upon information and belief, this authorization was the only condition for the merger not under the control of the parties themselves, and after it was granted, there was no obstacle, other than intentional delay by the parties themselves, to the parties formally consummating the merger prior to January 1, 2007.

42.     Prior to January 1, 2007, as set forth below, TPS (and its owners, TF1 and M6 and Groupe Canal+ took numerous actions as a result of which TPS became the subject of a "Merger" as defined in the Agreement, and a "Merger," as a result of which Groupe Canal+ acquired and exercised all or a significant interest in or control of TPS or its major assets, actually occurred, including but not limited to those set forth in paragraphs 43 through 46 hereof.

43.     Corporate restructuring:  Upon information and belief, prior to January 1, 2007, TF1, M6 and Groupe Canal+ undertook corporate restructuring necessary to the consummation of the merger, which included, but were not limited to:

a.      Reorganizing the TF1 subsidiaries that held the shares of TPS.

b.      Transferring the TPS shares held by TF1 subsidiaries and M6 to TPS Gestion, whose shareholders were the TF1 subsidiaries and M6.

c.      Conducting valuation of the TPS shares contributed to TPS Gestion, which valued those shares as though a merger had already occurred.

d.      Contribution of most of Groupe Canal+'s assets, including CANALSAT, to a new entity, ultimately known as Canal+ France.

44.    <u>Exercise of Control Over TPS By Groupe Canal+</u>:    On September 4, 2006, the TPS Board of Directors, at the direction of Groupe Canal+'s parent Vivendi, appointed Jean-François Meaudre, who was working as a manager for Groupe Canal+, as "directeur général délégué" of TPS.  Upon information and belief, this appointment was made pursuant to prior agreement, and, as a result, Groupe Canal+ obtained all or a significant interest in or control of TPS or its major assets.

45.    <u>Joint Marketing and Cooperative Arrangements</u>:    Upon information and belief, prior to January 1, 2007, Groupe Canal+ engaged in joint marketing and cooperative arrangements with TPS, as a result of which Groupe Canal+ acquired and exercised all or a significant interest in or control of TPS or its major assets, and TPS and CANALSAT were no longer in competition.  Upon information and belief, these arrangements included, but were not limited to:

a.      As of November 2006, the most important Canal+ programming, under the title "Canal+ Le Bouquet," which included Canal+ Pay TV motion picture service, and which was previously available via satellite only to CANALSAT subscribers, became available

to TPS subscribers.

b.      By the end of December 2006, all TF1 and M6 programming, which was previously available via satellite only to TPS subscribers, became available to CANALSAT subscribers.

46.     MGM believes that discovery will show additional evidence of arrangements and/or agreements that (a) had the effect of directly or indirectly giving Groupe Canal+ all or a significant interest in or control over TPS or its major assets prior to January 1, 2007 and (b) resulted in a unified holding, whether direct or indirect, in the hands of a single entity or group of shareholders, of the premium Pay TV and PPV services of TPS and Groupe Canal+.

<u>Exercise By MGM of Its Options To Extend the Output Terms of the Annexes/TPS's and Groupe Canal+'s Denial of MGM's Right to Exercise Its Options and Refusal To Recognize Extension of the Output Terms of The Annexes</u>

47.     As a result of the facts set forth above, and others that will be determined through discovery, MGM became entitled to exercise its Options.  Accordingly, MGM sent a letter to TPS, dated September 28, 2006, exercising the Options.  A copy of that letter is attached as Exhibit 3.

48.     TPS responded to this letter by a letter dated October 10, 2006, which stated that TPS did not believe MGM "to be entitled at this time" to exercise the Options.  A copy of that letter is attached as Exhibit 4.

49.     MGM responded to TPS's letter by a letter of October 26, 2006, asking that TPS clarify and specifically explain its reasoning for its position denying MGM's entitlement to exercise its Options.  A copy of that letter is attached as Exhibit 5.

50.     TPS responded to this letter by another letter, dated November 13, 2006, in which

it reiterated its denial that conditions to MGM's right to exercise its Options had occurred, without providing any explanation for its reasoning. A copy of that letter is attached as Exhibit 6.

51.     By letter dated December 4, 2006, Maître Patrick Boiron, a French lawyer retained by MGM with the firm of Cariddi Mee Rué, responded that MGM had properly exercised its Options, and that it would exercise its legal rights if TPS persisted in denying that fact. A copy of that letter is attached as Exhibit 7.

52.     By letter to Maître Boiron dated December 19, 2006, TPS again denied that the conditions to MGM's right to exercise its Options had occurred, once again without providing any facts to support that conclusion. A copy of that letter is attached as Exhibit 8.

