# EXHIBIT #1

MGM - TPS Overall Agreement

## OVERALL AGREEMENT

This Agreement, including Annex "A", Annex "B", Annex "C" Annex "D" and Annex "E", incorporated herein by this reference, is made as of October _____, 1996 by and between Metro-Goldwyn-Mayer Inc. ("MGM") and Télévision par Satellite, a French société en nom collectif ("TPS") 29, rue du Colonel Pierre Avia, 75015 Paris, France

WHEREAS, MGM is entering into this Agreement in reliance upon the current ownership structure of TPS at the time of execution of this Agreement, which consists of TF1, Compagnie Luxembourgeoise de Teledifusion, M6, France Television, Lyonnaise des Eaux and France Telecom (the "Current Shareholders"); and

WHEREAS, the Current Shareholders have agreed to certain non-competition provisions in order to ensure the stability of the TPS Digital Platform.

NOW, THEREFORE, in consideration of the above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree, subject to the satisfaction of the Conditions Precedent, as follows:

1. **Definitions:**  All capitalized terms used herein without definition shall have the meanings ascribed to them in Annex "A".

2. **Conditions Precedent:**  The rights and obligations of the parties under this Agreement (other than this Section 2) are subject to the conditions precedent that: (i) this Agreement is approved by the respective boards of MGM and TPS within forty five (45) days from the date hereof, (ii) the conclusion of an agreement between TPS and MGM setting forth the technical quality standards of materials to be delivered by MGM pursuant to this Agreement (the "Quality Standards") within ten (10) days of the execution hereof, (iii) all the provisions of those Annexes to this Agreement which are or could be subject to French Law are reasonably acceptable to MGM in full consideration of French Law implications and EU regulations, and (iv) all of the Current Shareholders of TPS shall deliver to MGM a duly executed guarantee, in the form as set forth in Annex "E" (the "Guarantee") whereby such Current Shareholders guarantee in proportion to their respective shareholdings the performance of all of TPS's obligations under this Agreement and any of the Definitive Agreements, provided that TPS agrees that it shall so deliver the Guarantee no later than thirty (30) days after execution of this Agreement; provided however, if TPS were to request a reasonable limited extension of this deadline and Current Shareholders representing no less than seventy-five percent (75%) of the equity of TPS have issued the Guarantee within the aforementionned thirty (30) days period, MGM shall not unreasonably withhold its consent with respect to such extension, if it does not exceed Fifteen (15) days.

3. **Representations and Warranties:**  Each party represents and warrants that, to the best of its knowledge and belief:

(a) it is duly constituted and validly existing under the laws of the country of its constitution;

(b) the party has all requisite power and authority, including, without limitation, corporate and shareholder authority, to enter into this Agreement and, subject to fulfillment of the Conditions Precedent, to consummate the transactions contemplated by this Agreement; and

(c) this Agreement has been duly executed and delivered to the other parties, has been effectively authorized and constitutes legal and binding obligations.

MGM - TPS Overall Agreement

**4. Definitive Agreements:**    Each of the parties shall use its best efforts to negotiate promptly in good faith and to execute: (i) a Long Form Pay TV license agreement between MGM or one of its Affiliates and TPS on the terms and conditions set forth with respect thereto in Annex "A"; (ii) a Long Form Pay-Per-View license agreement between MGM or one of its Affiliates and TPS containing the terms set forth with respect thereto in Annex "B"; (iii) a Long Form agreement formalizing the equity options (the "Equity Options") granted to MGM herein with respect to TPS on the terms and conditions set forth with respect thereto in Annex "D"; (iv) such other agreements as are necessary for MGM to effect the transfers of equity contemplated by the Equity Options in the event MGM exercises its rights thereunder on the terms and conditions set forth with respect thereto in Annex "D"; (v) an agreement for the exhibition of a block of MGM Gold programming to be exhibited on Pay TV channels owned and controlled by TPS, as more fully set forth in Annex "C"; and (vi) any other agreements which may become necessary to effectuate the Agreement set forth herein (collectively, the "Definitive Agreements").

**5. No Partnership:**    Nothing contained herein shall be construed to create a partnership or joint venture between the parties hereto.

**6. Term/Termination:**  The Term of this Agreement shall continue until such time as all of the Definitive Agreements have been entered into and been executed by both parties; or in the event the parties do not conclude Definitive Agreements with respect to some or all of the transactions contemplated herein, until such time as the Agreement Terms contemplated in the Annexes for which no Definitive Agreements have been entered into have expired or terminated. This Agreement and the obligations and rights of the parties hereunder may be terminated by either party if the other party in any material respect has breached the terms of this Agreement and the breaching party has failed to cure such breach within thirty (30) days after receipt of written notification by the non-breaching party.

**7. Assignment:**  Unless otherwise provided herein to the contrary, neither party may assign any of its rights or obligations hereunder, other than to an Affiliate without the prior written consent of the other party.

**8. Indemnification:**    Each of the parties hereto (each an "Indemnifying Party") agrees to indemnify and hold the other party and its agents, employees, directors, and affiliates harmless from and against any loss, cost or expense incurred in connection with any breach of the terms of this Agreement by such Indemnifying Party.

**9. Entire Agreement:**  This Agreement contains the entire Agreement between the parties with respect to the subject matter contained herein and may not be modified, amended or changed except by written instrument signed by each party and designated as an amendment.

**10. Waiver:**    The failure by any party at any time to require performance by any other party or to claim a breach of any provision of this Agreement will not be construed as affecting any subsequent breach or the right to require performance or to claim a breach with respect thereto.

**11. Governing Law/Venue:**  This Agreement (and any Definitive Agreements that are license agreements) will be governed in all respects by the laws of the State of New-York. Each of the parties hereby irrevocably and unconditionally submits itself and its property in any legal action or proceeding relating to this Agreement (and any Definitive Agreements that are license agreements) or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Courts of New-York (whether State or Federal), or of the United States of America, agrees that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the

MGM - TPS Overall Agreement

venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.

**12. Validity/Severability:**    If any provision of this Agreement is held to be invalid or unenforceable, such provision will not affect in any respect the validity or enforceability of the remainder of this Agreement unless the invalidity materially affects the ability of any party to perform as contemplated hereunder.

**13. Construction:**    The parties agree that this Agreement was fully negotiated by the parties and, therefore, no provision of this Agreement will be interpreted against any party because such party or its legal representative drafted such provision.

**14. Confidentiality:**    Each of the parties hereto agrees that certain of the information it has or will receive with respect to the other party, including the terms and conditions of this Agreement, is of a confidential and/or proprietary nature and agrees that it will, and will cause its employees and agents to, hold such information in strict confidence and not reveal any such information to any third parties; provided, however, that each party may disclose such information to its employees, directors, agents and those it is contractually required to do so as of the date of this Agreement to the extent that they need to know such information in connection with this Agreement and that the parties may disclose such information if required to do so pursuant to a valid, binding and non-appealable court order to the extent required pursuant to any applicable securities laws and in any event with the prior written consent of the other party.   Neither party may disclose the existence, nature or terms of the Agreement to any third party, other than as set forth in the preceding sentence, except through a public disclosure in writing upon which the parties have mutually agreed.


    IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

ACCEPTED AND AGREED TO:

Metro-Goldwyn-Mayer Inc.                    Télévision par Satellite

By: _____             By: _Patrick le Luy_____

Its: _EXECUTIVE Vice PRESIDENT_            Its: _Chairman_____

Date: _NOVEMBER 15, 1996_                  Date: _6 / 17 / 1996_

Annex "A"

ANNEX "A"

PAY TV OUTPUT LICENSE TERM SHEET (the "Term Sheet")

| | |
|---|---|
| 1. Licensee: | Télévision par Satellite, a French société en nom collectif 29, rue du Colonel Pierre Avia 75015 PARIS FRANCE |
| 2. Licensor: | Metro-Goldwyn-Mayer Inc. (or its designated subsidiary) |
| 3. Territory: | France including Dom Tom (Martinique, French Guyana, Guadeloupe, Reunion, St. Pierre and Miquelon, New Caledonia, New Hebrides, Wallis and Futuna, French Polynesia, Mayotte); Andorra; and French-speaking Switzerland, French-speaking Belgium and Luxembourg. |
| 4. Language of Transmission: | French dubbed and French subtitled. |
| 5.1 License: | Licensor hereby licenses to Licensee (and Licensee hereby accepts such license) the exclusive Pay TV (as defined in Section 25) rights to the Licensed Pictures in the Territory (i.e., Current Films, TVM's and Library Films as they are defined in Section 11) during the Initial License Period and Back Window (as defined in Section 6) in the Language of Transmission only to residential subscribers and subscribers in Non-Residential Establishments other than the common areas of such Non-Residential Establishments, in accordance with the terms and conditions set forth herein; provided that each Licensed Picture shall be exhibited contiguously and without interruption. Licensee has not been granted PPD (as defined in Section 25) rights to the Licensed Pictures and such rights are reserved to Licensor. Notwithstanding the foregoing, Licensor shall not exploit the PPD rights for any Licensed Picture in the Territory during the Pay TV License Period for such Licensed Picture provided, however, that such PPD rights may be granted to Licensee at such time, if any, that Licensee and Licensor have agreed on all terms and conditions with respect to such PPD exploitation. |
| 5.2 "Premium Pay-TV Service: | No Licensed Picture shall be exhibited by Licensee on any program service other than Licensee's Premium Pay-TV Service consisting of two primary channels ("Primary Channels") a flanker channel ("Flanker Channel") and up to three Multiplex Channels of each Premium Pay-TV Service (collectively referred to herein as "Channels") . A "Multiplex Channel" shall mean a channel which has the same name as the Channel but a different identifier (e.g., TPS-1A, TPS-1B, TPS-1C) for which no additional fee is charged to |

TPS  MGM 06 11 96 04 34 02

Annex "A"

any subscriber and on which the programming is identical to the programming on the related Channel except that it is scheduled at a different time, but always on the same Exhibition Day as its carriage on the related Channel.

6. License Period:

Twelve (12) months Initial License Period per title for TVM's and Current Films. Current Films have a six (6) month Back Window beginning immediately after the Initial License Period. Six (6) months per title for Library Films. The six (6) month License Period for Library Films to be exhibited on an MGM Gold Block shall begin upon Licensor's initial planned exhibition on such MGM Gold Block. Licensor and Licensee agree to cooperate and develop a mechanism for determining when the License Periods shall begin for Library Films that are not exhibited on an MGM Gold Block in the Definitive Agreement (as defined in the Agreement to which this Term Sheet is attached). The "Back Window" shall mean the six-month period that immediately follows the Initial License Period for such Licensed Picture provided that, with respect to the Back Window titles listed on Attachment 1 hereto incorporated herein by this reference, the Back Window shall mean the six-month period commencing with the Availability Date (as set forth in Section 11.1) for each such Back Window title as listed on Attachment 1. Current Films, TVM's and Library Film's are defined in Section 11.

7. Method of Delivery:

As set forth in the Pay TV definition in Section 25.

8. Number of Subscribers:

For purposes of calculating the number of subscribers, the number of subscribers in Non-Residential Establishments shall be counted as sixty-five percent (65%) of maximum occupancy of such Non-Residential Establishments. In all other instances, the number of subscribers shall be calculated on a per authorized decoder basis.

9. Agreement Term:

Initial Term: 5 years, commencing as of January 1, 1997; plus:

(a) In the event Licensee (or its permitted successor or assignee) has two (2) million or more subscribers for three (3) consecutive months during the Initial Term, Licensor shall be required to elect, prior to the end of the Initial Term whether or not to extend the Initial Term for an additional five (5) years (the "Extended Term").

(b) In the event Licensee (or its permitted successor or assignee) does not have two (2) million or more subscribers for three (3) consecutive months during the Initial Term, and either: (i) Licensee (or its

Page 2

Annex A

*[handwritten:] Extended Term
written approval of
Nov-Dec 1992*

permitted successor or assignee) is engaged in the distribution or provision of satellite delivered television channels at the end of the Initial Term, then Licensor and Licensee may extend the Output Term of this Term Sheet for an additional five (5) years ("Extended Term") by mutual approval [as set forth below in subsection 9(h)];  or (ii) Licensee (or its permitted successor or assignee) is not engaged in the distribution and/or provision of satellite delivered television channels at the end of the Initial Term other than by reason of Force Majeure and subject to Section 9(c) below, then Licensee shall pay to Licensor no later than thirty (30) days following the end of such Initial Term a one time termination fee of US$3,000,000 which shall not be subject to reduction, mitigation or offset in any manner. In such situation, there will be no extension of the Initial Term and the Right of First Refusal and Topping right shall not apply.  In the event that Licensee (or its permitted successor or assignee) is engaged in the distribution and/or provision of satellite delivered television channels at any time within six (6) months of payment of the termination fee set forth above, then Licensor shall be entitled to elect whether or not to renew this Term sheet pursuant subsection 9(a) hereinbelow.

*[handwritten:] If TPS is involved in a merger Licensee can not extend term in its sole option*

(c) Further, notwithstanding anything contained herein to the contrary, in the event that Licensee is the subject of a Merger during the Initial Term (regardless whether such Merger is consumated during or after the Initial Term) with an entity or an Affiliate of an entity, provided that such entity or Affiliate is unaffiliated to the current shareholders of TPS, which is in the business of operating or Controlling any digital television distribution platform, then Licensor shall have the right in its sole election to extend the Initial Term for an Extended Term. In the event that there is an Extended Term pursuant to the provisions herein, then the terms and conditions contained in this Term Sheet shall apply for such Extended Term.

