# EXHIBIT # 2



# AMENDMENT TO AGREEMENT

This Amendment to Agreement ("Amendment") is between Metro-Goldwyn-Mayer Studios Inc. (formerly Metro-Goldwyn-Mayer Inc.) ("MGM"), and Télévision par Satellite ("TPS") and is dated as of July 9, 1999 ("Effective Date"). Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the "Agreement" (as defined below).

WHEREAS:

A. TPS and Metro-Goldwyn-Mayer Inc. entered into that certain agreement, dated as of November 15, 1996, which consists of the following: (i) an overall agreement ("Overall Agreement"); (ii) Annex "A" to the Overall Agreement consisting of a "Pay TV Output License Term Sheet" ("Annex A"); (iii) Annex "B" to the Overall Agreement consisting of a "PPV Output License Term Sheet" ("Annex B"); (iv) Annex "C" to the Overall Agreement consisting of a "MGM Gold Block License Term Sheet" ("Annex C"); (v) Annex "D" to the Overall Agreement consisting of an "Equity Option Term Sheet" ("Annex D"); and (vi) Annex "E" to the Overall Agreement consisting of a "Form of Current Shareholders Guarantee" ("Annex E");

B. TPS and MGM have entered into certain letter agreements (collectively referred to herein as the "Equity Option Extensions"), whereby the time period in which MGM is entitled to exercise the Pay Option, the PPV Option and/or the Platform Option set forth in Annex D has been extended (the foregoing Overall Agreement and Annex A-Annex E thereto, and the Equity Option Extensions, shall be collectively referred to herein as the "Agreement"); and

C. MGM and TPS now wish to amend the Agreement on the terms hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, MGM and TPS hereby agree to amend the Agreement as set forth below.

## I. AMENDMENTS TO ANNEX A

1. **Term:** Notwithstanding anything to the contrary in Paragraph 9(b) and Paragraph 9(h) of Annex A, the terms of which are deemed to have been satisfied by the parties, the Initial Term set forth at Paragraph 9 of Annex A shall be extended for an additional period of five (5) Years, commencing immediately upon expiration of Annex A (*i.e.*, January 1, 2002), and ending on December 31, 2006 ("Extended Term"), as set forth below:

| | |
|---|---|
| Year 1 | Expiration of Annex A – 31 December 2002 |
| Year 2 | 1 January 2003 – 31 December 2003 |
| Year 3 | 1 January 2004 – 31 December 2004 |
| Year 4 | 1 January 2005 – 31 December 2005 |
| Year 5 | 1 January 2006 – 31 December 2006 |

1

2. **Merger/Merger Extension:**

(a) In the event (and only in such event) of a Merger, consolidation, or reorganization between TPS and Canal + which results in a unified holding, whether direct or indirect, in the hands of a single entity or group of shareholders, of the premium Pay TV service of Canal + (presently consisting of the channel known as Canal + and its satellite and/or cable multiplexes Canal + Bleu, Canal + Jaune, Canal + Vert, and/or any other multiplexes thereof existing at the time of such Merger, consolidation or reorganization) ("Canal + Pay Service") and the Premium Pay TV Service of TPS presently known as TPS Cinema (presently consisting of the channels CINETOILE, CINESTAR, and CINEFAZ), and/or any multiplexes thereof existing at the time of such Merger, consolidation or reorganization ("TPS Cinema"), MGM shall have the right to extend the Term of Annex A for an additional five (5) Years beyond the Extended Term thereof ("Pay Merger Extension"). The number of Minimum Guaranteed Subscribers during such Pay Merger Extension shall be equal to the Minimum Guaranteed Subscribers for Year 5 of the Extended Term plus ten percent (10%).

(b) In the event of such a Merger, consolidation, or reorganization between TPS and Canal +, the obligations of TPS shall continue in full force and effect; provided, however, that if (i) any Licensed Pictures are exhibited on the Canal + Pay Service or (ii) any theatrical motion pictures from another Major Studio are exhibited on TPS Cinema, the calculation of Subscribers for purposes of determining the License Fee under paragraphs 12 and 13 of Annex A shall apply to the greater of (i) the total number of Subscribers on TPS Cinema and the Canal + Pay Service (minus the number of common subscribers), or (ii) the Minimum Guaranteed Subscribers specified in paragraph I.4 below.

3. **Territory:** As of the Effective Date, the Territory set forth at Paragraph 3 of Annex A shall remain as set forth therein, except that Mauritius, the Comoros Islands, and Madagascar shall be added to the Territory on a non-exclusive basis (*i.e.*, MGM shall be entitled to license any Licensed Picture[s] to third parties on any form of television during the Pay TV License Period for such Licensed Picture[s] in Mauritius, the Comoros Islands, and Madagascar).

4. **Minimum Subscriber Guarantees/Extended Term:** The Minimum Subscriber Guarantees for the Extended Term shall be as follows:

| Year | Minimum Guaranteed Subscribers |
|------|-------------------------------|
| Year 1 | Canal + Pay TV subscribers* on Oct. 1, 2001 + 10% |
| Year 2 | Minimum Guaranteed Subscribers in Year 1 + 2.5% |
| Year 3 | Minimum Guaranteed Subscribers in Year 2 + 2.5% |
| Year 4 | Minimum Guaranteed Subscribers in Year 3 + 2.5% |
| Year 5 | Minimum Guaranteed Subscribers in Year 4 + 2.5% |

*Canal + Pay TV subscribers shall be as most recently publicly reported by Canal + as of October 1, 2001 (or the closest date prior to October 1, 2001 upon which Canal + Pay TV subscribers are publicly reported).





5. **Most Favored Nations:** During the Extended Term, and, if applicable, the Pay Merger Extension, the Most Favored Nations terms set forth at Paragraph 23 of Annex A shall apply if and only if the Minimum Guaranteed Subscribers, if any, provided for in the relevant agreement between TPS and another Major Studio are linked or indexed to the number of subscribers to the Canal + Pay TV service.

6. **Pricing:**

   (a) **Back Window:** As of the Effective Date, the License Fee for Licensed Pictures during the Back Window shall be the as set forth in Paragraph 13 of Annex A, provided that the amounts set forth below shall be applicable:

   | Number of French Theatrical Admissions | Column A Base Fee Per Title (FF) | Column B CPS (FF)* |
   |---|---|---|
   | Greater than 4,000,000 | 540,000 | 0.90 |
   | 1,500,000 - 3,999,999 | 345,000 | 0.60 |
   | 700,000 - 1,499,999 | 175,000 | 0.35 |
   | 300,000 – 699,999 | 120,000 | 0.20 |
   | 200,000 – 299,999 | 90,000 | 0.15 |
   | Less than 200,000 | 70,000 | 0.125 |
   | No Local release | 50,000 | 0.075 |

   *The applicable CPS shall be the greater of number set forth above or the applicable CPS as of 31 December 2001.