53.     By letter to TPS dated December 20, 2006, Andrew L. Deutsch, a New York lawyer retained by MGM with the firm of DLA Piper US LLP, responded to TPS's letter. A copy of that letter is attached as Exhibit 9. This letter insisted that all conditions precedent to MGM's exercise of its Options had occurred and that the Options had been validly exercised. Further, for the avoidance of doubt, and without waiving the effectiveness of the exercise of the Options made by MGM's letter of September 28, 2006, MGM, by this letter, again exercised the Options, based upon all acts through the date of the letter that demonstrated that any condition to exercise of the Options had been satisfied. The letter also advised TPS that a refusal by TPS to acknowledge the effectiveness of the extension of the output terms of the Annexes by MGM would constitute an anticipatory repudiation of the Agreement, and give MGM the right to treat the Agreement as breached and sue accordingly.

54.     TPS did not respond to this letter. However, Lauren Reiter Brody, a New York attorney with the firm of Manatt Phelps and Phillips, LLP, sent a letter to Mr. Deutsch dated

February 2, 2007. The letter asserted that the Manatt firm represented Groupe Canal+, and asserted that it was Groupe Canal+'s position that "any rights that MGM may have possessed as to the extension of the 'Terms' of the Agreement were subject to conditions, that the conditions were not fulfilled, and that therefore there is no extension and the Agreement expired in accordance with the terms of the Amendment." A copy of this letter is attached as Exhibit 10.

<u>Groupe Canal+'s and TPS's Postponement of Formal Consummation of the Merger</u>

55.     On August 31, 2006, the Chairman of the Board of Groupe Canal+, Bernard Méheut, announced publicly that the TPS-CANALSAT merger would be formally consummated in November 2006.   Thereafter, as alleged above, MGM sent notice to TPS that MGM was exercising its Options.

56.     The TPS-CANALSAT merger gave Groupe Canal+ a monopoly position in the French satellite television market.  Upon information and belief, it planned to exploit its new market power by demanding that American motion picture studios that had previously held output contracts with TPS or CANALSAT renegotiate those contracts before the end of their terms and accept new contracts with shorter terms and lower license fees.  Upon information and belief, Groupe Canal+ planned to enforce these demands by denying some studios the ability to supply content to the merged entity, and informing other studios that they would risk the same fate if they did not comply with the demands.

57.     Upon information and belief, MGM's exercise of its Options, which extended the output terms of the Annexes for five years with an increase in license fees, undermined Groupe Canal+'s plan to compel American motion picture studios to accept shorter and less lucrative contracts.  Upon information and belief, to protect its plan, Groupe Canal+ decided to deny that MGM was entitled to exercise its Options.  Upon information and belief, to this end, Groupe

Canal+ caused TPS to send the letters attached as Exhibits 2, 4, 6, and 8, and directed its attorneys to send the letter attached as Exhibit 10.

58.     Upon information and belief, Groupe Canal+ and TPS also erroneously believed that if the formal consummation of the TPS-CANALSAT merger were not to take place until January 1, 2007 or later, this would create a pretext justifying their refusal to recognize MGM's exercise of its Options and the extension of the output terms of the Annexes. Upon information and belief, acting on this belief and to further this pretext, Groupe Canal+ decided to postpone the formal consummation of the TPS-CANALSAT merger until after December 31, 2006, and caused TPS to agree to such postponement.

59.     Upon information and belief, in order to further this pretext, (a) the Chairman of the Board of Groupe Canal+, Bernard Méheut, announced on November 14, 2006 that the formal consummation of the TPS-CANALSAT merger would be postponed to the beginning of January 2007, and (b) Groupe Canal+ and TPS did postpone it to January 4, 2007. On January 4, 2007, the merger was formally approved by all parties.

60.     The postponement of the formal consummation of the TPS-CANALSAT merger had no legal effect on MGM's exercise of its Options. Prior to MGM's exercise of its Options on September 28, 2006 and/or its re-exercise of those Options on December 20, 2006, TPS had become the subject of a "Merger," as defined in the Agreement. Moreover, prior to MGM's exercise of its Options on September 28, 2006 and/or its re-exercise of those Options on December 20, 2006, a "Merger," as defined in the Agreement, actually occurred, which resulted in a unified holding, whether direct or indirect, in the hands of a single entity or group of shareholders, of the premium Pay TV and PPV services of TPS and Groupe Canal+. As a result, MGM became immediately entitled to exercise its Options.

61.     MGM's letters of September 28, 2006 and December 20, 2006 were legally effective to exercise the Options.  As a result of that exercise, the output terms of each of the Annexes was extended for five years, starting on January 1, 2007 and ending on December 31, 2011.