*[handwritten:] however subject to second to last ¶*

(d) Notwithstanding the foregoing, in the event that Licensor elects <u>not</u> to extend the Initial Term of this Term Sheet pursuant to subsections 9(b) and 9(g) and Licensee does elect to extend the Initial Term, then Licensee shall be entitled to a Right of First Refusal and a Topping right as follows:

Before Licensor enters into negotiations with a third party unaffiliated with Licensee for the license of French language  Pay TV rights (whether for an output deal, package deal or individual title) in the Territory for what would otherwise be subject to the exclusivity provisions of this Term Sheet, it will first enter into negotiation of such a license with Licensee.

Page 3

Annex "A"

In the event that the parties fail to agree within a period of sixty (60) calendar days, then Licensor shall be free to offer those rights to a third party for an amount equal to or greater than the amount contained in the last offer made to Licensee by Licensor. In the event that Licensor intends to offer Key Terms and Conditions (as hereinbelow defined) which, when taken in the aggregate, are more favorable to such third party than those last offered to Licensee pursuant to the immediately preceding paragraph, Licensor shall first offer such Key Terms and Conditions to Licensee and enter into good faith negotiations for a period of thirty (30) calendar days with Licensee. Such obligation of Licensor's shall apply each time that Licensor offers more favorable Key Terms and Conditions to a third party unaffiliated with Licensee following the end of any negotiations with Licensee. This procedure shall be known as the "Right of First Refusal." "Key Terms and Conditions" shall mean the following categories of terms: license fees, number of motion pictures licensed, duration of license period, exclusivity, subscriber guarantees, most favored nations provisions, Term and renewals.

Notwithstanding such Right of First Refusal, in the event Licensor has a bona fide intent to enter into an agreement for French language Pay TV rights with a third party unaffiliated with Licensee on terms and conditions equal to or more favorable to Licensor than those last offered to Licensee pursuant to the Right of First Refusal, Licensor shall offer Licensee the right to match such terms and conditions, provided that Licensee agrees to pay amounts equal to 110% of the monetary amounts contained in the proposed third party agreement with respect to such Key Terms and Conditions. This shall be known as the "Topping" right. The Topping right shall be exerciseable within thirty (30) calendar days of the presentation of the relevant offer by Licensor to Licensee. The Right of First Refusal and the Topping right shall be in effect until the date which is one(1) year following the end of the Initial Term.

(e) Notwithstanding the foregoing, in the event that Licensee elects not to extend the Initial Term of this Term Sheet pursuant to subsections 9(b) and 9(h) and Licensor does elect to extend the Initial Term, then Licensor shall be entitled to a Renewal Right as follows (and for clarification, shall be entitled to retain any equity it holds in Licensee and/or the Channels) if at any time prior to six (6) years after the first day of the Agreement Term, Licensee,

Page 4

TPS MGM 06/11/06 04:34:02

(x) renews with a Major Studio [provided that any continuation of the license of Pay TV rights beyond an initial term or in excess of seven (7) years shall be considered as a renewal for the purposes of this provision], or

(y) renews with a Major Studio within the seventh year after the first day of this Agreement Term (and the negotiation for such renewal were engaged within the first six years from the first day of this Agreement and were not discontinued prior to the end of this sixth year),

an agreement for French language Pay TV rights, then Licensor shall have the right to renew this Term Sheet, the PPV Output Term Sheet and/or the MGM Gold Block License Term Sheet for a renewal term of three (3) years on the financial terms and conditions with respect to each such Term Sheet as are in effect with respect to the third year of the Agreement Term of such Term Sheet.

(f) With respect to section 9(a) and 9(b) above, Licensee shall provide Licensor with written notice, no later than six months prior to the end of the Initial Term, stating whether Licensee reasonably believes it will be actively engaged in the distribution or provision of satellite delivered television channels at the end of the Initial Term.  Licensee shall also provide Licensor with written notice at any such time, that Licensee has subscribers in excess of 2 million for three (3) consecutive months.

(g) The Topping Right, and Right of First Refusal contained in this Section 9 must be exercised jointly with the Topping Right, Right of First Refusal and Matching Right contained in Section 7 of the PPV Output License Term Sheet to the extent the relevant third party offers and agreements which are the subject of such Topping Rights, Rights of First Refusal and Matching Rights contain both Pay TV and PPV rights.

(h) The process for determining whether either or both of the parties have elected to renew the Term Sheet pursuant to subsection 9(b)(i), 9(d) and 9(e) is as follows:

Licensor shall be required to select a Big 6 accounting firm  (the "Accounting Firm") and  send Licensee a written notice setting forth the Accounting Firm, its address and the person to whom the Election Notice (as set forth below) should be addressed no later than seven (7) months prior to the end of the Initial Term.

TPS  MGM 06/11/96 04:34 02

Annex "A"

Each party shall then be required to send a sealed written notice (each an "Election Notice") no later than six (6) months prior to the end of the Initial Term to the Accounting Firm stating whether or not such party wishes to renew the Term Sheet (or Definitive Agreement as applicable) for an Extended Term. Each party shall only be allowed to give one Election Notice (successive notices after the first Election Notice shall be of no effect) and Election Notices shall not be retractable. Election Notices shall be held by the Accounting Firm until five (5) days after the last day of the sixth month prior to the expiration of the Initial Term, at which point the Accounting Firm shall courrier to each party the Election Notice of the other party. Any Election Notice that purportedly elects to renew this Term Sheet (or Definitive Agreement as applicable) for an Extended Term but places a condition(s) or qualification(s) upon the renewal or the terms and conditions of such renewal shall be deemed to be an election not to renew for an Extended Term. Also, any failure to deliver an Election Notice on the date due shall be deemed to be an election not to renew for an Extended Term.

10. Exhibition Days:

For the purposes of exhibition of a Licensed Picture by Pay TV, Exhibition Day shall mean on any channel, the twenty-four hour period commencing at 6:00 a.m. and ending at 5:59 a.m.; provided that an exhibition of a Licensed Picture which commences on one Exhibition Day and runs continuously until it finishes on another shall be treated as having been exhibited on the Exhibition Day on which such exhibition commenced; and further provided that any exhibition of a Licensed Picture in excess of two (2) times on a single channel during an Exhibition Day shall constitute the commencement of an additional Exhibition Day; and further provided that nothing in this definition is intended to limit TPS' multiplexing rights set forth in this Term Sheet.

10.1. Exhibition Days During the Initial License Period :

Twenty eight (28) on Licensee's Premium Pay-TV Service (plus Licensee's ability to multiplex as provided for in paragraph 5.2) .

10.2 Exhibition Days During the Back Window :

Twenty eight (28) on Licensee's Premium Pay-TV Service (plus Licensee's ability to multiplex as provided for in paragraph 5.2) .

10.3 Exhibition Days for Library Pictures:

Page 6

Annex "A"

| | |
|---|---|
| Pay-TV Service | Thirty-six(36) per Licensed Picture on Licensee's Premium |

11.1 Licensed Pictures:

Each motion picture for which Licensor controls the Pay TV rights in the Territory during the Initial Term, as it may be extended, with an Availability Date as set forth in Section 11.2 and which meets the requirements of one of Section 11.1(a) through 11.1 (f) but is not a Restricted Picture [as set forth in Section 25]:

(a) Theatrically released by Metro-Goldwyn-Mayer Inc. (or any of its divisions or subsidiaries)("MGM"), under labels owned or controlled by MGM, in the U.S. which was also the subject of a bona fide theatrical release in France; or

(b) Theatrically released by a Major Studio in the U.S. with a national advertising campaign, which was also theatrically released in France on no fewer than eighty (80) screens (simultaneously at its widest release), provided that Licensor also: (i) owns or controls the PPV, Pay TV, Free TV and Basic-TV rights in France and in two of Germany, UK, Italy, Japan, Spain, Latin America, Brazil and Australia ; or (ii) owns or controls the theatrical, video PPV, Pay TV, Free-TV and Basic-TV rights in France [(i) and (ii) referred to hereinbelow as "Additional Qualifying Criteria"]; or

(c) Theatrically released in the U.S. with a national advertising campaign, on no fewer than four hundred (400) screens (simultaneously at its widest release) which was also theatrically released in France on no fewer than eighty (80) screens (simultaneously at its widest release), which also meets the Additional Qualifying Criteria; or

(d) Any TVM produced by MGM and/or otherwise made available by Licensor to Licensee during the Output Term provided that Licensee shall not be required to license in excess of ten (10) such TVMs in any calendar year. Licensor shall supply Licensee with a list of all TVMs available. In case Licensor is able to provide over two consecutive calendar years during the Initial Term of the Output a list of more than fifteen (15) TVM per year, then Licensee shall be required to license up to twelve (12) such TVMs in any calendar year;

and

(e) Any picture listed on Attachment 1;

Page 7

Annex 'A'

or

(f) Any picture whose qualification is set forth in 14. hereinbelow. initially theatrically released in the United States sixty (60) or more months before their proposed availability date hereunder. and for which Licensor controls the Pay TV rights in the Territory (a "Library Film").

(g) For the avoidance of doubt, a theatrical release used in this section shall mean a commercial theatrical release (i.e., preview, test, promotional and free screenings are not included). Notwithstanding anything contained herein to the contrary, Current Films shall also include feature motion pictures that would otherwise constitute Current Films hereunder except for the fact that they have no French theatrical release; provided that, Licensor may deliver no more than eight (8) such films in any two (2) year period [i.e., a rolling two (2) year average of four (4) films per year].

(h) Licensee acknowledges that due to co-financing and co-production agreements Licensor has or may enter into, Licensor may not control the French television rights in certain motion pictures, provided however, Licensor shall not use the provisions of this subsection to frustrate the purposes of this Term Sheet. Further, beginning with the third year of the Agreement Term, Licensor shall be obligated to deliver at least six (6) Current Films (of which, on a two (2) year average, no less than four (4) per year shall be released theatrically in France) per year of the Agreement; provided that, failure to deliver at least an average of six (6) Current Films of which four (4) are theatrically released in France as set forth above shall not be a breach of this Term Sheet and the only remedy available to Licensee shall be that Licensor shall be obligated to pay Licensee a penalty per missing title equivalent to the License Fee set forth herein for a Current Film with a French theatrical release that received less than 200,000 French admissions for each undelivered Current Film.

(i) For purposes of clarification, the motion picture currently known as "Goldeneye" and other James Bond films which Licensor makes available during the Agreement are Restricted Pictures but shall be included herein as Current Films; provided that, in all instances such films, regardless of box office performance or any other criteria, shall receive the highest License Fee payable for any Licensed Picture hereunder [i.e., as set forth in Section 12(c)]. Licensor also acknowledges that Licensee has

TPS MGM 06 10 06 04 34 02

Annex "A"

requested to license, some or all of the library James Bond films, French dubbed and subtitled, on an exclusive basis and agrees to use reasonable endeavors to secure the required third party approval for such an exclusive license.

(j)  Restricted Pictures:  In the event Licensor is contractually capable of granting Licensee the rights of first negotiation and last refusal with respect to any Restricted Pictures, then Licensor shall grant Licensee such rights, provided that Licensor shall use reasonable endeavors to obtain the right to make such grant to Licensee.

11.2 Availability Date:

(a)  For each Current Film, no later than the earliest of (i) twelve (12) months after Licensor's authorized initial Home Video release of the Current Film in France ("Home Video Street Date"); (ii) twenty-four (24) months after Licensor's authorized initial theatrical release in France; and (iii) thirty-six (36) months after such Licensed Picture's initial theatrical release in the U.S.  Notwithstanding the above, for one (1) Current Licensed Picture per calendar year the Availability Date may be delayed up to thirty six (36) months after Licensor's authorized initial French theatrical release but in no event later than twelve (12) months after Licensor's Home Video Street Date in France with respect to such Licensed Picture.

(b)  For each TVM - no later than the earlier of the following (i) twelve (12) months after Licensor's initial Home Video Street Date for the TVM in France and (ii) thirty (30) months after the TVM's initial broadcast in the U.S.

(c)  For listed Licensed Pictures - the date set forth in Attachment 1.

(d)  In the event that the laws in France relating to release windows are modified and the general industry practice relating to the sequential release of motion pictures changes so as to accelerate the period between French theatrical release and French video release or between French video release and French Pay TV availability, then the parties shall mutually discuss in good faith a modification to and an acceleration of the availability dates set forth in this Section 11.

12. License Fees and Categories for First Pay TV Window :

(a)  Minimum Subscriber Guarantees: The Minimum Subscriber Guarantee  equals the weighted average

TPS  MGM 06 11 96 04 34  02

Annex "A"

of the yearly subscriber guarantees set forth below over the applicable License Period.