   During the Extended Term, the License Fees for the Back Windows set forth above shall increase by the greater of the French CPI or two and one-half percent (2.5%), beginning with Year 2 of the Extended Term.

   (b) **Library Films:** As of the Effective Date, the License Fee for Library Films shall be as set forth below:

   | Category: Number of years from U.S. Theatrical Release | Fee for each of First 100 Library Films Selected Per Year (FF) | Fee for each Library Film in Excess of First 100 Selected Per Year (FF) |
   |---|---|---|
   | Less than 6 | 100,000 | 180,000 |
   | 6-10 years | 80,000 | 150,000 |
   | More than 10 | 50,000 | 120,000 |

7. **Exhibition Days:** As of the Effective Date, an "Exhibition Day" shall mean the period beginning with the commencement of the first exhibition during such Exhibition Day of the relevant Licensed Picture and ending twenty-four (24) hours thereafter.



3

8. **Exclusivity – Back Window:** As of the Effective Date, upon the expiration of first three (3) months of the six (6) month Back Window for a Licensed Picture, MGM shall be entitled to license such Licensed Picture on Free TV in French speaking Belgium and French speaking Switzerland.

9. **Library Title Selection:** TPS shall make its selection of Library Films from a list of Library Films supplied by MGM ("List"), which shall list those Library Films which are or will become available between 1 January and 31 December of the relevant Year of the Term and/or Extended Term. The List shall contain a minimum of two hundred (200) Library Films, out of which one hundred fifty (150) Library Films shall be different from those Library Films on the List for the prior Year of the Term and/or Extended Term, provided that at least one hundred and fifty (150) such different Library films are available in such Year. Such List shall be provided to TPS no later than March 1 of each Year. Selection of Library Films shall be made by TPS no later than May 1 of each Year. MGM shall be entitled to license any Library Films not selected from the List by TPS without restriction.

10. **Reference to Compagnie Luxembourgeoise de Teledifusion and Lyonnaise Communications:** The reference to "Compagnie Luxembourgeoise de Teledifusion" and the reference to Lyonnaise Communications set forth in paragraph 25 of Annex A shall be deleted and shall be replaced by "Suez Lyonnaise des Eaux."

11. **Payment Terms – Number of Subscribers:** The reference in paragraph 15(b) of Annex A to "section 12(c)" shall be deemed, retroactively to the date of full signature of the Overall Agreement, to be a reference to section 12(b) of Annex A.

## II. AMENDMENTS TO ANNEX B

1. **Term:** Pursuant to the terms of Paragraph 7(b) of Annex B, the Initial Term set forth in Paragraph 7 of Annex B shall be extended for an additional period of five (5) Years, commencing immediately upon the expiration of Annex B (*i.e.*, January 1, 2002), and ending on December 31, 2006 ("Extended Term"), as set forth below:

| | |
|---|---|
| Year 1 | Expiration of Annex B – 31 December 2002 |
| Year 2 | 1 January 2003 – 31 December 2003 |
| Year 3 | 1 January 2004 – 31 December 2004 |
| Year 4 | 1 January 2005 – 31 December 2005 |
| Year 5 | 1 January 2006 – 31 December 2006 |

2. **Merger/PPV Merger Exception:**

(a) In the event (and only in such event) of a Merger, consolidation, or reorganization between TPS and Canal + which results in a unified holding, whether direct or indirect, in the hands of a single entity or a group of shareholders, of the Canal + PPV service presently known as "Kiosque" (and any multiplexes thereof existing at the time of such Merger, consolidation or reorganization) and the TPS PPV service presently known as "Multivision" (and any multiplexes thereof existing at the time of such Merger,



4



consolidation or reorganization), MGM shall have the right to extend the Term of Annex B for an additional five (5) Years beyond the Extended Term thereof ("PPV Merger Extension"). The Minimum Guaranteed Number of Subscribers during such PPV Merger Extension shall be equal to the Minimum Guaranteed Number of Subscribers for Year 5 of the Extended Term plus ten percent (10%).

(b) In the event of such a Merger, consolidation, or reorganization between TPS and Canal +, the obligations of TPS shall continue in full force and effect; provided, however, that if (i) any Licensed Pictures are exhibited on Kiosque or (ii) any theatrical motion pictures from another Major Studio are exhibited on Multivision, the calculation of Subscribers for purposes of determining the License Fee under paragraphs 9(g) and 9(h) of Annex B shall apply to the greater of (i) the total number of Subscribers on Multivision and Kiosque (minus the number of common subscribers), or (ii) the Minimum Guaranteed Number of Subscribers specified in paragraph II.5 below.

3. <u>Territory</u>: As of the Effective Date, the Territory set forth at Paragraph 2 of Annex B shall remain as set forth therein, except that Mauritius, the Comoros Islands, and Madagascar shall be added to the Territory on a non-exclusive basis (*i.e.*, MGM shall be entitled to license any Licensed Picture[s] to third parties on any form of television during the PPV License Period for such Licensed Picture[s] in Mauritius, the Comoros Islands, and Madagascar).

4. <u>Decoders</u>: As of the Effective Date, TPS shall have the right to provide Subscribers receiving Licensed Pictures hereunder by means of PPV with "TiVo"-style decoders which include the capability for a Subscriber to store the Licensed Pictures in such device's memory ("TiVo Decoder"). The use of such TiVo decoders shall be permitted hereunder, provided that: (i) TPS's entire PPV signal is receivable by Subscribers using such TiVo Decoders; (ii) the use of such TiVo Decoder is solely for the purpose of time shifting the viewing of the Licensed Pictures for personal use; (iii) such TiVo Decoder is not capable of making a copy of such Licensed Picture which is capable of being removed from the TiVo Decoder; (iv) such TiVo Decoder is not capable of altering the Licensed Pictures in any manner; and (v) such TiVo Decoder is not capable of retranslating or redistributing the Licensed Pictures to any digital recording device or to any computer network via any interface, protocol, or other technology (including, without limitation, the Internet) or any other device outside of the Subscriber's residence.