62.     From January 1, 2007 through the present date, MGM has been ready, willing and able to perform its obligations under the Agreement, and has so informed TPS and Groupe Canal+.  However, TPS and Canal+ France (to the extent that it succeeded to the rights and obligations of TPS),  have failed and refused to perform TPS's obligations under the Agreement. Upon information and belief, this was at the direction of Groupe Canal+.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

63.     MGM repeats and realleges the allegations contained in paragraphs 1 through 62 of this Complaint as though fully set forth.

64.     TPS's denial that MGM had validly exercised its Options to extend the output terms of the Annexes, its denial after January 1, 2007 that the extended output terms of the Annexes had come into effect, and the refusal and failure of TPS and Canal+ France to perform TPS's obligations under the Annexes as so extended, constitute an anticipatory repudiation and/or breach of the Agreement.

65.     MGM is entitled to judgment declaring that the conditions precedent to exercise of MGM's Options have been fulfilled, that MGM has validly exercised its Options, that as a result of such exercise the output terms of the Annexes have been extended in accordance with the Agreement, and that the extended output terms of those Annexes are in effect through December 31, 2011.

66.    MGM is entitled to judgment directing TPS, Canal+ France,  and any successor-in-interest to TPS to specifically perform all of the obligations of TPS under the output terms of the Annexes as extended.

67.    As an alternative remedy, MGM is entitled to an award of compensatory damages against TPS, Canal+ France, and any successor-in-interest to TPS, in an amount to be determined by a jury at trial but which exceeds $75,000 exclusive of interest and costs.

## SECOND CAUSE OF ACTION
### (Tortious Interference With Contractual Relations)

68.    MGM repeats and realleges the allegations contained in paragraphs 1 through 67 of this Complaint as though fully set forth.

69.    The Agreement constitutes a valid contract between MGM and TPS.

70.    Prior to inducing TPS and/or Canal+ France to repudiate and/or breach the Agreement, Groupe Canal+ was aware of the Agreement.

71.    As set forth above, Groupe Canal+ intentionally and deliberately induced TPS and/or Canal+ France to repudiate and/or breach the Agreement.

72.    As a result of Groupe Canal+'s wrongful conduct as set forth above, TPS and/or Canal+ France  repudiated and/or breached the Agreement.

73.    MGM has sustained damages by reason of Groupe Canal+'s wrongful conduct as set forth above.

74.    Groupe Canal+'s conduct, as set forth above, was willful, wanton, malicious, and without due regard for MGM's rights.

75.    As a result of the foregoing, MGM is entitled to a judgment awarding

compensatory damages to MGM and against Groupe Canal+, in an amount to be determined by a jury at trial but which exceeds $75,000 exclusive of interest and costs, and exemplary and punitive damages, in an amount to be determined by a jury at trial.

**JURY DEMAND**

MGM demands a trial by jury of all issues triable of right by a jury.

WHEREFORE, plaintiff MGM demands judgment as follows:

a).     On the First Cause of Action, (i) declaring that the conditions precedent to exercise of MGM's Options have been fulfilled, that MGM has validly exercised its Options, that as a result of such exercise the output terms of the Annexes are extended in accordance with the Annexes, and that the extended output terms of those Annexes are in effect through December 31, 2011, and (ii) directing TPS, Canal+ France and any successor-in-interest to TPS to specifically perform all of the obligations of TPS under the Annexes as extended, or, alternatively, awarding compensatory damages to MGM and against TPS, Canal+ France and any successor-in-interest to TPS, in an amount to be determined by a jury at trial but which exceeds $75,000 exclusive of interest and costs.

(b) On the Second Cause of Action, awarding compensatory damages to MGM and against Groupe Canal+, in an amount to be determined by a jury at trial but which exceeds $75,000 exclusive of interest and costs, and exemplary and punitive damages, in an amount to be determined by a jury at trial.

(c) On all Causes of Action, awarding to MGM its costs of the action, including a reasonable attorney's fee and interest as allowed by law.

(d) Such other and further relief as the Court may deem just and proper.

Dated: New York, New York  
       April 11, 2007

Respectfully submitted,

DLA PIPER US LLP

By:    _____  
    Andrew L. Deutsch (AD 5782)  
    Joseph C. Gioconda (JG 4716)  
    Monica Petraglia McCabe (MG 5853)  
    Anne Hardcastle (AH 3274)  
1251 Avenue of the Americas  
New York, NY 10020  
(212) 335-4500

Attorneys for Plaintiff  
Metro-Goldwyn-Mayer Studios Inc.