By way of example, for a License Period commencing 3/1/97 and ending 2/28/98, the Minimum Subscriber Guarantee shall be calculated as follows:

10(4MM) + 2(4.2MM) / 12 = 4.033MM

(b) Minimum Subs Per Year:

| Year | Subs (000) |
|------|-----------|
| 1997 | 4.000 |
| 1998 | 4.200 |
| 1999 | 4.400 |
| 2000 | 4.600 |
| 2001 | 4.800 |
| 2002+ | 5.000 |

(c) Pricing:

(I) Current Films:

| Number of French Admissions | Charge Per Subscriber ("CPS") |
|------------------------------|-------------------------------|
| No Release | 0.26 FF |
| <200.000 | 0.52 FF |
| 200.000-299.999 | 0.78 FF |
| 300.000-699.999 | 1.04 FF |
| 700.000-1.499,999 | 1.82 FF |
| 1.500,000-4.000,000 | 2.60 FF |
| >4.000,000 | 3.64 FF |

French theatrically released James Bond movies will be guaranteed the per subscriber license fee for motion pictures which have greater than 4,000,000 French theatrical admissions.

The CPS shall increase each calendar year by the greater of French CPI or 2.5% commencing January 1, 2000.

(II)TVM's: 450,000 FF flat license fee and such License fees for TVM's shall increase each calendar year by the greater of French CPI or 2.5% commencing January 1, 2000.

13. License Fees and Categories for Back Window :

When Licensee has 300,000 subscribers or less, Licensee pays Column A License Fees only. When Licensee has more than 300,000 subscribers, Licensee pays Column A plus Column B for incremental subscribers above 300,000 :

| Number of French Admissions | Column A FF per Title* | Column B FF per sub (>300.000) |
|------------------------------|------------------------|-------------------------------|

TPS - MGM 06 11 96 04 34 02

Annex "A"

| No Release | 40.000 FF | 0.075 FF |
| <200.000 | 60.000 FF | 0.10 FF |
| 200.000-299.999 | 75.000 FF | 0.125 FF |
| 300.000-699.999 | 90.000 FF | 0.15 FF |
| 700.000-1.499.999 | 150.000 FF | 0.25 FF |
| 1.500.000-4.000.000 | 345.000 FF | 0.60 FF |
| >4.000.000 | 540.000 FF | 0.90 FF |

License fees for the Back Windows set forth in Column A above shall increase each calendar year by the greater of French CPI or 2.5% commencing January 1, 2000.

14. Library Films:

(a) Volume: Pursuant to the terms and conditions contained in Annex "C" - MGM Gold Block License Term Sheet, in the event that an MGM Gold Block (as set forth in Annex "C") will be exhibited on any of the Channels (or on any successor channels in the event of a Merger) during any year of the Agreement Term, then Licensee shall be obligated to license no less than one hundred (100) Library Films which shall be exhibited initially for one single exhibition (subject to the right to re-run the MGM Blocks) in the MGM Gold Block. For any years when an MGM Gold Block will not be exhibited on any of the Channels (or on any successor channels in the event of a Merger), Licensee shall be obligated to license the lesser of the following numbers of Library Films (of which Licensor shall supply a paired list for selection by Licensee) or that number which equals one-half (1/2) the number of Library Films set forth by Licensor on such paired list [unless Licensee is also distributing a stand-alone MGM Gold channel on the Digital Platform in which case the maximum annual volume commitment shall be twenty (20) Library Films]:

| Year | # of Library Films |
| --- | --- |
| 1997 | 45 |
| 1998 | 35 |
| 1999 | 30 |
| 2000 | 25 |
| 2001+ | 20 |

MGM undertakes to make available to TPS all rights on Library Films which shall become available during the term of this agreement, immediately upon the availability of such Library Films.

(b) Library Film License Fees:

| Category | Price Per Title* |
| --- | --- |
| - less than 6 years old | 100.000 FF |
| - from 6 to 10 year old | 80.000 FF |
| - greater than 10 years old | 50.000 FF |

License fees for Library Films set forth above (Price Per Title) shall increase each calendar year by the

Page 11

Annex 'A'

greater of French CPI or 2.5% commencing January 1, 2000.

**15. Payment Terms -**
**Number of Subscribers:**

(a) General: Initial Payment (as set forth below) and flat License Fees (i.e., Library and TVM's) are due ninety (90) days after avail date provided that all materials with respect to Licensed Pictures whose payments are due were delivered and accepted by Licensee: and further provided that materials meeting the Quality Standards shall be deemed accepted by Licensee if such standards are effectively met. Overages (as set forth below) are due ninety (90) days after the end of the applicable License Period. All license fees are paid in French Francs.

(b) Current Films - First Window: Initial Payment equals the applicable charge per subscriber (the "CPS") multiplied by the greater of (i) the average number of subscribers during the initial month of availability (the "Initial Number of Subscribers") or (ii) the Minimum Subscriber Guarantee [as set forth in section 12(c)]. The Overage Payment, if applicable (i.e., a positive number), equals the Overage Adjuster minus the Initial Payment. The Overage Adjuster is equal to the applicable CPS multiplied by the greater of (i) the average number of subscribers during the last month of availability (the "Ending Number of Subscribers") or (ii) the Minimum Subscriber Guarantee.

(b) Current Films - Back Window: For purposes of this subsection only, the terms Initial Payment, Overage Payment and Overage Adjuster shall have the meanings ascribed to them in this subsection. For the Second Pay TV Window, the Initial Payment is equal to the flat License Fee plus the Initial CPS Portion if applicable (i.e., a positive number). The Initial CPS Portion is equal to the Initial Number of Subscribers minus 300,000 multiplied by the applicable CPS. The Overage Payment, if applicable (i.e., a positive number), is equal to the Overage Adjuster minus the Initial CPS Portion. The Overage Adjuster is equal to the Ending Number of Subscribers minus 300,000 multiplied by the applicable CPS.

**16. Delivery of Technical Material:**

(a) Licensor will deliver technical materials meeting the Quality Standards at least sixty (60) days prior to the commencement of a film's license period in a video digital one inch format with a French language dubbed soundtrack included. Licensee shall pay all cost in connection with the importation and return of all material into and from the Territory, including duplication of materials.

Page 12

CPS MGM 06 03 06 04 34 42

Annex 'A'

(b) Licensee agrees to protect the Licensor's control and ownership of the Licensed Pictures and all Licensor Property and materials created under this Term Sheet. The Licensee shall return the materials within thirty (30) days after the end of the license period in respect of any film.

(c) Licensor will deliver free of charge all available trailers in dubbed and subtitled versions as well as any advertising material which would be available for each Licensed Picture.

(d) Licensor owns and can use/access any/all materials created by Licensee, including any dubbed or subtitled versions (if Licensee is authorized to create such), free of any charges.

(e) In the event Licensor has delivered technical materials pursuant to the PPV Output License Term Sheet for a given Licensed Picture and such materials have been accepted by Licensee, then Licensor shall be deemed to have delivered (and the Licensee accepted) the technical materials with respect to such Licensed Picture.

17. Holdbacks:

During License Period no other French Dubbed and/or subtitled Pay TV, Free TV, Basic TV, PPV or PPD in or directed to the Territory.

18.1 Audit Rights:

In addition to supplying monthly usage reports, Licensee shall maintain complete books, returns and records with respect to all matters contained herein. Licensor or its international audit firm will have usual audit rights of the above information for up to two (2) years after the end of the last license period of last Licensed Picture exhibited. All cost relative to    s audit right will be borne by the Licensor unless t   a is an under-reporting by Licensee in excess of ten percent (10%) of the total License Fees due Licensor for the time period in question. In which case, all costs of the audit will be born by Licensee.

18.2 Reports:

No later than sixty (60) days after the end of each calendar month, the Licensee shall send to the Licensor a monthly reporting statement.    This statement shall include at least the following information:   (1) the scheduled and unscheduled exhibitions;  (2) the number of subscribers during the month of such exhibition;  (3) the name of each Channel with details of the scheduling of Licensor's Licensed Pictures on each Channel.  Licensee shall send to Licensor a copy of all its published programming schedules or guides promptly upon availability.

TPS / MGM 06/17/98.04.14 .02

Annex "A"

**18.3 Cross-Default:** In the event that either party (the "Non-breaching Party") is entitled to terminate this Term Sheet due to one (1) or more material breaches of this Term Sheet by the other party (the "Breaching Party") which, despite written notice to the Breaching Party and a cure period of at least thirty (30) days, have gone uncurred, then, among other remedies, the Non-breaching Party shall be entitled to terminate the PPV Output License Term Sheet and this Term Sheet.

**19. Security:** The Service will be encrypted at all times except previews and promotional material. Once Licensee reaches a total of two million subscribers to the Digital Platform, or if the competitors of Licensee in the Territory are obligated to do the same, the Licensee shall, at its facility, and through its delivery system employ such security systems and procedures as may be reasonable and commercially feasible to prevent theft, piracy, unauthorized copying or duplication of any print or any other copy of any of the films licensed and any promotional materials hereunder.

**20. Interest on Late Payments:** Three percent (3%) per year above US prime rate compounded monthly.

**21. Taxes:** With the exception of withholding taxes, if applicable, the License Fees are net of any other tax.

**22. Promotions:** The Licensee may promote Licensor films no earlier than ninety (90) days to trade publications and sixty (60) days to consumers prior to the start of each license period for the applicable films.

**23. Most Favored Nations:** In the event Licensee has prior to, or shall during the two (2) year period beginning upon execution of the Agreement to which this Term Sheet is attached, make any agreement with any Major Studio, which agreement provides for a greater total amount of license fees however calculated [e.g., whether calculated on a flat fee basis or as a product of CPS taking into account the number of French Admissions and the number of applicable subscribers whether guaranteed or actual ("License Fee Factors")] for any picture which is the substantial equivalent (measured by the total Number of French Admissions) of a Current Film than the License Fee for each Current Film hereunder, then such greater total amount of license fees shall be applicable to each Current Film licensed hereunder retroactive to the date such greater total amount of fees were applicable to such Major Studio.

**24. Sublicensing and Subdistribution:**

CPS/MGM 06-13-96 04:34:02

Annex "A"

In the event Licensee has ceased to be in the business of distribution and provision of satellite delivered television channels during the Initial Term and such cessation is not due to an event of Force Majeure, Licensee shall have the right to sublicense the rights granted hereunder but only on the following terms and conditions: (i) Licensor shall be granted the exclusive right to sublicense the rights granted hereunder which sublicensing rights shall be exercised in Licensor's sole discretion; (ii) Licensor shall be entitled to a ten percent (10%) commission (the "Sales Commission") on the gross amount of all sales (the "Sublicense Fee") it makes with respect to rights it sublicenses on behalf of Licensee; (iii) Licensee shall be entitled to recoup, on a sublicensed picture by sublicensed picture basis, up to the amount of any License Fees paid hereunder to Licensor with respect to such sublicensed picture (the "Licensee Recoupment"); and (iv) Licensor shall retain and own for its own account the remainder, if any, of any Sublicense Fees after deduction of the Sales Commission and the Licensee Recoupment. Licensor agrees that during such time that Licensee is actively engaged in the business of distribution and provision of satellite delivered television channels during the Agreement Term, it will consider requests of Licensee to sublicense the rights granted herein and Licensor agrees not to unreasonably withhold its approval with respect to such requests; provided that, any decision by Licensor to withhold its approval shall be deemed to be reasonable if in Licensor's own business judgment, as determined by Licensor, such sublicensing is not in its best interests.

25. Definitions:

"Affiliate":                       shall mean with respect to a party, any other party that, directly or indirectly, it Controls, it is Controlled by, or with which it is under common Control.

"Basic TV":                       shall mean the remote (i.e., from other than where received) analog or digital Encrypted transmission by wire, cable, optic fiber, or satellite of audio-visual programs for analog or digital exhibition on a television monitor or comparable non-public video display device for viewing by the ultimate consumer in private residences for which a periodic fee is charged for the reception of a group of television channels that are otherwise available by Free TV or for the lowest tier of television programming available to subscribers, and that does not include any premium channels or Free TV, Pay TV, PPD, PPV, VOD, Video Downloading, Home Video, Interactive Media, Theatrical Exhibition or Non-Theatrical Exhibition.

TPS MGM 06 13 96 04 34  02

Annex "A"

"Current Shareholders"
shall be Compagnie Luxembourgeoise de Teledifusion, M6, France Television, Lyonnaise Communications, TF1 and France Telecom.

"Control"
shall mean that, with respect to any entity, a party owns, directly or indirectly, more than 50% of such entity or has the ability to direct or substantially influence the policies or management of such entity whether by ownership, pursuant to contract or otherwise.

"Digital Platform"
shall mean TPS, its successors, substitutes and/or assigns and/or any entity which would result from a Merger.

"Encrypted/Encryption":
a transmission is considered "Encrypted" if it uses a secure technological system ("Encryption") which ensures that only authorized viewers in the Territory, or where the Territory includes more than one country, the relevant country in the Territory, can receive such transmissions and which prevents unauthorized viewers from accessing such programming from any authorized channel or service.

"Force Majeure"
as used in this term sheet, the failure of the Licensee to be engaged in the distribution or provision of satellite delivered television channels due to labor disputes and/or strikes, acts of God, war, public disaster, failure of carriers, failure of satellite or transmission equipment, order or decree of governmental agency, failure or delay of laboratory, unavoidable casualty, embargo or for any other cause beyond its control.