5. <u>Minimum Subscriber Guarantees/Extended Term</u>: The Minimum Guaranteed Number of Subscribers for the Extended Term shall be as follows:

| Year | Minimum Guaranteed Number of Subscribers |
|------|------------------------------------------|
| Year 1 | Canal + PPV subscribers* on Oct. 1, 2001 + 10% |
| Year 2 | Minimum Guaranteed Number of Subscribers in Year 1 + 2.5% |
| Year 3 | Minimum Guaranteed Number of Subscribers in Year 2 + 2.5% |
| Year 4 | Minimum Guaranteed Number of Subscribers in Year 3 + 2.5% |
| Year 5 | Minimum Guaranteed Number of Subscribers in Year 4 + 2.5% |



MGM/BVF/4/4/00

*Canal + PPV subscribers shall be as most recently publicly reported by Canal + as of October 1, 2001 (or the closest date prior to October 1, 2001 upon which Canal + Pay TV subscribers are publicly reported).

6. **Most Favored Nations:**

(a) During the Extended Term, and, if applicable, the PPV Merger Extension, the Most Favored Nations terms of Paragraph 19(a) of Annex B shall apply if any only if the minimum guaranteed number of subscribers, if any, provided for in the relevant agreement with another supplier of PPV product to TPS ("Other PPV Supplier Minimum Guaranteed Number of Subscribers") are linked or indexed to the number of subscribers to the Canal + PPV service.

(b) During the Extended Term, and, if applicable, the PPV Merger Extension, the Most Favored Nations terms of Paragraph 19(b) of Annex B shall apply if any only if the Other PPV Supplier Minimum Guaranteed Number of Subscribers are linked or indexed to the number of subscribers to the Canal + PPV service.

## III. AMENDMENTS TO ANNEX C

1. **Territory:** The Territory covered by the Annex C shall remain as set forth in the Agreement and Annex C, except that Mauritius, the Comoros Islands, and Madagascar shall be added to the Territory on a non-exclusive basis (*i.e.*, MGM shall be entitled to license any Licensed Picture[s] to third parties on any form of television during the Pay TV License Period for such Licensed Picture[s], in Mauritius, the Comoros Islands, and Madagascar).

2. **Programming:** The parties agree and acknowledge that "Block A" and "Block B" set forth in Paragraph 5 of Annex C shall be merged into a single block known as the "MGM Gold Block." The MGM Gold Block shall be broadcast weekly on Saturday night, commencing at 8:30 PM (20:30) local time, for a duration of approximately two (2) hours, on the channel presently known as CINEFAZ.

3. **Block Fee:** As of the Effective Date, the "Block Fee" payable by TPS to MGM for the right to broadcast the MGM Gold Block shall be Twenty Thousand French Francs (FF20,000) per block plus One and One Quarter French Francs (FF1.25) per calendar month per Subscriber to TPS Cinema greater than Two Hundred Thousand (200,000), with a cap of Two Million Five Hundred Thousand (2,500,000) Subscribers. The Block Fee shall be payable to MGM thirty (30) days after the relevant calendar month.

4. **Selection:** TPS shall select sufficient Library Films to program the MGM Gold Block in accordance with the terms of Paragraph I.9 hereof. MGM shall have no other obligation to TPS to offer Library Films to TPS before other third parties.

5. **Materials:** TPS shall be responsible for all costs related to any and all channel graphics/marketing and subtitling/dubbing, and any and all other costs associated with the MGM Gold Block. If MGM later uses or licenses to a third party a dubbed or subtitled version of a Licensed Picture created by TPS, MGM shall or shall require such third party to

MGM/BVF/4/4/00



pay to TPS fifty percent (50%) of the cost of creating such version, provided that TPS shall deliver all such materials to MGM promptly following MGM's request therefor free of any charges other than actual costs for physical materials (*i.e.*, tape stock and out-of-pocket duplication costs) and shipping.

6. **Dark Period:**  As of the Effective Date, the one (1) month dark period for Library Films after the last Exhibition on the MGM Gold Block set forth in Paragraph 6 of Annex C shall be deemed deleted.

## IV. REVISIONS TO ANNEX D

1. **Equity Options:**  The Pay Option set forth at paragraph 3 of Annex D, and the PPV Option set forth at paragraph 4 of Annex D, as both have been extended by the Equity Option Extensions, shall each be further extended for an additional nineteen (19) months commencing June 1, 1999, and ending December 31, 2000.

## V. MISCELLANEOUS

1. **Change of Ownership/Control:**  If MGM is Controlled by a Prohibited Shareholder as a result of a change in Control of MGM, TPS shall have a right of approval over whether MGM's Pay Option, PPV Option and/or Platform Option may be exercised, if such Pay Option, PPV Option, or Platform Option has not been exercised as of the date which any such change in Control of MGM becomes effective.  If TPS wishes to prohibit MGM from exercising the Pay Option, PPV Option, and/or Platform Option because MGM is under the Control of a Prohibited Shareholder, TPS shall inform MGM of such prohibition within thirty (30) days of notice from MGM that MGM is Controlled by a Prohibited Shareholder.  Failure by TPS to so inform MGM shall be deemed approval of the Prohibited Shareholder's Control of MGM.  A "Prohibited Shareholder" shall be defined as Canal +, or any Major Studio or parent company or Affiliate thereof which has an ownership interest in, or long-term Pay TV output agreement with, Canal + in the Territory.  Notwithstanding the foregoing, with respect to the Platform Option, a Prohibited Shareholder shall not refer to a Major Studio (or parent company or Affiliate thereof) to which an offer of equity in the Digital Platform has been made pursuant to paragraph 5 of Annex D.

2. **Computer Network Exhibition:**  If MGM exploits Licensed Pictures by means of delivery over the Internet (via computer) during the Extended Term in the Licensed Language in the Territory, TPS and MGM will have a good faith discussion of no longer than thirty (30) days regarding potential ways to cooperate on an Internet-based business.  This discussion will in no way prevent MGM from any Internet strategies it may develop in or outside the Territory.

3. **Headings:**  The various headings in this Amendment are inserted for convenience only and shall not be deemed a part of or in any manner affect this Amendment or any provision thereof.