"Free TV":
shall mean the remote (i.e., from other than where received) analog or digital transmission by UHF/VHF terrestrial transmitters, microwave distribution systems, wire, cable or optic fiber, Encrypted satellite or any combination of the foregoing, of audio-visual programs for analog or digital exhibition on a television monitor or comparable non-public video display device for viewing by the ultimate consumer in private residences for which no fee is charged for the unimpaired reception of such transmission other than (i) government-imposed fees or taxes applicable to the use or ownership of television receivers generally or (ii) fees only for the physical equipment necessary to receive such transmission and not for any program service(s), and which is not Basic TV, Pay TV, PPD, PPV, VOD, Video Downloading, Home Video, Interactive Media, Theatrical Exhibition or Non-Theatrical Exhibition.

Annex "A"

"Home Video":

shall mean the exploitation by rental or sale of any motion picture that is embodied in a video device now known or hereafter devised (including, without limitation, video cassette, CD-ROM and video disc).

"Interactive Media":

shall mean the exhibition, distribution, and/or exploitation of a Licensed Pictures (or portions thereof) through any arrangement, apparatus, device, process or procedure, whether now known or hereafter devised, which, as part of an interactive activity, prompts the user to choose and/or alter the order of presentation of audio and/or video portions of all or any part of an audio visual program in connection or in conjunction with (i) computer programs contained in magnetic or optical media or any other form of delivery now known or hereafter devised, (ii) spoken word, printed word and/or pictorial materials, and/or (iii) any other means now known or hereafter devised which prompts the user to choose and/or alter the order of the presentation of the portions of the program, irrespective of the form of delivery of the program, including, without limitation, computer on-line media and the so-called "Internet".

"Licensor Property":

shall mean all materials supplied or created by or for Licensor or Licensee or any third party for Licensee's use pursuant to this Term Sheet, including, without limitation, all transmission masters, dubbed versions, sub-titled versions and promotional materials.

"Major Studio"

shall mean the principal releasing arms of the Walt Disney Co./Buena Vista (i.e., Touchstone, Hollywood Pictures, Disney), Dreamworks, Universal City Studios Inc., MGM/UA, Warner Bros., Twentieth Century Fox, Columbia Tristar and Paramount Pictures, and any production/distribution entity which will in the future be generally accepted in the industry as of equivalent stature. For the avoidance of doubt, the releasing divisions that are not currently part of the principal releasing arms of the entities listed above shall not be Major Studios; for example: (a) Miramax is not currently a principal releasing arm of Walt Disney Co./Buena Vista.

"Merger"

shall mean any sale of assets or shares, joint venture, distribution or liquidation, contribution, merger, spin-of, licensing arrangement, joint marketing or cooperative arrangement or other agreement that has the effect of directly or indirectly transferring from Licensee to any other entity which is in the business of operating a digital platform all or a significant interest in or control of TPS or its major assets (i.e. the assets which are together indispensable for TPS to carry-out its activities as a digital platform operator).

TPS MGM 06 11 06 04 34 02

Annex "A"

"Non-Residential
Establishment/s":

shall mean a hotel, motel, bed and breakfast accommodation, military installation, hospital, nursing home or similar institution, prison, oil rig, dormitory, fraternity and/or sorority house and other place of temporary residence.

"Non-Theatrical Exhibition":

shall mean the exhibition of a motion picture by any means other than Theatrical Exhibition, whether or not an admission or viewing fee is charged, (i) to Non-Residential Establishments, on airlines, aircraft and ships (and similar modes of transportation) and/or (ii) viewed in a single room, hall, public place, and/or other place of public gathering.

"Number of French Admissions":

shall mean with respect to any motion picture that number of paid admissions of individual persons admitted to motion picture theaters located in France to view such motion picture as reflected in the statistics publicly made available by CNC on a regular basis or in such other statistical source as is mutually agreed upon between the parties.

"Pay-Per-Day" ("PPD"):

shall mean the Encrypted transmission from a distance (i.e. other than where received) of programs whether or not as part of a programming service and intended for receipt on a television monitor or other comparable non-public video display device at a private residence or other non-public unit where a supplemental charge is made for the privilege of viewing such films on a one-day, or multiple day, week, or other period of time basis (versus all of the days in a month). For the avoidance of doubt, PPD shall not include Basic TV, Free TV, Interactive Media, Home Video, Non-Theatrical Exhibition, PPV, Pay TV, Theatrical Exhibition, VOD or Video Downloading.

"Pay-Per-View" ("PPV"):

shall mean the Encrypted transmission from a distance (i.e., other than from where received) of a single audio visual program or picture whether or not as part of a programming service and intended for receipt on a television monitor or other comparable non-public video display device at a private residence or other non-public unit where a charge on a per-exhibition basis is made for the privilege of viewing such single exhibition of such program ("Single Fee") at a time scheduled by the transmitter, which Single Fee is unaffected in any way by the purchase of other programs, products or services; provided, however, that such Single Fee may be in addition to a single or periodic access, service or equipment use fee also applicable to programming other than a Licensed Pictures (a "Service Charge"), but only if such Service

TPS_MGM 06 11 06 04 34 02

Annex "A"

Charge is payable by each viewer who has elected not to have the ability to receive programming on a PPV basis; and further provided that the PPV licensee(s) authorized by Licensor is permitted, periodically, on a limited basis, to offer to first-time subscribers coupons for free or reduced fee PPV exhibitions during the first month of their eligibility to receive programming on a PPV basis ("Coupon Exhibitions"), provided that for purposes of calculating Licensor's PPV License Fees for such Coupon Exhibitions, the revenue due for each such Coupon Exhibition shall be deemed to be equal to the revenue that would have been due had each such Coupon Exhibition been purchased at the price charged a viewer not using such coupons  For the avoidance of doubt, Pay-Per-View shall include exhibition by what is commonly known as "near-video-on-demand" (i.e., multi-channel PPV) ("NVOD") and shall exclude exhibition by means of VOD, Video Downloading, Pay TV, Free TV, Basic TV, PPD, Home Video, Interactive Media, Theatrical Exhibition or Non-Theatrical Exhibition (except as expressly permitted under the PPV/NVOD License Term Sheet on a non-exclusive basis with respect to Non-Residential Establishments).

"Pay TV":

shall mean Encrypted linear (i.e. non-interactive) transmission of audio visual programs from a distance (i.e., other than where received) and intended for receipt on a television monitor or other comparable non-public video display device at a private residence or other non-public unit by broadcast (i.e., UHF or VHF), microwave, satellite, optical fiber, telephone cable and/or coaxial cable of synchronized video and audio signals which is only available as part of a program service or channel where: (i) a fee or other payment is charged, directly or indirectly, to subscribers for such program service or channel which is separately identifiable from any fees charged to receive the lowest tier of programming available to such subscribers and (ii) such program service or channel at any time carries any  motion picture(s) which were released for initial Theatrical Exhibition within five (5) years of such motion picture's initial availability on such program service or channel; provided, however, that the following fees or charges shall not be a fee under clause (i) of this sentence: (A) any government imposed fees or taxes applicable to the use or ownership of television receivers generally, (B) any fees charged that are only for the physical equipment necessary to receive such transmission and not for any program service, (C) any fees that are only for the reception of a package of television channels that are otherwise available in the same territory only by unencrypted UHF or VHF terrestrial transmissions, and (D) a per-time or periodic charge

Page 19

Annex "A"

for connection to a cable, MMDS, satellite or other distribution system. For purposes of this definition, "First Run" shall mean not previously exhibited on any form of television in the Territory (other than Theatrical Exhibition, Non-Theatrical Exhibition (except as expressly permitted under the PPV/NVOD License Term Sheet), Pay-Per-Day, Pay-Per-View, Home Video, Video-On-Demand, Video Downloading and Interactive Media). For the avoidance of doubt, Pay TV shall not include Basic TV, Free TV, Interactive Media, Home Video, Non-Theatrical Exhibition, (except as expressly permitted with respect to Non-Residential Establishments on a non-exclusive basis under the Pay TV License), PPD, PPV, Theatrical Exhibition, VOD or Video Downloading.

"Restricted Picture"

Any motion picture for which Licensor does not unilaterally control the rights necessary to license the rights licensed to Licensee hereunder.

"TVM":

shall mean, respectively, an audio-video program created for the U.S. television market and initially exhibited on (i) U.S. network television (i.e., ABC, NBC, CBS, FOX, UPN, WB, or any successor of any of the foregoing or other network television channel having substantially similar audience reach as any of the foregoing), or (ii) USA Networks or any other Basic TV channel covering not less than 25 million U.S. TV households as defined using the Nielsen index ("NTI"), or (iii) syndication or another network television channel covering not less than 65% of U.S. TV households as defined using the NTI, or (iv) on a national pay television service (including, without limitation, and otherwise of the stature of HBO, Showtime, Encore, Starz!, The Movie Channel, Cinemax). A "TVM" is a Television Program that is a live action made-for-television movie as that term is commonly understood in the U.S. television market that has a run time of not less than 90 minutes. Notwithstanding anything herein to the contrary, made-for-video motion pictures shall also be TVM's hereunder if they are produced by Licensor, have an actual negative cost of at least US$ 3,000,000 and have sold at least 20,000 Home Video units in France.

"Theatrical Exhibition":

shall mean the exhibition of a motion picture or other audio visual material, whether or not an admission or viewing fee is charged, in movie theaters by any means.

"Video Downloading"

shall mean television exhibition where the viewer is specifically authorized to record a program being exhibited in exchange for a fee or other consideration.

"Video-on-Demand"

Page 20

Annex "A"

("VOD"):                          shall mean the Encrypted television exhibition to
                                  consumers of programming where the scheduling of
                                  the transmission to, or viewing by, the consumer of
                                  such programming is determined by the consumer
                                  and not the exhibitor. For the avoidance of doubt,
                                  VOD shall not include Basic TV, Free TV, Interactive
                                  Media, Home Video, Non-Theatrical Exhibition, PPD,
                                  PPV, Pay TV, Theatrical Exhibition or Video
                                  Downloading.

Page 21

## ATTACHMENT 1
## TO THE PAY TV OUTPUT LICENSE TERM SHEET

| TITLE | PPV Start Date | PPV End Date | | FIRST PAY Start Date | FIRST PAY End Date | | BACK WINDOW Start Date | BACK WINDOW End Date | |
|---|---|---|---|---|---|---|---|---|---|
| 1. SPEECHLESS | 1-Jan-97 | 31-Jun-97 | | 1-Jul-97 | 30-Jun-98 | | 1-Jul-98 | 31-Dec-98 | |
| 2. FLUKE | 1-Jan-97 | 31-Jun-97 | | 1-Jul-97 | 30-Jun-98 | | 1-Jul-98 | 31-Dec-98 | |
| 3. SON OF THE PINK PANTHER | N/A | N/A | | 1-Jan-97 | 31-Dec-97 | | 1-Jan-98 | 30-Jun-98 | |
| 4. FATAL INSTINCT | N/A | N/A | | 1-Jan-97 | 31-Dec-97 | * | 1-Jan-98 | 30-Jun-98 | * |
| 5. HACKERS | 1-Sep-97 | 28-Feb-98 | (T) | 1-Mar-98 | 28-Feb-99 | (T) | 1-Mar-99 | 31-Aug-99 | (T) |
| 6. WILD BILL | 1-Sep-97 | 28-Feb-98 | (T) | 1-Mar-98 | 28-Feb-99 | (T) | 1-Mar-99 | 31-Aug-99 | (T) |
| 7. ALL DOGS GO TO HEAVEN 2 | 1-Aug-97 | 31-Jan-98 | (T) | 1-Feb-98 | 31-Jan-99 | (T) | 1-Feb-99 | 31-Jul-99 | (T) |
| 8. FAMILY THING | 1-Aug-97 | 31-Jan-98 | (T) | 1-Feb-98 | 31-Jan-99 | (T) | 1-Feb-99 | 31-Jul-99 | (T) |
| **TV MOVIES** | | | | | | | | | |
| 1. FATAL MEMORIES | 1-Jan-97 | 30-Jun-97 | | 1-Jul-97 | 30-Jun-98 | | 1-Jul-98 | 31-Dec-98 | |
| 2. HAVE YOU SEEN MY SON? | 1-Jan-97 | 30-Jun-97 | | 1-Jul-97 | 30-Jun-98 | | 1-Jul-98 | 31-Dec-98 | |
| 3. HIT MAN, THE | 1-Jan-97 | 30-Jun-97 | | 1-Jul-97 | 30-Jun-98 | | 1-Jul-98 | 31-Dec-98 | |
| **SECOND PAY ONLY** | | | | | | | | | |
| 1. ROCKY V | N/A | N/A | | N/A | N/A | | 1-Jan-97 | 30-Jun-97 | * |
| 2. RUSH | N/A | N/A | | N/A | N/A | | 1-Jan-97 | 30-Jun-97 | * |
| 3. OF MICE AND MEN | N/A | N/A | | N/A | N/A | | 1-Jan-97 | 30-Jun-97 | * |
| 4. UNTAMED HEART | N/A | N/A | | N/A | N/A | | 1-Jan-97 | 30-Jun-97 | * |
| 5. METEOR MAN | N/A | N/A | | N/A | N/A | | 1-Jan-97 | 30-Jun-97 | * |
| 6. GETTING EVEN WITH DAD | N/A | N/A | | N/A | N/A | | 10-Feb-97 | 9-Aug-97 | * |
| 7. BLOWN AWAY | N/A | N/A | | N/A | N/A | | 8-Jun-97 | 7-Dec-97 | * |

T = Tentative dates   † = First Pay Window already taken in Belgium   * = Non-exclusive against Belgian Free TV windows

10/24/96

Annex "B"