4. **Entire Agreement:**  This Amendment and the Agreement constitute the full and complete expression of the understanding between the parties, and no other understandings or

MGM/BVF/4/4/00



agreements, either oral or written, exist between the parties. Except for the specific provisions which have been amended herein, all other terms and conditions of the Agreement shall remain unchanged. In the event of any conflict between the terms, conditions, and provisions of this Amendment and the Agreement, the terms, conditions, and provisions of this Amendment shall prevail. The parties, and each of them, represent(s) that they have not executed this Amendment in reliance on any promise, representation, or warranty not contained herein.

5. **Notices:** All notices or other documents (collectively, "Notices") which either party may be required to or may desire to give to the other party hereunder shall be in writing, unless otherwise specified, and shall be addressed or directed to the party intended to receive the Notice at its address set forth below. All such Notices shall be given in one (1) of the following ways: (i) by personal delivery; (ii) by United States mail or airmail (if available) or the mail or airmail (if available) service of France (as applicable), postage pre-paid; (iii) by express mail or courier service; (iv) by delivery, toll prepaid to a telegraph or cable company; or, (v) by transmittal via any electronic means now known or hereafter devised (including telex, telecopier or laser transmissions), provided that the party to whom Notice is directed is capable of receiving the Notice by such electronic means. Any notices given to the parties shall be addressed as follows:

MGM:
MGM International Television Distribution Inc.
2500 Broadway Street
Santa Monica, CA 90404-3061
U.S.A.

Attention: Jim Griffiths
Facsimile Number: 1 310 586 8139

TPS:
Télévision par Satellite
Siege Social
145 Quai de Stalingrad 92137
Issy Les Moulineaux Cedex
Paris FRANCE
Attention: Mr. Guillaume de Posch
Facsimile Number: 33 141 33 88 01

6. **Joint Preparation:** This Amendment shall be deemed and construed to have been jointly prepared by each of the parties hereto. Each party hereto agrees that uncertainties and/or ambiguities, if any, existing in this Amendment shall not be interpreted against either of the parties.

7. **Competency of the Parties:** The parties, and each of them, acknowledge, warrant, represent, and agree that in executing and delivering this Amendment, they do so freely, knowingly and voluntarily, that they have had an opportunity to and did discuss the terms and the implications of this Amendment with legal counsel, that they are fully aware of the contents and effect of this Amendment and that such execution and delivery is not the result of any fraud, duress, mistake, or undue influence whatsoever.

8. **Board of Directors Approval:** MGM's obligations hereunder shall be subject to approval by the Board of Directors of Metro-Goldwyn-Mayer Studios Inc.

9. **Other Documentation:** MGM and TPS shall each execute and deliver to the other such further documents, if any, as are reasonably required to carry out and effectuate the purposes

MGM/B VF/4/4/00



8



and intent of this Amendment. Each party shall bear its own costs and attorneys' fees incurred in connection with any such additional action.

10. **Non-Involvement of Principals:** (a)    The parties to the License Agreement acknowledge that neither Kirk Kerkorian nor Tracinda Corporation, individually or collectively, is a party to this Amendment, the License Agreement or any agreement provided herein. Accordingly, the parties hereby agree that in the event (i) there is any alleged breach or default by any party under this Amendment, the License Agreement or any agreement provided herein, or (ii) any party has any claim arising from or relating to any such agreement, no party, nor any third party claiming through such party, shall claim commence any proceedings or otherwise seek to impose any liability whatsoever against Kirk Kerkorian or Tracinda Corporation by reason of such alleged breach, default, or claim.

(b) Except with regard to the obligations of the Current Shareholders pursuant to their respective "Guarantees" (as defined in Paragraph 2[iv] of the Overall Agreement), which Guarantees shall remain in full force and effect, the parties to the this Amendment and the License Agreement acknowledge that none of the Current Shareholders set forth in Annex A, individually or collectively, is a party to this Amendment, the License Agreement or any agreement provided herein. Accordingly, the parties hereby agree that in the event (i) there is any alleged breach or default by any party under this Amendment, the License Agreement or any agreement provided herein, or (ii) any party has any claim arising from or relating to any such agreement, no party, nor any third party claiming through such party, shall claim commence any proceedings or otherwise seek to impose any liability whatsoever against the Current Shareholders by reason of such alleged breach, default, or claim. For purposes of clarity, and notwithstanding anything contained herein to the contrary, each of the Current Shareholders shall remain obligated to guarantee in proportion to their respective shareholdings the performance of all of TPS's obligations under the Agreement as set forth in their respective Guarantees.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Effective Date set forth above.

**METRO-GOLDWYN-MAYER STUDIOS INC. ("MGM")**

By: _____

Its: ___SENIOR EXECUTIVE VICE PRESIDENT___

MGM/BVFS 4/00

**TÉLÉVISION PAR SATELLITE ("TPS")**

By: ___Patrick LE LAY___

Its: _____

Jacques ESPINASSE

9

# EXHIBIT # 3



MGM WORLDWIDE TELEVISION GROUP

BLAKE V. FLYNN
VICE PRESIDENT
WORLDWIDE TELEVISION DISTRIBUTION
BUSINESS AND LEGAL AFFAIRS

September 28, 2006

**Via Facsimile 011 33 1 41 33 88 51 and Overnight Delivery**
Mr. Guillaume Jouhet
Managing Director
Télévision Par Satéllite
145 Quai de Stalingrad
92137 Issy les Moulineaux Cedex
FRANCE

RE: **Extension of Agreement**

Dear Mr. Jouhet:

Please refer to the Overall Agreement and Term Sheets dated as of October 1996 between Metro-Goldwyn-Mayer Inc. and Télévision Par Satéllite ("TPS"), as amended by the Amendment to Agreement ("First Amendment") dated as of July 9, 1999, between Metro-Goldwyn-Mayer Studios Inc. (formerly Metro-Goldwyn-Mayer Inc.) ("MGM") and TPS, and the Second Amendment Agreement ("Second Amendment") dated as of 16 June 2006, between MGM and TPS (collectively, the "Agreement"). All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement.

This shall serve as notice of the following:

(1)     Pursuant to Section I.2(a) of the First Amendment, MGM hereby exercises its Pay Merger Extension option to extend the Term of the Pay TV Output License Term Sheet set forth in Annex A of the Agreement for five (5) additional years beginning 1 January 2007; and

(2)     Pursuant to Section II.2(a) of the First Amendment, MGM hereby exercises its PPV Merger Extension option to extend the Term of the PPV Output License Term Sheet set forth in Annex B of the Agreement for five (5) additional years beginning 1 January 2007.