## ANNEX "B"

### PPV OUTPUT LICENSE TERM SHEET (the "Term Sheet")

| | |
|---|---|
| 1.1 Licensee: | Télévision par Satellite, a French société en nom collectif 29, rue du Colonel Pierre Avia 75015 PARIS FRANCE |
| 1.2 Licensor : | MGM/UA Telecommunication Group, a division of Metro-Goldwyn-Mayer Inc. 2500 Broadway Street Santa Monica, CALIFORNIA 90404-3061, USA |
| 1.3 Definitions: | All Capitalized terms used herein without definition shall have the meanings ascribed to them in Annex "A". |
| 2. Territory : | France including Dom Tom (Martinique, French Guyana, Guadeloupe, Reunion, St. Pierre and Miquelon, New Caledonia, New Hebrides, Wallis and Futuna, French Polynesia, Mayotte); Andorra; and French-speaking Switzerland, French-speaking Belgium and Luxembourg. |
| 3. Exhibition Language: | French dubbed and French subtitled. |
| 4. Agreement: | Licensor hereby licenses to Licensee (and Licensee hereby accepts such license) the non-exclusive right to exhibit (in the French dubbed and French subtitled versions) each Licensed Picture (as defined in Section 8 herein below) by means of PPV in the Territory during such Licensed Picture's PPV License Period [as defined in Section 9(a) herein below] in accordance with the terms of this Term Sheet. Notwithstanding the above, Licensor shall have the right to, on a year by year basis, convert the license herein granted to be exclusive against other PPV exploitation in the Territory but only in the event that Licensor notifies Licensee of such in accordance with Section 9 herein below. The non-exclusive right to exhibit each Licensed Picture by means of PPV in the Territory during such Licensed Picture's License Period may also include the non-exclusive PPD and non-exclusive hotel PPV rights, in the event that Licensor and Licensee agree on all terms and conditions of such PPD and/or hotel PPV exploitation. For the avoidance of doubt, Licensee shall not have the right to exercise such PPD and/or hotel PPV rights until such time, if any, that Licensor and Licensee have entered into a separate written agreement with respect to the exploitation of such rights. |
| 5. Method of delivery | PPV as defined in Annex "A". |

6. Ordering Technology: Impulse and advanced reservation

| | |
|---|---|
| 7. Agreement Term: | Initial Term: 5 years, commencing as of January 1, 1997; plus: |
| | (a)  In the event Licensee (or its permitted successor or assignee) is not engaged in the distribution and/or provision of PPV programming at the end of the Initial Term other than by reason of Force Majeure and subject to Section 7(e) below, then in such situation, there will be no extension of the Initial Term and the Right of First Negotiation, Matching Right and |

Page 1

Annex "3"

Topping Right (as set forth below) shall not apply. The foregoing notwithstanding, in the event that this Term Sheet is not renewed at the end of the Initial Term because the Licensee (or its permitted successor or assignee) is not engaged in the distribution and/or provision of PPV programming pursuant to this subsection 7(a), then if at any time within six (6) months after the end of the Initial Term Licensee (or its permitted successor or assignee) is engaged in the distribution and/or provision of PPV programming in the Territory, then Licensor shall be entitled renew this Term Sheet for a term which will end the sooner of (x) the time at which Licensee ceases to operate a PPV business or (y) five (5) years, on the terms and conditions contained herein with respect thereto (an "Extended Term").

(b)    In the event Licensee (or its permitted successor or assignee) is engaged in the distribution and/or provision of PPV programming at the end of the Initial Term and Licensor has exercised its unilateral right to renew the Pay TV Output License Term Sheet pursuant to subsection 9(a) thereof or the Pay TV Output License Term Sheet has been renewed by mutual agreement pursuant to subsection 9(b)(i), then Licensor shall be required to renew this Term Sheet for an Extended Term.

(c)    In the event Licensee (or its permitted successor or assignee) is engaged in the distribution and/or provision of PPV programming at the end of the Initial Term and Licensor elects not to renew the Pay TV Output License Term Sheet pursuant to subsection 9(b)(i) of the Pay TV Output License Term Sheet, then Licensee shall be entitled to a Right of First Negotiation, Matching Right and/or Topping Right as follows:

Before Licensor enters into negotiations with a third party unaffiliated with Licensee for the license of French language PPV rights (whether for an output deal, package deal or individual title) in the Territory for what would otherwise be subject to this Term Sheet, it will first enter into negotiation of such a license with Licensee. In the event that the parties fail to agree within a period of thirty (30) calendar days, then Licensor shall be free to offer those rights to such third party. In the event that Licensor has a bona fide intent to enter into a non-exclusive arrangement with such third party for PPV rights in the Territory, Licensor shall offer Licensee the right to match the "PPV Key Terms and Conditions" of such non-exclusive arrangement. "PPV Key Terms and Conditions" shall mean the following categories of terms:  guaranteed buy rates, minimum fees per buy, actual number of subscribers, subscriber guarantees, availability dates, exhibition schedule, duration of license period, most favored nations provisions, promotional windows, term and renewals. In the event Licensor has a bona fide intent to enter into an exclusive agreement for PPV rights with a third party unaffiliated with Licensor, Licensor shall offer Licensee the right to match the PPV Key Terms and Conditions of such exclusive arrangement, provided that Licensee agrees to pay amounts equal to 110% of the monetary amounts contained in the

MGM - TPS-06-11-96.04.35   14

Annex "B"

proposed third party agreement. These rights shall be known as the Right of First Negotiation, the Matching Right and the Topping Right.

The Matching Right and the Topping Right shall be exerciseable within thirty (30) calendar days of the presentation of the relevant offer by Licensor to Licensee. The Right of First Negotiation, Matching Right and Topping right shall be in effect until the date which is one(1) year following the end of the Initial Term.

(d)  In the event Licensee is engaged in the distribution and/or provision of PPV programming at the end of the Initial Term and Licensee elects not to renew the Pay TV Output License Term Sheet pursuant to subsection 9(b)(i) of the Pay TV Output License Term Sheet, then Licensor shall have the option of renewing the Term Sheet for an Extended Term or not renew the Term; provided that, in the event Licensor has not renewed the Term Sheet but later exercises its right to renew the Pay TV Output License Term Sheet pursuant to subsection 9(e), then Licensor shall have the right to renew this Term Sheet for a further three (3) years on the financial terms and conditions with respect to the third year of the Initial Term as set forth herein.

(e)  Further, notwithstanding anything contained herein to the contrary, in the event that Licensee is the subject of a Merger during the Initial Term, regardless of whether or not such Merger concludes during the Initial Term or thereafter, with an entity or an Affiliate of an entity which is in the business of operating or Controlling any digital television platform, then Licensor shall have the right in its sole election to extend the Initial Term for an Extended Term. In the event there is an Extended Term pursuant to the provisions herein, then the terms and conditions contained in this Term Sheet shall apply for such Extended Term.

(f)  With respect to section 7(a) and 7(b) above, Licensee shall provide Licensor with written notice, no later than six months prior to the end of the Initial Term, stating whether Licensee reasonably believes it will be engaged in the distribution and/or provision of PPV at the end of the Initial Term.

(g)  The Topping Right, Right of First Negotiation and Matching Right contained in this Section 7 must be exercised jointly with the Topping Right and Right of First Refusal contained in Section 9 of the Pay TV Output License Term Sheet to the extent the relevant third party offers and agreements which are the subject of such Topping Rights, Rights of First Refusal and Matching Rights contain both Pay TV and PPV rights.

8. Licensed Pictures:    Licensed Pictures are those motion pictures for which Licensor controls the PPV rights in the Territory during such motion picture's proposed License Period hereunder; that are Current Films or TVM's under the Pay TV Output License

Page 3

Annex "B"

Term Sheet (Annex "A"); and, are made available to Licensee pursuant to Section 9 herein below.

9. Supply and Provision :

a) License Period : six (6) months from availability date for each Licensed Picture, which will be made available no later than six (6) months after Home Video release in the Territory. In general, each Licensed Picture made available by Licensor to any competing PPV service in the Territory, will be offered to Licensee at the same availability date offered to such competing PPV service.

b) Exhibitions : Unlimited number of exhibitions permitted.

c) Each calendar year, Licensor will have the option exercised by written notice to Licensee no later than three (3) months prior to the end of the preceeding calendar year to elect that all the Licensed Pictures (but not less than all), except Restricted Pictures, shall be either exclusive or non-exclusive to Licensee and shall have the corresponding License Fees apply as described herein below.    Notwithstanding the foregoing, for the initial year of the Agreement Term Licensor has elected to license to Licensee exclusive PPV rights.

d) License  Fees non Exclusive : With respect to all Films distributed on a non exclusive basis, Licensor's Share shall be fifty percent (50%).  The Guaranteed Buy Rate and Minimum Fee Per Buy shall be as follows:

| Number of French Admissions | Guaranteed Buy Rate | Minimum Fee/Buy |
|---|---|---|
| > 3,000,000 | 7.% | FF 12 |
| > 1,500,000 - 2,999,999 | 7.% | FF 12 |
| 700,000 - 1,499,999 | 5.% | FF 12 |
| 300,000 - 699,999 | 4.% | FF 10 |
| 200,000 - 299,999 | 3.% | FF 10 |
| 0 - 199,999 | 2.% | FF 10 |
| Not released theatrically in France/TVM | 1.% | FF 8 |

e) License  Fees Exclusive :  With respect to all Films distributed on an exclusive basis , Licensor's Share shall be fifty-five  percent  (55%).   The  Guaranteed Buy Rate and Minimum Fee Per Buy shall be as follows:

| Number of French Admissions | Guaranteed Buy Rate | Minimum Fee/Buy |
|---|---|---|
| > 3,000,000 | 10.% | FF 13 |
| > 1,500,000 - 2,999,999 | 8.% | FF 13 |

Page 4

Annex "B"

| | | |
|---|---|---|
| 700,000 - 1,500,000 | 7 % | FF 13 |
| 300,000 - 699,999 | 5.% | FF 11 |
| 200,000 - 299,999 | 4.% | FF 11 |
| 0 - 199,999 | 3.% | FF 11 |
| Not released theatrically in France/TVM | 1.% | FF 9 |

f) Definition of PPV License Fee Terms.

1. Licensor's Share:  shall mean a percentage of (a) the total sum of all monies paid or payable by each viewer of a Licensed Picture for each Buy of such Licensed Picture minus only (b) the sum of the V.A.T. imposed by law on such transaction and the tax imposed by law by the Cinema National Centre.

2. Guaranteed Buy Rate:  shall mean with respect to each Licensed Picture the percentage to be applied to the applicable number of   Subscribers capable of receiving Licensee's PPV service (whether guaranteed or actual) to determine the number of Buys, which percentage is guaranteed by Licensee to Licensor. A "Buy" shall mean a request by a viewer, with  an authorization by Licensee, to receive an exhibition of a Licensed Picture by means of PPV. "Actual Buy Rate" refers to the percentage derived by dividing the Actual Number of Buys by the Actual Number of Subscribers.

3. Minimum Fee Per Buy:  shall mean the minimum amount of money which Licensee shall pay Licensor with respect to each Buy.

g)  Minimum Guaranteed Number of Subscribers.  With respect to each year in which a Licensed Picture's Availability Date occurs, the Minimum Guaranteed Number of Subscribers for the purposes of calculating License Fees shall be as follows and shall be the weighted average on a per month basis over the applicable License Periods:

| | |
|---|---|
| 1997 | 400,000 |
| 1998 | 600,000 |
| 1999 | 800,000 |
| 2000 | 1,000,000 |
| 2001 and over | 1,200,000 |

h)  Calculation of License Fees.  License Fees with respect to each Licensed Picture shall be calculated as follows:

$$LF = (S) \times (B) \times (Z)$$

where:
LF - refers to the License Fee.

Page 5

Annex "B"

S - refers to the greater of the applicable Minimum Guaranteed Number of Subscribers and the Actual Number of Subscribers. A "Subscriber" shall mean any viewer capable of receiving Licensee's PPV service or portion thereof.

B - refers to the greater of the applicable Guaranteed Buy Rate and the Actual Buy Rate.

Z - refers to the greater of (i) the Licensor's Share as set forth above; and (ii) the applicable Minimum Fee Per Buy.



i) Payment of License Fee: With respect to each Licensed Picture, Licensee shall pay Licensor all License Fees no later than thirty (30) days following the last day of the License Period for such Licensed Picture.

j) VOD: In the event that: (i) Licensor is operating a VOD service in the Territory and is exhibiting its Current Films and TVM's on such VOD service; (ii) such VOD service is available to comparable numbers of subscribers as Licensee's PPV service; and (iii) the Actual Buy Rates for such TVM's and Current Films hereunder are, on average for a one (1) year period, less than fifty (50%) of what the Actual Buy Rates for TVM's and Current Films of the same License Fee categories have been prior to Licensor's operation of such VOD service, then Licensor and Licensee shall negotiate in good faith with respect to an appropriate reduction in the Guaranteed Buy Rates set forth in 9(d) and 9(e) above.

k) Increased Channels: Notwithstanding anything contained herein to the contrary, in the event that Licensee increases the number of PPV channels upon which it exhibits PPV programming in the Territory beyond the twenty-four (24) channels Licensee initially intends to use, then for each additional eight (8) channels Licensee (or its permitted assignee) makes available as part of its PPV service, the Guaranteed Buy Rates set forth in 9(d) and 9(e) above shall be increased by fifteen percent (15%) until Licensee (or its permitted assignee) has in excess of forty-eight (48) PPV channels.

l) all License Fees as provided for hereinabove are inclusive of withholding taxes, if applicable.