All other terms of the Agreement shall remain in full force and effect. Of course, please do not hesitate to contact me if you have any questions or comments.

Very truly yours,

Blake Flynn

METRO-GOLDWYN-MAYER STUDIOS INC.
10250 CONSTELLATION BLVD., LOS ANGELES, CA 90067-6241
(310) 449-3564 • FAX (310) 586-8564 • E-MAIL: bflynn@mgm.com

# EXHIBIT # 4

Fax émis par : 0150000261          JURIDIQUE                    1~~18/06    16:05    Pg : 1/1



*Via fax (001 310 586 8564) and airmail*
Mr. Blake V. FLYNN
MGM Worldwide Television Distribution
Vice President, Business and Legal Affairs
10250 Constellation Blvd
Los Angeles CA 90067-6241
USA

October 10, 2006

Dear Mr. Flynn,

I acknowledge receipt of your fax dated September 28, 2006.

Please be advised that we do not consider Metro-Goldwin-Mayer Studios Inc. to be entitled at this time to exercise the options to which you refer.

In addition, we are hereby reserving all rights at law and in equity with regard to the present matter.

Very truly yours,

Guillaume JOUHET
Managing Director

# EXHIBIT # 5



MGM WORLDWIDE TELEVISION GROUP

BLAKE V. FLYNN
VICE PRESIDENT
WORLDWIDE TELEVISION DISTRIBUTION
BUSINESS AND LEGAL AFFAIRS

October 26, 2006

**Via Facsimile 011 331 41 33 88 51 and Overnight Delivery**
Mr. Guillaume Jouhet
Managing Director
Télévision Par Satéllite
145 Quai de Stalingrad
92137 Issy les Moulineaux Cedex
FRANCE

**RE:  Extension of Agreement**

Mr. Jouhet:

    MGM is in receipt of your letter of October 10, 2006.  Please be aware that MGM is entitled to exercise the Pay Merger Extension Option and PPV Merger Extension option (the "Options"), and we believe that MGM has in fact exercised the Options pursuant to my letter dated September 28, 2006.

    However, your letter of October 10, 2006 states that TPS does not believe MGM "to be entitled at this time to exercise" the Options.  MGM hereby requests that TPS clarify its position with regard to this matter, and specifically explain its reasoning for this position.

    This letter is not intended and should not be understood to contain a complete recitation of the all facts relevant to this matter, and MGM hereby reserves all of its rights and remedies with respect thereto.

Very truly yours,

Blake Flynn

cc:    Jerry Ament; Alecia Dixon; Jim Packer; Scott Packman; Gilberte de Turenne;
      Barbara Van Sickle

METRO·GOLDWYN·MAYER STUDIOS INC.
10250 CONSTELLATION BLVD., LOS ANGELES, CA 90067-6241
(310) 449-3564 • FAX (310) 586-8564 • E-MAIL: bflynn@mgm.com

# EXHIBIT # 6



*__Via fax (001 310 586 8564) and airmail__*
Mr. Blake Flynn
Vice President, Worldwide Television Distribution
Business & Legal Affairs
Metro-Goldwyn-Mayer Studios Inc.
10250 Constellation Boulevard
Los Angeles, Ca  90067-6241
Etats-Unis d'Amérique

November 13, 2006

Re:    Extension of Agreement

Dear Mr. Flynn:

We refer to the Overall Agreement and Term Sheets dated as of October 1996 between Metro-Goldwyn-Mayer Inc. and Television Par Satellite ("TPS"), as amended by the Amendment to Agreement dated as of July 9, 1999 (the "First Amendment"), between Metro-Goldwyn-Mayer Studios Inc. (formerly Metro-Goldwyn-Mayer Inc.) ("MGM") and TPS, and the Second Amendment Agreement dated as of 16 June 2006 between MGM and TPS (collectively, the "Agreement"); your letters of September 28, 2006 and October 26, 2006; and your request that we clarify our position with respect to the assertions of MGM in the October 26th letter both that MGM is entitled to exercise the Pay Merger Extension Option (sic) and PPV Merger Extension option as provided for in the First Amendment (the "Options"), and that "MGM has in fact exercised the Options".

In response to your request we note, without limitation to and in full reservation of our rights and remedies with respect to these matters, that the "Options" to which your correspondence refers are expressly conditional in nature and that the conditions to their exercise have not occurred.  Accordingly, MGM neither was nor is "entitled" to exercise these "Options", nor has it "in fact" exercised them.

While we trust this explanation is both clear and sufficient, we hereby reserve all the rights and remedies of TPS with respect to this matter and the "Agreement" generally.

Very truly yours,

Guillaume JOUHET

80376589 1

# EXHIBIT # 7

Alan F. Cariddi**
Bruce C. Mee*
Fabrice Rué
Patrick Boiron
Frédéric Bucher
Bijan E. Eghbal
Philippe X. Ledoux
Anne Maréchal
Carol A. F. Umhoefer*

*Avocats Associés / Partners*

Christine Bougis-Stentz*
Anne-Noëlle Charvillat-Carrez

*Of Counsel*

** Also member of New York and D.C. bars
* Also members of New York bar

12 rue de la Paix
75002 Paris, France

T +33 (0) 1.40.15.24.00
F +33 (0) 1.40.15.24.03

W www.dlapiper.com

Correspondants de



Télévision Par Satellite
M. Guillaume Jouhet
Directeur Général
145 quai de Stalingrad
92137 Issy les Moulineaux

Par lettre recommandée avec accusé de réception et par fax (01.41.33.88.51)

Paris, le 4 décembre 2006

Re:    MGM / TPS
       Prorogation de Contrat

Monsieur le Directeur Général,

Nous sommes les conseils en France de la société Metro-Goldwyn-Mayer Studios Inc. (« **MGM** »). Notre client et votre société ont signé les 6 et 15 novembre 1996 un contrat cadre intitulé « Overall Agreement » (le « **Contrat Cadre** ») comportant 5 annexes modifié par deux avenants l'un en date du 9 juillet 1999 : « Amendment to Agreement » (l'« **Avenant** ») et l'autre du 16 juin 2006 : « Second Amendment Agreement » (l'ensemble de ces documents contractuels étant conjointement désignés ci-après : les « **Contrats** »).

Dans un courrier adressé à TPS en date du 28 septembre 2006, MGM a levé l'option prorogeant, en cas de fusion, les accords concernant la télévision à péage (« *Pay Merger extension option* ») et celle concernant le Pay-Per-View (« *PPV Merger extension option* »), telles que celles-ci sont prévues par les Contrats (les « **Options** »).