10. Assignment:

Licensee shall have the right, provided Licensee supplies timely written notification to Licensor, to assign its PPV rights to Multivision (or such other operational entity approved by Licensor) which shall operate the PPV service in the Territory, provided further that such entity and Licensee shall provide Licensor with documented assurances satisfactory to Licensor stating that such entity and Licensee shall continue to remain responsible for all of Licensee's obligations under this Term Sheet.

11. VOD/Video Downloading Rights:

The parties acknowledge that neither VOD nor Video Downloading (collectively "VOD/Video Downloading") rights

Page 6

Annex 3

are granted to Licensee hereunder and that such VOD/Video Downloading rights are fully reserved to Licensor. Notwithstanding the foregoing, in the event that Licensor elects to license VOD/Video Downloading rights in the Territory to an unaffiliated third party, then Licensee shall be entitled to a right of first negotiation, matching and/or topping rights as follows:

Before Licensor enters into negotiations with a third party unaffiliated with Licensor for the license of VOD/Video Downloading rights in the Territory, it will first enter into negotiations with Licensee. In the event that the parties fail to agree within a period of thirty (30) calendar days, then Licensor shall be free to offer those rights to such third party. In the event that Licensor has a bona fide intent to enter into a non-exclusive aggrangement with such third party for VOD/Video Downloading rights in the Territory, Licensor shall offer Licensee the right to match the "VOD/Video Downloading Key Terms" of such non-exclusive arrangement. "VOD/Video Downloading Key Terms" shall mean the following categories of terms: guaranteed buy rates, minimum fees per buy, actual number of subscribers, subscriber guarantees, availability dates, exhibition schedule, duration of license period, most favored nations provisions, promotional windows, term and renewals. In the event Licensor has a bona fide intent to enter into an exclusive agreement for VOD/Video Downloading rights with a third party unaffiliated with Licensor, Licensor shall offer Licensee the right to match the VOD/Video Downloading Key Terms of such exclusive arrangement, provided that Licensee agrees to pay amounts equal to 110% of the monetary amounts contained in the proposed third party agreement. The topping right and matching right described above, as applicable, shall be exercisable only within fifteen (15) calendar days of the presentation of the relevant offer by Licensor to Licensee.

12. Reporting Statement/Payment Due:

No later than sixty (60) days after the end of each calendar month, the Licensee shall send to the Licensor a monthly reporting statement. This statement shall include at least the following information: (1) the scheduled and unscheduled exhibitions, (2) the number of subscribers to such exhibition; (3) the name of each pay-per-view channel with details of the scheduling of Licensor's Films on each channel; (4) the average number of subscribers that; (5) the buy rate registered on each Licensed Picture; and (6) the retail price for each Licensed Picture. Simultaneously with the sending of the reporting statement the Licensee shall make payment.

13. Program Guides:

The Licensee shall send to Licensor a copy of all its published programming schedules or guides promptly upon availability.

14. Delivery of Technical Material:

Licensor will deliver technical materials meeting the Quality Standards at least sixty (60) days prior to the commencement of a Licensed Picture's License Period in a video digital one inch format with a French language dubbed track included.

MGM  CPS 06 11 06 04 35   14

Annex 3

Licensee shall pay all cost in connection with the importation and return of all material into and from the Territory, including duplication of materials.

Licensee agrees to protect the Licensor's control and ownership of the Licensed Pictures and all Licensor Property and materials created under this Term Sheet. The Licensee shall return the materials within thirty (30) days after the end of the license period in respect of any film.

Licensor will deliver free of charge all trailers in dubbed and subtitled versions as well as any advertising material which would be available for each Licensed Picture.

Licensor owns and can use/access any/all materials created by Licensee, including any dubbed or subtitled versions, free of any charges.

15. Promotion:

(i) Exercisable by all means (television/radio commercials, billboards, direct mail, etc.) during the license period and in case of advertising to the public thirty (30) days prior to License Period and in case of advertising to the trade sixty (60) days prior to the license period. Licensor will make all available marketing and advertising material available at no cost.

(ii) Licensee shall advertise and promote the exhibition of the License Period at least as extensively as similar films of other licensors. Such promotion shall include on-air promotion, promotion in programming guides and promotion on barker channels utilizing Licensor approved promotional material only.

(iii) The parties agree to include in the Definitive Agreement provisions relating to promotion of Licensor's Licensed Pictures including but not limited to:

> (a) Minimum numbers of promotional spots to be aired on any "barker" channel(s) and to be aired interstitially on regular pay-per-view channels;

> (b) Extraordinary co-op marketing campaign for MGM/UA pay-per-view titles;

> (c) Cross-channel support and promotional opportunities for MGM/UA pay-per-view titles; and

16. Advertising:

No advertising on the PPV channel(s) other than promotion of the Licensed Pictures or the PPV channel(s).

The Licensee agrees to protect the Licensor's control and ownership of the films and any material created under the Agreement. The Licensee shall return the materials within thirty (30) days after the end of the License Period in respect of any film.

MGM TPS-6 11 26 04 35   4

Annex "B"

| | |
|---|---|
| 16. Audit Rights: | The Licensee is to maintain complete books, returns and records relating the Licensed Pictures exhibited under the Agreement. Licensor or its international audit firm will have usual audit rights of the above information for up to two (2) years after the end of the last license period of last Licensed Picture exhibited. All costs relative to this audit right will be born by Licensor unless there is an under-reporting in excess of ten percent (10%) of the total License Fees due Licensor for the time period in question. In which case, all costs of the audit will be born by Licensee. |
| 17. Security: | The service [PPV channel(s)] will be Encrypted at all times except limited previews to be determined and approved by Licensor and promotional material. The Licensee shall, at its facility, and through its delivery system employ such effective security systems and procedures as may be reasonable and commercially feasible to prevent theft, piracy, unauthorized copying or duplication of any print or any other copy of any of the Licensed Pictures hereunder. The Licensee shall inform the Licensor about any such breach. |
| 18. Interest on Late Payments: | Three percent (3%) per year above US prime rate compounded monthly. |
| 19. Most Favored Nations: | |

(a) If Licensor has elected to license PPV rights exclusively to Licensee, and Licensee has or shall agree to Key Terms and Conditions in any agreement between Licensee or its Affiliates with any other supplier for PPV exhibition of such supplier's product on PPV Key Terms and Conditions that are more favorable (the "PPV More Favorable Terms") to such other supplier of product than the PPV Key Terms and Conditions agreed to hereunder, Licensee shall notify Licensor in writing as soon as reasonably practicable of such PPV More Favorable Terms. Licensor shall then have the option, given by written notice to Licensee within thirty (30) days of receipt of Licensee's written notice to Licensor, to cause this Agreement to be deemed amended to include any of the PPV More Favorable Terms retroactive to the date such PPV More Favorable Terms were granted by Licensee.

(b) If Licensor has elected to license PPV rights non-exclusively to Licensee and Licensee or Licensor have or shall agree to PPV Key Terms and Conditions in any agreement for the supply (with respect to Licensor) or acquisition or license (with respect to Licensee) of non-exclusive French language PPV rights in the Territory for the same time period as Licensor has elected to license non-exclusive PPV rights to Licensee hereunder on PPV Key Terms and Conditions that are more favorable (the "PPV More Favorable Terms") to such other supplier of product or broadcaster, as applicable, than the PPV Key Terms and Conditions agreed to hereunder by either Licensor or Licensee, respectively, then such party (the "Obligated Party") shall notify the other (the "Favored Party") in writing as soon as reasonably practicable of such PPV More Favorable

MGM-TPS-0    06-04-35    4

Annex "B"

Terms. The Favored Party shall then have the option, given by written notice to the Obligated Party within thirty (30) days of receipt of the Obligated Party's written notice, to cause this Agreement to be deemed amended to include any of the PPV More Favorable Terms retroactive to the date such PPV More Favorable Terms were granted by the Obligated Party.

20. Cross-Default:

In the event that either party (the "Non-breaching Party") is entitled to terminate this Term Sheet due to one (1) or more material breaches of this Term Sheet by the other party (the "Breaching Party") which, despite written notice to the Breaching Party and a cure period of at least thirty (30) days, have gone uncured, then, among other remedies, the Non-breaching Party shall be entitled to terminate the Pay TV Output License Term Sheet as well as this Term Sheet.

MGM TPS - 6 11 96 04 35   04

Annex "C"

**ANNEX "C"**

**MGM GOLD BLOCK LICENSE TERM SHEET (the "Term Sheet")**

| | |
|---|---|
| 1. Licensee: | Télévision par Satellite, a French société en nom collectif 29, rue du Colonel Pierre Avia 75015 PARIS FRANCE |
| 2. Licensor: | Metro-Goldwyn-Mayer Inc. 2500 Broadway Street Santa Monica, CALIFORNIA 90404-3061. USA (or such other Affiliate of Metro-Goldwyn-Mayer Inc. as Licensor may designate) |
| 3. Definitions: | Capitalized terms used herein without definition shall have the meanings ascribed to them in Annex "A" - Pay TV Output License Term Sheet. |
| 4. Rights: | Licensor, or its affiliate, shall grant, and Licensee undertakes to license exclusive Pay TV rights to the French language MGM Gold Block (as defined below) in the Territory (with the exception of satellite rights in the Dom Tom which shall be non-exclusive) under the terms hereof during the Term to residential subscribers and subscribers in Non-Residential Establishments. |
| | This License shall become effective at the first election of Licensor. |
| 5. MGM Gold Block: | The MGM Gold Block refers collectively to the following elements: Each Block A shall be approximately three and one-half (3 1/2) hours long beginning its first run at 8:30 p.m. on a weekday night to be agreed upon by the parties of each and every week of the Term on the Flanker Channel. Each Block B shall be approximately two (2) hours long and shall begin at 7:00 p.m. on each and every Sunday night of each week of the year on the Flanker Channel. Each Block A shall consist of one (1) Library Film and up to ninety (90) minutes of television programming (e.g., a television movie or one hour format television series episode), MGM interstitial programming and MGM Gold branding (e.g., movie opens, etc.) ("MGM Gold Branding"). Each Block B shall consist of one (1) Library Film and MGM interstitial programming and MGM Gold Branding. Notwithstanding anything to the contrary contained herein, Licensor shall only be required to supply fifty (50) Block A's and fifty (50) Block B's per year. Each Block A and B shall, at TPS's option repeat one time in the following week in a time slot at Licensee's sole discretion and at no additional cost, provided however that if Licensee elects to repeat each such blocks during the week following their initial broadcast, they shall not be repeated during night time (i.e. between 2:00am and 6:00am). |
| 6) Programming: | Licensee shall be consulted with respect to the so-called "look" of the MGM Gold Branding and all decisions shall be made jointly between Licensor and Licensee with respect to the programming and the selection of the Library Films, TV Movies and TV Series (collectively "Programming") that will be part of the MGM Gold Block. The procedure for consultation and joint decision shall be decided and established in good faith in the relevant Definitive Agreement. The terms of the license of the Library Films that will play in the MGM Gold Blocks are set forth in Annex "A" to the extent that they are not |

Annex "C"

otherwise modified herein (i.e., the Library Films will, after their initial exhibition on the MGM Gold Block, continue to be under license to Licensee who may exploit its rights set forth in Annex A with respect to such Library Films). The foregoing notwithstanding, Licensee agrees that all Library Films exhibited on the MGM Gold Block shall be subject to a one (1) month dark period after their last exhibition in the MGM Gold Block and shall not be exhibited on any of the Channels during that time.

7. Territory:

France including Dom Tom (Martinique, French Guyana, Guadeloupe, Reunion, St. Pierre and Miquelon, New Caledonia, New Hebrides, Wallis and Futuna, French Polynesia, Mayotte); Andorra; and French-speaking Switzerland Belgium and Luxembourg.

8. Number of Subscribers:

For purposes of calculating the number of subscribers, the number of subscribers in Non-Residential Establishments shall be counted as sixty-five percent (65%) of maximum occupancy of such Non-Residential Establishments. In all other instances, the number of subscribers shall be counted on a per authorized decoder box basis.

9. Agreement Term:

Co-terminus with the Annex "A" - Pay TV Output License Term Sheet.

10. License Fees:

The License Fees for the Library Films are set forth in Annex "A". The License Fees for the television programming shall be 25,000 FF per hour episode/TV Movie. The License Fee for the MGM Gold Branding shall be 10,000 FF for each Block A and 10,000 FF for each Block B; provided that, at such time as Licensee has reached two hundred thousand (200,000) subscribers, Licensee shall pay an additional 1.25 FF per subscriber fee per month for each and every subscriber exceeding two hundred thousand (200,000) subscribers, and further provided that at the time the nominal subscriber price to the Cinestar service shall reach a cumulative increase of more than 15% as compared to the nominal subscriber price at the time of the launch of Licensee's Digital Platform, then the per subscriber fee hereinabove shall also increase by the same factor.

11. Materials

Licensor shall provide Licensee with a program log setting forth the exact scheduling of each element of each Block at the same time as it delivers the materials with respect to such Block. All elements of the blocks will, as appropriate be subtitled or dubbed in the French language. All materials will be delivered in a digital format to be agreed upon by the parties and shall in all other respects be delivered pursuant to the Quality Standards.