Aux termes de l'article 9 de l'Annexe C du Contrat Cadre (« *MGM Gold Block License Term Sheet* »), la durée de l'Annexe C coïncide avec celle de l'Annexe A

- 2 -

(« *Pay TV Output License Term Sheet* ») et a, de ce fait, également été étendue par l'effet de la levée des Options.

Notre client a dûment et valablement levé les Options par la notification qui vous a été adressée le 28 septembre 2006, prorogeant ainsi la durée du Contrat Cadre et de ses annexes A, B et C jusqu'au 31 décembre 2011.

Il nous apparaît évident, ainsi qu'à notre client, que, quelque soit l'interprétation des Contrats, les conditions nécessaires à la levée des Options étaient réunies. Nous ne comprenons pas les motifs vous permettant de prétendre que tel n'était pas le cas. En effet, dans vos courriers des 10 octobre et 13 novembre 2006, vous n'essayez même pas de justifier votre position. Cette absence d'argumentation nous conduit à conclure que vous n'avez aucune justification à apporter.

Compte tenu des termes des courriers précités, notre client est aujourd'hui confronté au risque d'une inexécution majeure par TPS de ses obligations contractuelles. Faute par TPS de retirer purement et simplement ses lettres en date des 10 octobre et 13 novembre 2006, et ce avant le 15 décembre 2006, notre client envisagera toutes les mesures nécessaires afin de préserver les droits qu'il tient des Contrats face à ce risque majeur d'inexécution contractuelle. Vous noterez par ailleurs que tout litige issu de l'exécution du contrat sera réglé par référence à la loi de l'Etat de New-York, selon les termes de l'article 11 du Contrat Cadre qui stipule que (a) chaque partie accepte irrévocablement et sans condition de se soumettre, dans le cadre de toute action ou procédure judiciaire, à la compétence exclusive des tribunaux de New-York (d'Etat ou Fédéraux) ou des Etats-Unis ("*irrevocably and unconditionally submit itself and its property in any legal action or proceeding (...) to the exclusive jurisdiction of the Courts of New York (whether State or Federal) or of the United States of America*") et (b) chaque partie renonce à toute objection qu'elle pourrait élever à ce jour ou ultérieurement quant à la compétence d'un tel tribunal, s'agissant d'une telle action ou procédure, ou quant au fait qu'une telle action ou procédure a été introduite devant un tribunal incompétent et accepte de ne pas plaider ou se prévaloir de tels arguments ("*waives any objection that it may now or hereafter have to the venue of any such action or proceedings in any such court or that such action or proceeding was brooked in an inconvenient court and agrees not to plead or claim the same*").

Nous demeurons à votre disposition ou à la disposition de votre conseil afin de nous entretenir de ce qui précède.

Nous vous prions d'agréer, Monsieur le Directeur Général, l'expression de nos salutations distinguées et dévouées.

Patrick Boiron
Avocat à la Cour

# EXHIBIT # 8



Maître Patrick BOIRON
Avocat
DLA Piper
12 rue de la Paix
75002 PARIS

Issy- les- Moulineaux, le 19 décembre 2006

**Par télécopie au 01.40.15.24.03 confirmée par lettre recommandée avec AR**

Objet : Contrat Général et Term Sheets d'octobre de 1996 tel qu'amendé le « Contrat »)

Maître,

Je vous écris pour faire suite à votre lettre du 4 décembre 2006.

En premier lieu, je suis contraint de préciser que TPS a pleinement rempli toutes ses obligations découlant du Contrat et ne s'expose donc pas au risque de commettre une quelconque violation contractuelle comme vous l'indiquez.

Les faits tels que présentés dans les lettres de TPS des 10 octobre et 13 novembre 2006 sont corrects. Aux termes du Contrat, Metro-Goldwyn Mayer Studio Inc. (« MGM ») n'a pas le droit de, et ne peut valablement, exercer les « Options » auxquelles votre lettre se réfère. Contrairement à votre affirmation, TPS a expliqué la raison pour laquelle les options ne peuvent être exercées *« the "Options" [...] are expressly conditional in nature and [...] the conditions to their exercise have not occurred »* (voir notre lettre du 13 novembre). Il n'y a ici aucune ambiguïté, et nous ne comprenons pas pourquoi vous refusez d'accepter que les conditions, telles que prévues au Contrat, n'ont pas été remplies. En conséquence, nous nous en tenons à nos lettres du 10 octobre et 13 novembre 2006, et n'avons aucunement l'intention de les retirer.

Nous avons bien noté votre souci de rappeler les termes du Contrat relatifs à la loi applicable et aux tribunaux compétents.

Nous continuons bien entendu à faire toute réserve des droits de TPS relatifs au Contrat, son interprétation et son exécution.

Nous vous prions d'agréer, cher Maître, l'expression de nos sentiments distingués.

Guillaume JOUHET

Directeur Général Adjoint en charge des Programmes

# EXHIBIT # 9



**DLA Piper US LLP**
1251 Avenue of the Americas, 29th Floor
New York, New York  10020-1104
www.dlapiper.com

Andrew L. Deutsch
andrew.deutsch@dlapiper.com
**T**  212.335.4880
**F**  212.884.8580

December 20, 2006

*Via Facsimile:011-331-41-33-88-51*
*Via DHL Overnight*

Television Par Satellite
Mr. Guillaume Jouhet
Managing Director
145, quai de Stalingrad
92137 Issy le Moulineaux
France

**Re:    MGM/TPS Extension of Agreement**

Dear Mr. Jouhet:

Reference is made to the letter of our client Metro-Goldwyn-Mayer Studios, Inc. ("MGM") to TPS dated September 28, 2006, your letter on behalf of TPS dated October 10, 2006, MGM's letter to you of October 26, 2006, your letter to MGM of November 13, 2006, the letter of M$^e$ Patrick Boiron of the law firm Cariddi Mee Rué (correspondent of DLA Piper US LLP) to you of December 1, 2006, and your letter to M$^e$ Breton of December 19, 2006.  DLA Piper is New York counsel to MGM in this matter.