12. Marketing:

Licensee shall make all reasonable efforts to promote the MGM Gold Block on the other channels it offers which it controls and where it promotes the Cinestar channels, and shall promote the MGM Gold Block on the Cinestar Channels and on any barker or promotional channels where it promotes the Cinestar channels.

13. Channel Put:

At such time that Licensee's Channels have reached three hundred thousand (300,000) subscribers, Licensor shall have the right to convert the MGM Gold Block into a stand-alone MGM Gold Channel which Licensee shall provide as part of its Digital Platform to consumers on the following terms and conditions, amongst others to

TPS MGM-06-13-06 03 50 01

Annex "C"

be agreed upon at such time: (i) most favored nations on carriage fees and other key terms with respect to similar channels; (ii) exclusive carriage at Licensor's option, including minimum subscriber guarantees, provided that Licensee shall, at all times have a first refusal and a 110% topping right for the exclusive carriage in the Territory the MGM Gold program or channel originating from Licensor or its Affiliates, and matching right with respect to non-exclusive carriage of the same; and (iii) assistance and cooperation of Licensee in causing MGM Gold to meet European and French content restrictions.

TPS/MGM/06/11/96/03/56/01

Annex "D"

# ANNEX "D"

## EQUITY OPTION TERM SHEET:

1. Parties

1.1 Grantor:

Télévision par Satellite, a French société en nom collectif 29, rue du Colonel Pierre Avia 75015 PARIS FRANCE ("TPS")

1.2 Grantee :

Metro-Goldwyn-Mayer Inc. (or its designated Affiliate) ("MGM")

2. Definitions:

(a) All capitalized terms used herein without definition shall have the meanings ascribed to them in Annex "A" - Pay TV Output License Agreement.

(b) "Cost" shall mean with respect to each of the Digital Platform, the Pay Entity or the PPV Entity (as set forth below), the pro rata share of the total of all shareholder contributions in the form of cash or property net of all returns in the form of shareholder distributions (whether cash or property) plus interest on a pro rata basis at PIBOR (as determined by Banque Nationale de Paris) plus seventy five (75) basis points.

(e) "equity" shall mean with respect to each of the Digital Platform, the Pay Entity or the PPV Entity (as set forth below), any equity, direct or indirect participation or other ownership interest, including capital stock, partnership or trust interest and any option or right (including by way of a convertible or exchangeable security or warrant) to acquire such equity.

2. Representations :

TPS (and its shareholders) represent and warrant:

(a) that with respect to the supply of Pay TV programming to consumers and PPV programming to consumers in the Territory (the "Pay Business" and the "PPV Business", respectively), TPS (and/or the Digital Platform) shall operate and organize its Pay Business and PPV Business into separate corporate entities through which it shall exclusively operate the Pay Business and the PPV Business (the "Pay Entity" and the "PPV Entity", respectively) and that such Entities shall not convey, dispose or license the the assets of the Pay Business or PPV Business to any other entity except as expressly provided for in the Pay TV Output License Term Sheet and PPV Output License Term Sheet;

(b) that TPS (and/or the Digital Platform) is or has and the Pay Entity and PPV Entity shall be or shall have: (i) duly constituted and validly existing under the laws of France; (ii) all requisite power and authority, including, without limitation, corporate and shareholder authority, to enter into this Term Sheet and to consummate the transactions contemplated herein;

(c) that neither the shareholders of TPS (and/or the Digital Platform), and the shareholders of the Pay Entity and PPV Entity when organized, nor any Affiliates thereof, shall make any loans to (or engage in any other transactions with) any of TPS (and/or the Digital Platform), the Pay Entity and/or the PPV Entity other than loans whose interest rate and re-payment or other terms do not

Page

Annex "D"

substantially vary from the best rate or terms TPS (and/or the Digital Platform), the Pay Entity and/or the PPV Entity, all as applicable, can obtain from an unrelated third party (i.e., a bank, other lending institution or other unrelated third party);

(d) that, should there be a merger, consolidation, sale of business, sale of greater than fifty percent (50%) of the assets or equity of TPS, the Pay Entity and/or the PPV Entity or a reorganization of any kind of TPS (and/or the Digital Platform), the Pay Entity and/or the PPV Entity MGM shall be informed of such an event no later than any other Major Studio, and in any event no later than fifteen (15) days following the occurrence of the relevant event, provided that such information of MGM shall include the key financial terms of the transaction and shall advise MGM of any changes in the equity ownership of TPS, the Pay Entity and/or the PPV Entity or of such merged entity as a result thereto ;

(e) that the equity option granted to MGM in Section 3 and the financial terms of the equity option granted to MGM in Section 4 hereunder are no less favorable to MGM than any other equity options granted to any of the Major Studios ; and

(f) within 30 calendar days following each triggering event under the present Option, TPS shall provide written notice to MGM of such triggering event, which shall include a summary of the terms and conditions of such Triggering Event (the "Triggering Notice"). TPS shall, within 21 calendar days after MGM's request therefor, assemble a data room in Paris that includes copies of all the relevant documents containing the terms and conditions of the grant or other conveyance giving rise to such triggering event (including shareholder and similar agreements). MGM and its advisors shall then have 45 calendar days in which it may review the documents included in such data room. TPS will cooperate with MGM in connection with such review and will respond promptly to reasonable requests for additional information. MGM may, within 60 days of its receipt of the Triggering Notice, elect to acquire the applicable amount of Option Equity on the same terms and conditions as the triggering entity, taking into account and based upon such triggering entity's and MGM's proportional interest in the relevant Option Equity. The closing of the acquisition by MGM of any Option Equity shall take place on a date specified by TPS (and in any event such closing will have to take place within 60 days after its receipt of the Triggering Notice).

MGM represents and warrants (also in the name of its relevant Affiliates) that,

(x) should it exercise any of the options granted to it under the present term sheet, it shall upon such exercise adhere to any relevant shareholders agreement to which the Current Shareholders are bound at the time of exercise of any of the options hereunder, provided that MGM shall have the right to withdraw from the exercise of its option, should the terms of such relevant shareholders agreement(s) not be reasonably acceptable to MGM, and provided that MGM shall not be bound by provisions which are dispropor-tionately detrimental to it, and more generally to any shareholders

II
Page

Annex D

other than the Current Shareholders, without prejudice however, to certain specific priority preemptive rights which the Current Shareholders may have granted to themselves.

(y) should MGM or an Affiliate of MGM, further to or following the exercise any of the options granted to it under the present term sheet, decide to make a bona fide sale of its equity position in any of the relevant entities, it shall, prior to the consumation of any such transaction, give to all the then Current Shareholders an irrevocable last refusal right to purchase such equity on a matching basis, which such Current Shareholders shall be entitled to exercise in proportion to their then respective shareholding in any of the relevant entities, provided that MGM is granted the same preemptive rights as the Current Shareholders vis a vis shareholders other than the Current Shareholders, without prejudice however, to certain specific priority preemptive rights which the Current Shareholders may have granted to themselves.

3. Pay Entity Option :





INITIAL

TPS hereby grants to MGM the exclusive option (the "Pay Option") exerciseable no later than twenty four (24) calendar months from January 1, 1997 to purchase a fifteen percent (15%) fully-diluted equity interest in the Pay Entity (the "Pay Entity Equity") with the same designation, preference and other rights as the equity held by the Current Shareholders other than the specific preemptive rights among the Current Shareholders. In the event MGM has exercised its Pay Option, MGM shall have the right to subscribe on an equal and non-discriminatory basis for shares in all future issuances of equity (other than reserved equity issuances of equity made in conformance with applicable law governing such reserved equity issuances) in order to maintain its fifteen percent (15%) fully-diluted equity proportion. Notwithstanding the foregoing, in the event the total equity held by Major Studios in the Pay Entity would exceed forty percent (40%), then if required by TPS, MGM undertakes, at TPS first demand, to sell a portion of its equity in the Pay-Entity at Cost from the date of the exercise of the relevant option on a pro rata basis with any other Major Studio shareholders such that the total of all equity held by Major Studios is equal to forty percent (40%) of the total Pay Entity Equity and each Major Studio holds an equal percentage of Pay Entity Equity; provided that, in no event shall MGM be held required to sell equity such that it will hold less than ten percent (10%) of the fully-diluted equity of the Pay Entity.

4. PPV Entity:





INITIAL

TPS hereby grants to MGM the exclusive option (the "PPV Option") exerciseable no later than twenty four (24) calendar months from January 1, 1997 to purchase a fifteen percent (15%) fully-diluted equity interest in the Pay Entity (the "PPV Equity") with the same designation, preference and other rights as the equity held by the Current Shareholders other than the specific preemptive rights among the Current Shareholders. In the event MGM has exercised its PPV Option, MGM shall have the right to subscribe on an equal and non-discriminatory basis for shares in all future issuances of equity (other than reserved equity issuances of equity made in conformance with applicable law governing such reserved equity issuances) in order to maintain its fifteen percent (15%) fully-diluted equity proportion. Notwithstanding the foregoing, in the event the total equity held by Major Studios in the PPV Entity would exceed

III
Page

Annex "D"

forty percent (40%), then if required by TPS, MGM undertakes, at TPS first demand, to sell a portion of its equity in the PPV Entity at Cost from the date of the exercise of the relevant option on a pro rata basis with any other Major Studio shareholders such that the total of all equity held by Major Studios is equal to forty percent (40%) of the total PPV Entity Equity and each Major Studio holds an equal percentage of PPV Entity Equity; provided that, in no event shall MGM be required to sell equity such that it will hold less than ten percent (10%) of the fully-diluted equity of the PPV Entity.

5. Digital Platform Option :

If equity in the Digital Platform is offered by the Current Shareholders to a Major Studio or any Affiliate of a Major Studio, then MGM will be offered a five percent (5%) fully-diluted equity interest (the "Platform Option") in the Digital Platform - with the same designation, preferences and other rights as the equity held by the in the Current Shareholders other than the specific preemptive rights among the Current Shareholders - on other terms no less favorable than those offered to any other Major Studio(s); provided that, in no event shall the cost of the equity exceed the price paid by any such other Major Studio for acquiring equity in the Digital Platform. In the event MGM has exercised its Platform Option, MGM shall have the right to subscribe on an equal and non-discriminatory basis for shares in all future issuances of equity (other than reserved issuances of equity made in conformance with applicable law governing such reserved issuances) in order to maintain its five percent (5%) fully-diluted equity proportion.

6. Tag-Along

In the event that MGM becomes a shareholder of the Pay Entity, the PPV Entity and/or the Digital Platform Entity pursuant to the present option, and any of the Current Shareholders proposes thereafter to sell to an unaffiliated third party, and as a result of such sale(s) the current shareholders cease to directly or indirectly own more than 50% of the Pay Entity, the PPV Entity and/or the Digital Platform Equity, then such Current Shareholder(s) shall promptly notify MGM and shall be obligated, prior to the consumation of such a sale, to offer MGM to sell all of its shares in the relevant entity(ies) on same terms and conditions on a per share basis as those offered to the Current Shareholder(s), provided that if it then elects to sell its shares, MGM shall be obligated to effectuate such a sale within the same time frame as the Current Shareholders.

7. Structure of the entities

Each of the PPV Entity, the Pay-Entity and the Digital Platform shall be controlled by the same shareholders as in TPS. In the event that any of such above referred entities are organized as wholly-owned subsidiaries of TPS, all the options pursuant to this term sheet shall be granted and performed by TPS with respect to equity of the relevant entity owned by TPS and all references herein to the "Current Shareholders" shall refer to TPS. In the event that such above referred entities are not initially organized as wholly-owned subsidiaries of TPS, each of TPS and the Current Shareholders shall undertake to cause such entity to reserve and/or issue such option equity in the event that the relevant option is duly exercised by MGM, and all references herein to "Current Shareholders" with respect to such equity shall refer to the initial shareholders of such entity.

IV
Page

Annex "D"

8. Choice of Law:     The Definitive Agreement (as defined in the Agreement to which this Term Sheet is attached) the subject of which is this Term Sheet shall be governed by the laws of France and once entered into, the parties thereto shall agree to submit to the non-exclusive jurisdiction of the Courts of France.

V
Page

MGM - TPS 06.11.96 04.29.03

Annex "E"

Form of Current Shareholders Guarantee

## GUARANTEE

This Guarantee is entered into as of _____, 1996, by [    ], a French société anonyme ("Guarantor"), in favor of [    ], [    ]. For valuable consideration, the receipt, value and adequacy of which Guarantor hereby acknowledges, Guarantor hereby agrees as follows, and for valuable consideration, the receipt, value and adequacy of which Beneficiary hereby acknowledges, Beneficiary hereby agrees as follows:

1.    Concurrently herewith, Beneficiary (as Licensor) and TPS s.n.c., a French société en nom collectif, as Licensee ("TPS"), are entering into that certain TPS Overall Agreement, dated as of _____, 1996, pursuant to the terms of which, *inter alia*, Beneficiary has agreed to license to TPS certain films and television programming for exhibition in the Territory (as defined in the Agreement) and TPS has agreed to make certain payments to Beneficiary. As used in this Guarantee, the term "Agreement" means the TPS Overall Agreement and all its Exhibits (including, without limitation, [    ] as such TPS Overall Agreement and its exhibits may be amended, supplemented, restated or otherwise modified from time to time and the term "Licensee" means Licensee (as defined in the Agreement).