As previously stated in these letters, MGM has exercised the Pay Merger Extension option (Annex A) and the PPV Merger Extension option (Annex B) (the "Options") provided for in an Overall Agreement, including five Annexes, signed on November 6 and 15, 1996 (the "Overall Agreement"), as amended by an Amendment to Agreement dated as of July 9, 1999 and a Second Amendment Agreement dated June 16, 2006 (collectively referred to as the "Agreements").  As the term of Annex C to the Overall Agreement is "co-terminus" with that of Annex A (Annex C, Section 9), exercise by MGM of an option to extend the term of Annex A automatically extends the term of Annex C as well.

Your November 13, 2006 letter, written in apparent response to MGM's request for greater precision as to TPS's position, asserted that the Options are "expressly conditional in nature" and that the "conditions to their exercise have not occurred."  Your December 19, 2006 letter, although purporting to respond to M$^e$ Breton's December 4 letter, merely repeated TPS's earlier position, claiming again that the conditions to exercise of the Options have not been fulfilled, but citing no facts to support that unfounded conclusion.  We strongly disagree with your conclusion.  Any condition precedent to MGM exercising its Options has been satisfied.



December 20, 2006
Page Two

The Agreements provide several grounds for MGM's exercise of the Options. Under Section 9(c) of Annex A to the Overall Agreement, "[i]n the event that [TPS] is the subject of a Merger...," MGM has the "right in its sole election" to extend the Initial Term of the Overall Agreement for an Extended Term, or, if the event arises in an Extended Term, to extend an Extended Term for a further Extended Term. Section 25 of Annex A defines a Merger as meaning "any sale of assets or shares, joint venture . . . contribution, merger, licensing arrangement, joint marketing or cooperative arrangement or other agreement that has the effect of directly or indirectly transferring from [TPS] to any other entity which is in the business of operating a digital platform all or a significant interest in or control of TPS or its major assets." Clearly, TPS is the "subject of a Merger," and MGM has the right to exercise its Options.

In fact, the situation has progressed beyond TPS being the "subject of a Merger." Section I(2)(a) of the Amendment further expands MGM's rights, by providing that in the event of a "Merger, consolidation, or reorganization" between TPS and Canal Plus "which results in a unified holding...whether direct or indirect, in the hands of a single entity or group of shareholders, of the premium Pay TV service of Canal + . . . and the premium Pay TV service of TPS presently known as TPS Cinema. . . MGM shall have the right to extend the Term of Annex A for an additional five (5) years beyond the Extended Term thereof." A similar provision in Section II(2)(a) of the Amendment gives MGM the option to extend the Term of Annex B in the event of "Merger, consolidation, or reorganization" between TPS and Canal Plus "which results in a unified holding. . . whether direct or indirect, in the hands of a single entity or group of shareholders, of the Canal + PPV service presently known as 'Kiosque'. . . and the TPS PPV service presently known as Multivision."

The public record establishes that a "Merger," within the meaning of the Agreements, has actually occurred. An agreement which, upon consummation, would accomplish the consolidation of the premium pay TV and PPV assets of Canal Plus and TPS in a new company was announced in 2005 and was thereafter signed between the parent companies of TPS and Canal Plus. This agreement has been approved by the French Ministry of the Economy, and joint arrangements are already in place that permit TPS subscribers to access Canal Plus premium pay TV services. We also note that on December 14, 2006, Bertrand Méheut, the President of the Canal Plus group, publicly stated that the merger between Canal Plus and TPS will be consummated on January 4, 2007 and that, as of that date, "the Canal Plus group will be the owner of TPS." Mr. Méheut did not state that there were any further conditions to be fulfilled before consummation of the merger.

Given the facts noted above, it is clear that the TPS and Canal Plus merger is complete in all relevant respects except for formal consummation. The Agreements unambiguously confirm the parties' intention that MGM will have the right to exercise the Options during the Extended Term by virtue of the definition of "Merger," even where "such Merger is consummated during or after the Initial Term." (Section 9(c) of Annex A to the Overall Agreement and wording to the same effect in Section 7(e) of Annex B). The definition of "Merger" and the concept of later consummation are absolutely consistent and provide clear contractual confirmation of MGM's



**DLA PIPER**

December 20, 2006
Page Three

position. MGM has the unambiguous right to exercise its contractual Options in 2006, regardless of when the consummation takes place.

For the avoidance of doubt, and without waiving the effectiveness of the exercise of the Options made by MGM's letter of September 28, 2006, MGM, by this letter, again exercises the Pay Merger Extension option and the PPV Merger Extension option granted by the Agreements (as well as the automatic right of extension of the term of Annex C), based upon all acts by TPS and Canal Plus through the date of this letter that demonstrate that any condition to exercise of the Options has been satisfied.

Under New York law, which governs the Agreements, a refusal by TPS to acknowledge the effectiveness of the extension of the terms of Annexes A, B and C by MGM would constitute an anticipatory repudiation of those Agreements. Such an anticipatory repudiation would give MGM the right to treat the contract as breached, and sue for accelerated damages, or treat the contract as valid, and sue for specific performance of the Agreements. MGM will inform you when it has elected its remedy, if formal measures become necessary.

MGM would prefer not to have to make such an election in order to protect its rights. As a final effort to resolve this matter without resort to formal measures, and to preserve as positive an on-going business relationship as possible for the further Extended Term, our client asks that you provide us, as soon as possible but in any event not later than December 29, 2006, with your written assurance that TPS will recognize MGM's exercise of the Options and that TPS will perform under the Agreements as extended.

This letter is not intended to and should not be understood to contain a complete statement of all facts relevant to this matter, and MGM expressly reserves all rights and remedies with respect thereto.

Sincerely yours,

Andrew L. Deutsch

ALD:ag

cc:    Jerry Ament
       Alecia Dixon
       Jim Packer
       Scott Packman
       Gilberte de Turenne
       Barbara van Sickle
       Patrick Boiron



**DLA Piper US LLP**
1251 Avenue of the Americas
New York, NY 10020
www.dlapiper.com

Andrew L. Deutsch
andrew.deutsch@dlapiper.com
**T** 212.335.4880
**F** 212.884.8580

# Fax Transmission Cover Sheet

**December 20, 2006**

| To | Telephone | Fax Number |
|---|---|---|
| **Mr. Guillaume Jouhet**<br>**Television Par Satellite** | | **011-331-41-33-88-51** |

From:    Andrew L. Deutsch          Client-Matter Number:
         212.335.4880

Re:      MGM/TPS Extension of Agreement

Pages:   -  __4__  - (including this form)      Originals:

**If there is a problem with this transmission, please call <u>Alishia Goodridge</u> at <u>212-335-4619.</u>**
**Message:**

Please see the attached letter.