2.    Guarantor has been instrumental in organizing TPS and beneficially* owns approximately [    ] of the capital stock of TPS. Guarantor is fully familiar with the financial condition, operations, properties and prospects of TPS. Guarantor also participated in the preparation and negotiation of, and is fully familiar with, the terms and conditions of the Agreement. It is a condition precedent to Beneficiary's execution and delivery of the Agreement that Guarantor execute and deliver this Guarantee.

3.    Guarantor hereby irrevocably guarantees the punctual and complete payment when due of all License Fees (as defined in the Agreement) and other amounts due, and the performance of all other obligations, agreements, covenants, representations and warranties of Licensee now or hereafter existing under the Agreement including, without limitation, [    ] thereunder, and all of Licensee's other payment obligations thereunder (the "Guaranteed Obligations"), and hereby agrees to indemnify Beneficiary from any damages or losses it may sustain by reason of any failure of Licensee to perform any of the Guaranteed Obligations; provided, however, that the liability of the Guarantor hereunder for payment of the Guaranteed Obligations shall not exceed [    ] percent (the "Guaranteed Percentage") of the total of the amounts of the Guaranteed Obligations which are not paid when due from time to time by the Licensee (the "Guaranteed Amount"), each such Guaranteed Amount being determined at the time such total first becomes due by Licensee without giving effect to any subsequent payment or reduction thereof other than a payment by the Licensee in performance of the Guaranteed Obligations or a payment hereunder by Guarantor ; provided that, any such subsequent payment by the Licensee shall reduce such Guaranteed Amount by an amount equal to the Guaranteed Percentage of such payment ; and provided further that the Guaranteed Amount so reduced (whether by such payment by Licensee or by payment hereunder by Guarantor) shall thereafter apply to the unpaid balance of the total of the amounts due by Licensee which was initially the object of the call on the present Guarantee. The Guarantor also agrees to pay any and all expenses (including counsel fees and expenses) incurred by the Beneficiary in enforcing any rights under this Guarantee upon presentation of supporting evidence therefor.

4.    To the extent the Guaranteed Obligations require the payment of money ("Payment Obligations"), this Guarantee constitutes a guarantee of payment when due and not merely of collection, and is not conditioned upon any attempt to collect from Licensee or any other party.

---

Note that the concept of beneficial ownership does not exist in French law - this in respect of Guarantors which are not direct Shareholders of TPS.

Payment by Guarantor pursuant to this Guarantee of any amount owed by reason of the Guaranteed Obligations shall be due and payable (a) in the case of a default by Licensee of its Payment Obligations, upon notice given by the Beneficiary to the Guarantor of Licensee's failure to pay the amount of such Payment Obligations pursuant to the terms of the Agreement, and (b) in the case of any other default by Licensee, upon a determination by a court of competent jurisdiction (whether or not such determination is subject to appeal) that Beneficiary is entitled to the payment of monetary damages or other losses (a "Judgment") and Licensee's failure to pay the amount of such Judgment within 30 days after receipt of notice of such Judgment. If a court of competent jurisdiction determines in a final nonappealable judgment that any amounts paid by Guarantor hereunder were not due and owing, Beneficiary shall promptly repay such amounts to the Guarantor.

All payments by Guarantor hereunder shall be made in U.S. Dollars. If for the purposes of obtaining judgment in any court it is necessary to convert a sum due hereunder in U.S. Dollars into another currency the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures Beneficiary could purchase U.S. Dollars with such other currency at New York, New York on the Business Day preceding that on which final judgment is given. The obligation of Guarantor in respect of any sum due Beneficiary hereunder shall, notwithstanding any judgment in a currency other than U.S. Dollars, be discharged only to the extent that on the Business Day following receipt by Beneficiary of any sum adjudged to be so due in such other currency Beneficiary may in accordance with normal banking procedures purchase U.S. Dollars with such other currency; if the U.S. Dollars so purchased are less than the sum originally due to Beneficiary in U.S. Dollars, Guarantor agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Beneficiary against such loss, and if the U.S. Dollars so purchased exceed the sum originally due to Beneficiary in U.S. Dollars, Beneficiary agrees to remit to Guarantor such excess.

5.      Without prejudice to the right of the Guarantor to invoke any defenses to payment arising from the Agreement, including any acts or omissions of the Beneficiary in connection with performance of the Agreement, the obligations of Guarantor under this Guarantee are independent of the Guaranteed Obligations. A separate action or actions may be brought to enforce this Guarantee, irrespective of whether any action is brought against Licensee or whether the Licensee is joined in any such action or actions. If Licensee fails to perform any of the Guaranteed Obligations, Beneficiary may take such action as it deems appropriate, either legal or equitable, and in connection therewith name Guarantor as a party in any such action.

6.      The liability of Guarantor hereunder shall be absolute, unconditional (except as expressly set forth herein), irrevocable and continuing irrespective of, and the Guarantor agrees that as between the Guarantor and Beneficiary, the Guarantor hereby assumes any and all risk of any of the following: (a) any lack of validity or enforceability of the Agreement or any other agreement or instrument relating thereto (including, without limitation, due to the existence of a bankruptcy, reorganization or similar proceeding involving the Licensee), (b) any modification, amendment or waiver of or any consent to depart from the Agreement or any other agreement or instrument relating thereto, and (c) any other change, merger, restructuring or termination of the corporate or partnership structure or existence of the Licensee (including, without limitation, any dissolution, reorganization, conversion to a société anonyme or other restructuring (whether or not retroactive) of Licensee, and any addition, substitution or withdrawal of any partner or shareholder of Licensee, in the case of each of (a), (b) and (c) whether as a result of regulatory action, by operation of law or otherwise. This Guarantee shall continue to be effective or be reinstated, as the case may be, if any payment of any of the Guaranteed Obligations is rescinded or otherwise must be returned upon any insolvency, bankruptcy, reorganization or similar event. Guarantor hereby agrees that it shall not be released from any of its obligations hereunder by any act or circumstance whatsoever which might be deemed a legal or equitable discharge, release, defense or basis for claim of exoneration of a guarantor or surety, including, without limitation, any change in the time, manner or place of payment of, or in any other term of, the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from the Agreement, or any taking, release, amendment or waiver of or consent to departure from any other guaranty of all or any of the Guaranteed Obligations. Except as specifically set forth herein, Guarantor hereby waives any and all notices that may be required by law or otherwise, including diligence, notice of acceptance

and any other notice with respect to the Guaranteed Obligations and this Guarantee, and waives any requirement that Beneficiary give any notice or exercise or exhaust any right, power or remedy otherwise available to Beneficiary before enforcing its rights hereunder. The Guarantor acknowledges that it will receive substantive direct and indirect benefits from the arrangements contemplated by the Agreement and that the waivers and agreements of Guarantor set forth in this Section 6 are knowingly made in contemplation of such benefits.

7.    Each payment payable by Guarantor to Beneficiary hereunder shall be made without any set-off or counterclaim and free and clear of (and without deduction for any taxes or withholdings of any kind), except that, if Guarantor is compelled to make any such deduction for any taxes or withholding of any kind, then Guarantor shall pay to Beneficiary such additional amount, if any, as shall be necessary to result in the same net payment to Beneficiary as would have been due from Licensee pursuant to the Agreement if Licensee were making such payment.

8.    Guarantor hereby represents and warrants to Beneficiary that it has the full right, power, authority and approval (including approval by its board of directors or other governing body) required to enter into, execute and deliver this Guarantee and to perform fully its obligations hereunder, that it has heretofore provided Beneficiary with a true and accurate copy of the board resolution approving this Guarantee, that this Guarantee has been duly executed and delivered by Guarantor, and that this Guarantee constitutes the valid and binding obligation of Guarantor, enforceable in accordance with its terms. There are no conditions precedent to the effectiveness of this Guarantee that have not been satisfied or waived. Guarantor hereby represents, warrants and covenants (a) that, even if and/or to the extent that it is a governmental entity or government sponsored entity, neither it or any of its successors, substitutes and/or assigns has or hereafter shall have or acquire any right of immunity as against Beneficiary or its successors, substitutes and/or assigns, whether characterized as sovereign immunity or otherwise, from any legal proceedings, whether in the United States, France or elsewhere, to enforce or collect upon this Guarantee (or any part hereof) or any other liability or obligation of it related to or arising from the transactions contemplated by the Agreement, the Related Agreements or the Parent Guarantees (as defined in the Agreement), including without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment in aid of execution upon a judgment, and (b) that to the extent that it or any of its successors, substitutes and/or assigns has or hereafter shall have or acquire any such right of immunity, it hereby expressly and irrevocably waives (or if acquired in the future shall waive) any such immunity.

9.    This Guarantee shall be governed by the laws of the State of New York with the same force and effect as if fully executed and to be fully performed therein. Guarantor submits to the exclusive jurisdiction of any New York state court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, with respect to any action or proceeding based upon or resulting from this Guarantee. Guarantor expressly waives the provisions of Article 14 of the French Civil Code and Article 48 of the French New Code of Civil Procedure.

10.    By execution and delivery of this Agreement, Guarantor accepts for itself and in connection with its assets, generally and unconditionally, the exclusive jurisdiction of the courts referred to in Paragraph 9 hereof, agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Guarantee and agrees that any such judgment shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Guarantor waives, to the fullest extent it may do so, any objection to venue and the defense of an inconvenient forum. Nothing in this Guarantee shall affect any right that Beneficiary may otherwise have to bring any action or proceeding relating to this Guarantee in the courts of any jurisdiction. Service of all process in any such proceedings in any court (if delivered or mailed in accordance with the provisions of Paragraph 11 hereof and, if mailed, mailed with return receipt requested) is hereby acknowledged by Guarantor to be effective and binding service of process upon Guarantor in every respect. A copy of any such process so served shall be mailed by registered mail, return receipt requested, to Guarantor at any address or addresses designated by it in Paragraph 12 hereof.

- 3 -

11.    By execution and delivery of this Agreement, Beneficiary accepts for itself and in conne
with its assets, generally and unconditionally, the nonexclusive jurisdiction of the courts referred
Paragraph 9 hereof, agrees that all claims in respect of any such action or proceeding may be heard
determined in any such New York State court or, to the extent permitted by law, in such federal c
irrevocably agrees to be bound by any judgment rendered therey, in connection with this Guara
and agrees that any such judgment shall be conclusive and may be enforced in other jurisdiction
suit on the judgment or in any other manner provided by law. Beneficiary waives, to the fullest ex
it may do so, any objection to venue and the defense of an inconvenient forum. Nothing in
Guarantee shall affect any right that any party may otherwise have to bring any action or procee
relating to this Guarantee in the courts of any jurisdiction. Service of all process in any
proceedings in any court (if delivered or mailed in accordance with the provisions of Paragrap
hereof and, if mailed, mailed with return receipt requested) is hereby acknowledged by Beneficia
be effective and binding service of process upon Beneficiary in every respect. A copy of any
process so served shall be mailed by registered mail, return receipt requested, to Beneficiary at
address or addresses designated by it in Paragraph 12 hereof.

12.    Any notice hereunder, and any service of process under Paragraph 10 hereof, shall
writing in the English language and shall be deemed given on the first to occur of the following:
the date it is delivered (or if that date is not a day on which commercial banks are open for busine
the city specified in the address for a notice provided by the recipient (a "Local Business Day"),
delivered after the close of business on a Local Business Day, on the first following day that is a L
Business Day) when delivered personally against receipt, or (ii) on the second Local Business
after being sent by overnight courier, or (iii) on the day when transmittal confirmation is receiv
sent by telecopy (or if that day is not a Local Business Day, or if after the close of business on a L
Business Day, on the first following day that is a Local Business Day), provided that a copy of
notice is concurrently delivered personally against receipt or sent by overnight courier, or (iv) on
third Local Business Day after the date mailed (if the recipient's address for notice is in the
country as the place of mailing, otherwise, on the seventh Local Business Day after the date mailed
registered or certified, first class mail (air mail, if overseas) to the parties at the following addresse
to such other addresses as a party may have specified by notice given to the other parties h
pursuant to this provision) :

        To:


        Attention:
        Facsimile:

        with a courtesy copy to:



        To:


        with a courtesy copy to:



13.    No amendment or waiver of any provision of this Guarantee and no consent to any depa
by the Guarantor therefrom shall in any event be effective unless the same shall be in writing
signed by the Beneficiary, and then such waiver or consent shall be effective only in the sp
instance and for the specific purpose for which given.  No failure on the part of the Beneficia
exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor
any single or partial exercise of any right hereunder preclude any other or further exercise there
the exercise of any other right.  The remedies provided herein are cumulative and not exclusive
remedies provided by law.  This Guarantee shall be binding upon the Guarantor, its succe

- 4 -

assigns and shall inure to the benefit of Beneficiary, its successors, transferees and assigns. This Guarantee is personal to Beneficiary, and cannot be assigned without the prior written consent of Guarantor, provided that such consent shall not be unreasonably withheld.

IN WITNESS WHEREOF, the undersigned have duly executed and delivered this Guarantee as of _____, 1996.

a French société anonyme

By: _____

Its: _____

Accepted and agreed to:

By: _____

Its: _____

- 5 -