**CONFIDENTIALITY NOTICE**
This communication is ONLY for the person named above. Unless otherwise indicated, it contains information that is confidential, privileged or exempt from disclosure under applicable law. If you are not the person named above, or responsible for delivering it to that person, be aware that disclosure, copying, distribution or use of this communication is strictly PROHIBITED. If you have received it in error, or are uncertain as to its proper handling, please immediately notify us by collect telephone and mail the original to us at the above address. Thank you.

(Form Rev. 8/02/04)

| JOB STATUS REPORT |
| --- |

```
TIME  : 12/20/2006 11:19
NAME  : DLA PIPER US LLP
FAX#  : 2128356298
TEL#  : 2128356000
SER.# : BR03J2521659
```

```
DATE,TIME        12/20  11:18
FAX NO./NAME     901133141338851
DURATION         00:00:58
PAGE(S)          04
RESULT           OK
MODE             STANDARD
                 ECM
```



**DLA Piper US LLP**
1251 Avenue of the Americas
New York, NY 10020
www.dlapiper.com

Andrew L. Deutsch
andrew.deutsch@dlapiper.com
**T** 212.335.4880
**F** 212.884.8580

# Fax Transmission Cover Sheet

**December 20, 2006**

| To | Telephone | Fax Number |
| --- | --- | --- |
| **Mr. Guillaume Jouhet**<br>**Television Par Satellite** | | **011-331-41-33-88-51** |

| From: | Andrew L. Deutsch<br>212.335.4880 | Client-Matter Number: |
| --- | --- | --- |
| Re: | MGM/TPS Extension of Agreement | |
| Pages: | - __4__ - (including this form) | Originals: |

If there is a problem with this transmission, please call <u>Alishia Goodridge</u> at <u>212-335-4619.</u>

**Message:**

Please see the attached letter.

**DLA PIPER**

## MAIL/COURIER REQUEST

Ticket No. _____

Date: 12/20/06

Number of pieces: 1

Client #: _____

Matter #: 40

Requested by: Andrew L. Deutsch

Employee #: 1102

### U.S. POSTAL SERVICE

| | | |
|---|---|---|
| ___ 1st Class Mail | ___ Express Mail | ___ Priority Mail |
| ___ Registered | ___ Certified Mail | ___ Return Receipt |

### COURIER SERVICES

| | | |
|---|---|---|
| ___ UPS | ___ Federal Express | ✓ DHL | ___ Other |

| | |
|---|---|
| ___ Next Day (early — by 8:00 am) | ___ 2nd Day (morning delivery) | ___ Ground |
| ___ Next Day Air (by 10:30 am) | ___ 2nd Day (afternoon delivery) | ___ Release Signature |
| ___ Next Day Air Saver (by 3:00 pm) | ___ 3rd Day (if service is provided) | ___ Saturday Delivery |

### SPECIAL INSTRUCTIONS

International

NEWY1\803\4376.1

Case 1:07-cv-02913-DAB    Document 4    Filed 05/08/2007    Page 31 of 33

**EXPRESS**

Process and Track your shipment online: http://www.dhl.com

**1 Payer account number and shipment value protection details**

1-800-CALL-DHL in USA only

Charge to ☑ Shipper  ☐ Receiver  ☐ 3rd Party

Payer Account No.

Declared Value for Carriage (see reverse)

Not all payment options are available in all countries

Not all payment options are available in all countries

☐ Cash  ☐ Check
☐ Credit Card

Shipment Value Protection (see reverse)

**2 From (Shipper)**

Shipper's Account Number
B S 9 7 1 A

Company Name
DLA PIPER RUDNICK GRAY CARY US

Address
1251 AV. OF THE AMERICAS
NEW YORK NY

Postal Code (required)
10020-1104

Phone, Fax, or E-mail (required)
(212) 335-4880

**3 To (Receiver)**

Contact Name
Andrew L. Deutsch

Shipper's Reference (up to 35 characters)
17-40

Contact Name
Television Par Satellite
Mr. Guillaume Jouhet
145 quai de Stalingrad
Issy les Moulineaux
Paris

Country
France

Postal Code (required)
92137

Phone, Fax, or E-mail (required)

**4**

**5 Shipment Details**

Total number of packages
1

Full Description of Contents
1 Letter

Total Weight
lbs.

**6 Dutiable Shipments Only (Customs requirement)**

Declared Value for Customs (in US $)

**7 Shipper's Authorization (signature required)**

Signature (required)                    Date

**PPF  PPF  PPF**

769 4877 153

7694877153

ORIGIN
JRA

DESTINATION CODE

**8 Products & Services**

Origin (DHL Billing) Copy

DHL Express (USA), Inc., 1200 South Pine Island Road, Plantation, Florida 33324

DHL EXPRESS (USA), INC.

# EXHIBIT # 10



**Lauren Reiter Brody**
Manatt, Phelps & Phillips, LLP
Direct Dial: (212) 790-4518
E-mail: LBrody@Manatt.com

February 2, 2007

**Via Facsimile and U.S. Mail**

Andrew L. Deutsch, Esq.
DLA Piper US LLP
1251 Avenue of the Americas, 29th Floor
New York, New York 10020-1104

Dear Mr. Deutsch:

We represent Group Canal +. As you know, various agreements signed between its shareholders and those of Télévision Par Satellite ("TPS") on January 4, 2007 have led to the convergence of certain of their businesses, including Pay TV.

I write with respect to the Overall Agreement and Term Sheets dated November 6 and 15, 1996 between Metro-Goldwyn-Mayer, Inc. ("MGM") and TPS, and the Amendment thereto dated July 9, 1999 (the "Agreement"). We understand that you have asserted that MGM has exercised the Pay Merger Extension option and PPV Merger Extension option under the Agreement. This is to inform you that it is our client's position that any rights that MGM may have possessed as to the extension of the "Terms" of the Agreement were subject to conditions, that the conditions were not fulfilled, and that therefore there is no extension and the Agreement expired in accordance with the terms of the Amendment.

Accordingly, neither TPS nor Group Canal + has any obligation to MGM or any other entity regarding any "Extended Terms".

Very truly yours,

Lauren Reiter Brody

LRB:aob

7 Times Square, New York, New York 10036  Telephone: 212.790.4500  Fax: 212.790.4545

Albany | Los Angeles | New York | Orange County | Palo Alto | Sacramento | Washington, D.C.