UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

METRO-GOLDWYN-MAYER STUDIOS
INC.,                                        :

                 Plaintiff,                  :

                                             :     07 Civ. 2918 (DAB)
       -against-
                                             :     (ECF Case)

TPS GESTION, S.A., TPS SOCIÉTÉ EN NOM        :
COLLECTIF, CANAL + FRANCE S.A., and
GROUPE CANAL + S.A.                          :

                 Defendants.                 :

------------------------------------- x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**


**DLA PIPER US LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4880

*Attorneys for Plaintiff*
*Metro-Goldwyn-Mayer Studios, Inc.*

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT ............................ 2

I       The Court Has Personal Jurisdiction Over All The Defendants ........................ 5

        A.      Non-Signatories Can Be Bound By Contractual Forum-Selection Clauses .......... 5

        B.      Defendants Other Than TPS SNC Are Bound By The Forum Selection
                Clause ........................................................................................................ 8

        C.      Alternatively, the Court Should Permit Jurisdictional Discovery ..................... 10

II      The Complaint States A Claim For Breach Of Contract ................................... 13

        A.      The Standards on a Rule 12(b)(6) Motion ............................................. 13

        B.      The Complaint States A Claim for Breach of Contract ........................ 14

                1.      Canal+ France and TPS Gestion Are Subject To Successor
                        Liability .................................................................................. 14

                2.      The Contractual Conditions to Exercise Of MGM's Options Were
                        Fulfilled .................................................................................. 15

        C.      Alternatively, Any Unfulfilled Condition Precedent To MGM's Option
                Exercise Was Excused By TPS's Frustration of That Condition ................. 19

IV.     The Complaint States A Claim For Specific Performance .............................. 21

V       The Complaint States A Claim For Tortious Interference With Contract ............ 23

## TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Allianz Ins. Co. v. Lerner,*
   416 F.3d 109 (2d Cir. 2005)..................................................................14

*Amies v. Wesnofske,*
   255 N.Y. 156 (1931) ..........................................................................20

*APA Excelsior III LP v. Premiere Technologies,*
   49 F. Supp. 2d 664 (S.D.N.Y. 1999)........................................................8

*Ayyash v. Bank Al-Medina,*
   04 Civ. 9201 (GEL), 2006 U.S. Dist. LEXIS 9677 (S.D.N.Y. Mar. 9, 2006).....................10

*Beech Aircraft Corp.,*
   751 F.2d at 120-21 ..........................................................................13

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007)................................................................13, 23

*Bernheim v. Litt,*
   79 F.3d 318 (2d Cir. 1996)..................................................................13

*Best Van Lines, Inc. v. Walker,*
   2007 U.S. App. 15152 (2d Cir. June 26, 2007) ..........................................10

*Bolt Elec. v. City of N.Y.,*
   53 F.3d 465 (2d Cir. 1995)..................................................................13

*Center v. Hampton Affiliates,*
   66 N.Y.2d 782, 497 N.Y.S.2d 898 (1985) ................................................22

*City of Peru v. Bouvier Hydropower, Inc.,*
   No. 00 C 1179, 2000 U.S. Dist. LEXIS 19393 (N.D. Ill. Dec. 28, 2000) ............8

*Courtroom Television Network v. Focus Media, Inc.,*
   264 A.D.2d 351, 695 N.Y.S.2d 17 (1st Dep't 1999) ....................................12

*Cross & Cross Properties v. Everett Allied Co.,*
   886 F.2d 497 (2d Cir. 1989)..................................................................20

*Daval Steel Prods. v. M.V. Juraj Dalmatinac,*
   718 F. Supp. 159 (S.D.N.Y. 1989) ........................................................10

*Dayhoff, Inc. v. H.J. Heinz Co.,*
   86 F.2d 1287 (3d Cir. 1996)..................................................................8

## TABLE OF AUTHORITIES

**PAGE**

*Direct Mail Production Servs. Ltd. v. MBNA Corp.*,
  99 Civ. 10550 (SHS), 2000 U.S. Dist. LEXIS 12945 (S.D.N.Y. Sept. 7, 2000) ............6, 8, 9

*DKR Capital, Inc. v. AIG Int'l W. Broadway Fund Ltd.*,
  03 Civ. 1568 (JGK),  2003 U.S. Dist LEXIS 17498 (S.D.N.Y. Oct. 1, 2003) .....................14

*Dogmoch Int'l Corp. v. Dresdner Bank AG*,
  304 A.D.2d 396, 757 N.Y.S.2d 557 (1st Dep't 2003) ........................................................7, 8

*Douchkess v. Campbell*,
  64 N.Y.S.2d 554 (Sup. Ct. N.Y. County 1946) ..................................................................20

*Erickson v. Pardus*,
  127 S. Ct. 2197 (2007)........................................................................................................23

*Foster v. Churchill*,
  87 N.Y.2d 744, 642 N.Y.S 2d 583 (1996) .........................................................................25

*Frietsch v. Refco, Inc.*,
  56 F.3d 825 (7th Cir. 1995) ..................................................................................................8

*Frummer v. Hilton Hotels, Inc.*,
  19 N.Y.2d 533, 281 N.Y.S.2d 41,45 (1967) ......................................................................12

*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir. 1985)..............................................................................................13

*Grad v. Roberts*,
  14 N.Y.2d 70, 284 N.Y.2d 633 (1964) ..............................................................................20

*IHR Assocs. v. C.E. Cabinets, Ltd.*,
  06-CV-5965 (JFB), 2007 U.S. Dist LEXIS 34788 (E.D.N.Y. May 11, 2007) ..................8, 9

*Impulse Marketing Group, Inc. v. National Small Business Alliance, Inc.*,
  No. 05-CV-7776 (KMK), 2007 U.S. Dist. LEXIS 42725 (S.D.N.Y. June 12, 2007) ..........11

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  725 F. Supp. 712 (S.D.N.Y. 1989) ....................................................................................20

*In re Magnetic Audiotape Antitrust Litig.*,
  334 F.3d 204 (2d Cir. 2003)................................................................................................10

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
  62 F.3d 69 (2d Cir. 1995)....................................................................................................14

*Int'l Mining Co. v. Allen & Co.*,
  No. 80 Civ. 3750 (RWS), 1981 U.S. Dist. LEXIS 16710 (S.D.N.Y. Dec. 15, 1981) ....24, 25

## TABLE OF AUTHORITIES

**PAGE**

*Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*,
  975 F. Supp. 483 (W.D.N.Y. 1997) ..................................................................6, 8, 11, 14

*Iqbal v. Hasty*,
  2007 U.S. App. LEXIS 13911 (2d Cir. June 14, 2007) ......................................13

*Jazini v. Nissan Motor Corp.*,
  148 F.3d 181 (2d Cir. 1998).................................................................................10

*Jones v. Wiebrecht*,
  901 F.2d 17 (2d Cir. 1990).....................................................................................7

*Karlan v. N.Y. Univ.*,
  464 F. Supp. 704 (S.D.N.Y. 1979) ......................................................................22

*Klein v. The Hongkong and Shanghai Hotels, Ltd.*,
  06 Civ. 377 (DAB), 2007 U.S. Dist. LEXIS 27340 (S.D.N.Y. Apr. 9, 2007) .....................10

*Kooleraire Serv. & Installation Corp. v. Board of Educ.*,
  28 N.Y.2d 101, 320 N.Y.S.2d 46 (1971) ............................................................20

*Kronos, Inc. v. AVX Corp.*,
  81 N.Y.2d 90, 595 N.Y.S.2d 931 (1993) .............................................................23

*Landoil Resources Corp. v. Alexander & Alexander Services, Inc.*,
  918 F.2d 1039 (2d Cir. 1990)...............................................................................11

*Lennon v. Seaman*,
  63 F. Supp. 2d 428 (S.D.N.Y. 1999).....................................................................22

*Lucente v. IBM*,
  310 F.3d 243 (2d Cir. 2002).............................................................................14, 19

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*,
  858 F.2d 509 (9th Cir. 1988) .................................................................................8

*Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*,
  878 F.2d 41 (2d Cir. 1989)....................................................................................18

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Group*,
  87 N.Y.2d 614, 641 N.Y.S.2d 581 (1996) ...........................................................25

*New Paradigm Software Corp. v. New Era of Networks, Inc.*,
  107 F. Supp. 2d 325 (S.D.N.Y. 2000)...................................................................25

*Novak v. Tucows, Inc.*,
  No 06-CV-1909 (JFB), 2007 U.S. Dist. LEXIS 21269 (E.D.N.Y. Mar. 26, 2007)........6, 7, 8

## TABLE OF AUTHORITIES

**PAGE**

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
    322 F.3d 147 (2d Cir. 2003)..................................................................................22

*Old Republic Ins. Co. v. Hansa World Cargo Serv.,*
    170 F.R.D. 361 (S.D.N.Y. 1997) ......................................................................14

*Paramedics Electromedicina Comercial LTDA v. GE Med. Sys. Info. Tech., Inc.,*
    02 Civ. 9369 (DFE), 2003 U.S. Dist. LEXIS 2692 ........................................6

*Peregrine Fixed Income Ltd. v. JP Morgan Chase Bank,*
    05 Civ. 4351 (RMB), 2006 U.S. Dist. LEXIS 8766 (S.D.N.Y. Jan. 26, 2006) ...................14

*Puerto Rico v. Airborne Groupe PLC,*
    882 F. Supp. 1212 (D.P.R. 1995)........................................................................7

*Roth v. Jennings,*
    2007 U.S. App. LEXIS 13035 (2d Cir. June 6, 2007) ......................................13

*Sammarco Garden Ctr., Inc. v. Sammarco,*
    173 A.D.2d 456, 570 N.Y.S.2d 80 (2d Dept. 1991) ..........................................22

*Sparks Tune-Up Centers, Inc. v. Strong,*
    No. 92 C 5902, 1994 U.S. Dist. LEXIS 6246 (N.D. Ill. May 11, 1994) ...............8

*Stern v. MDS Acquisition Corp.,*
    87 Civ. 4505 (RJW), 1991 U.S. Dist. LEXIS 11088 (S.D.N.Y. Aug. 8. 1991)...................24

*Stratagem Dev. Corp. v. Heron Int'l N.V.,*
    153 F.R.D. 535, 547-48 (S.D.N.Y. 1994)..........................................................10

*Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.,*
    15 N.Y.2d 97, 256 N.Y.S.2d 129 (1965) ..........................................................12

*Tauza v. Susquehanna Coal Corp.,*
    220 N.Y. 259 (1917) ..........................................................................................11

*Town of Austerlitz v. Dugwest Assocs.,*
    24 A.D.3d 847, 804 N.Y.S.2d 859 (3d Dep't 2005) ..........................................22

*TP Group, Inc. v. Wilson,*
    No. 89 Civ. 2227 (KMW), 1990 U.S. Dist. LEXIS 4367 (S.D.N.Y. April 16, 1990)..........20

*Triple Z Postal Services, Inc. v. United Parcel Service, Inc.,*
    13 Misc. 3d 1241A, 831 N.Y.S.2d 357, 2006 N.Y. Misc. LEXIS 3406
    (Sup. Ct. N.Y. County 2006) ....................................................................7, 8, 10

*U.S. Gypsum Co. v. Indiana Gas Co.,*
    350 F.3d 623 (7th Cir. 2003) ..............................................................................22

## TABLE OF AUTHORITIES

**PAGE**

*United States v. Agnello*,
   344 F. Supp. 2d 360 (E.D.N.Y. 2003) ...............................................................18

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
   751 F. 2d 117 (2d Cir. 1984)............................................................................12

*Weingrad v. Telepathy, Inc.*,
   05 Civ. 2024 (MBM), 2005 U.S. Dist. LEXIS 26952 (S.D.N.Y. Nov. 7, 2005)......6, 7, 8, 10

*White Plains Coat & Apron Co. v. Cintas Corp.*,
   8 N.Y.3d 422, 835 N.Y.S.2d 530  (2007) .........................................................24

*Young v. Hunter*,
   6 N.Y. 203 (1852) .............................................................................................20

*Yung v. Lee*,
   00 Civ. 3965 (DAB), 2002 U.S. Dist. LEXIS 16655 (S.D.N.Y. Sept. 5, 2002),
   aff'd, 160 Fed. Appx. 37 (2d Cir. 2005) .............................................................8

**Rules**

Fed. R. Civ. P. 8(a) ...............................................................................................14

Fed. R. Civ. P. 8(a)(2)...........................................................................................23

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 13

Fed. R. Civ. P. 12(e) .............................................................................................13

Plaintiff Metro-Goldwyn-Mayer Studios, Inc. ("**MGM**") respectfully submits this memorandum of law in opposition to the Motion to Dismiss Complaint of defendants TPS Gestion, S.A. ("**TPS Gestion**"), TPS Societe en Nom Collectif ("**TPS SNC**"), Canal + France S.A. ("**Canal+ France**") and Groupe Canal+ S.A. ("**Groupe Canal+**").[1]

## INTRODUCTION

The Court should deny defendants' motion to dismiss in its entirety. Their argument that the Court lacks personal jurisdiction over all defendants except TPS SNC is without merit. Those defendants, even though they did not sign the MGM – TPS SNC agreement containing a New York forum selection clause, are bound by the clause, because they are all closely related to TPS SNC and because it was reasonably foreseeable that they would be bound by that clause. Moreover, Canal+ France and or TPS Gestion are successors-in-interest to TPS SNC, including its obligations under the forum selection clause. Alternatively, the Court should permit jurisdictional discovery before ruling on the Rule 12(b)(6) branch of the motion to dismiss, because public record facts raise a substantial issue as to personal jurisdiction over the non-TPS SNC defendants, and therefore satisfy the prerequisites for jurisdictional discovery.

The branch of defendants' motion seeking dismissal for failure to state a claim under Rule 12(b)(6) should also be denied. The facts alleged in the Complaint, taken as true, state a valid claim for breach of contract against TPS SNC (and against Canal+ France and TPS Gestion, under principles of successor liability), for the remedy of specific performance against the same defendants, and for tortious interference with the MGM-TPS contract against Groupe Canal+.

---

[1]    "TPS," as used herein, refers to the television network and its service, whereas "TPS SNC" refers to the corporate entity that operated the TNS service.

## STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT[2]

In 1996, TPS SNC, a recently-formed French satellite television provider, asked MGM, a producer and distributor of motion pictures and television series, to consider entering into an "output agreement" to provide content to the new TPS television service. (Complaint ¶ 27).  An output agreement grants an operator of a foreign pay television system the right to transmit all of a studio's recently-released films and television series that meet contractually-specified standards, where the studio controls the Pay TV or Pay-Per-View TV (PPV) rights for the operator's territory.  The period during which MGM is contractually required to make its films and television series available to the operator is called the "output term."  Pay TV output agreements are typically exclusive for the operator's territory, meaning that the studio will not license the films or series to any competitor of the operator in the same territory.  (*Id.* ¶¶ 2, 19).

TPS SNC was formed to compete with an existing French satellite Pay TV provider, CANALSAT, which was owned by Groupe Canal+ and which broadcast the programming of Canal+, a Groupe Canal+ subsidiary. (*Id.* ¶¶ 25-27).  In fact, when approached by TPS SNC, MGM had an output agreement with CANALSAT, although this was about to expire.[3]  TPS SNC wanted to carry movies and American television series on an exclusive basis, as CANALSAT was doing, which TPS needed to effectively compete with CANALSAT.  (*Id.* ¶ 27).

MGM knew that by concluding an exclusive output agreement with TPS SNC, it would no longer be able to sell its films and series to CANALSAT.  It was also concerned that TPS

---

[2]     These facts must be assumed as true for purposes of this motion to dismiss. *See infra* at 13-14.

[3]     The competition between TPS and CANALSAT was characterized by exclusivity.  From 1997 until late 2006, CANALSAT subscribers could receive Canal+ programming but not that of the part-owners of TPS SNC, the

SNC, as a start-up, would not be able to effectively compete with CANALSAT over time and would ultimately be acquired by CANALSAT or its controlling entity. This would create a monopoly in French satellite television and MGM feared it would be frozen out of an output relationship with the successor entity. To protect its interests, MGM thus insisted that the output agreement give it the right to extend the output terms for a five year period in the case of an impending acquisition of the TPS service by a competitor. TPS SNC agreed. (*Id.* ¶¶ 32-33).

MGM and TPS SNC thus signed an Agreement, dated as of November 15, 1996 (the "**Agreement**") (Complaint, Ex. 1), which contained three annexes of relevance (the "**Annexes**"). These annexes licensed to TPS SNC the exclusive Pay TV and PPV rights in the specified territory (France and other French-speaking areas) for three categories of content in which MGM controlled the Pay TV and PPV rights for the territory: all recent theatrically-released motion pictures meeting specified criteria; a minimum number of made-for-television movies meeting specified criteria; and a minimum number of films and series from the MGM library. TPS SNC agreed to pay license fees based on specified formulas. The initial output terms of these Annexes ran from January 1, 1997 to December 31, 2001. (*Id.* ¶ 29).

The Agreement contained two provisions of relevance to this motion: (1) a forum selection clause, in which the parties agreed to submit any lawsuit "relating to this Agreement" to the exclusive jurisdiction of New York courts (Agreement ¶ 11), and (2) clauses in each of the Annexes allowing MGM to extend the then-existing output terms of the Annexes by five years if TPS SNC "is the subject of a Merger during the Initial Term (regardless whether such Merger is consummated during or after the Initial Term)" with an entity or its affiliate that controlled any digital television platform. (Agreement, Annex A ¶ 9(c); Annex B ¶ 7(e)).    The term "Merger"

---

French over-the-air television networks TF1 and M6, and TPS subscribers could receive the programming of TF1 and M6 but not Canal+. (*Id.* ¶ 26).

was broadly defined to include not just a corporate merger, but such matters as any "joint

marketing or cooperative arrangement or other agreement" which directly or indirectly transfers

to another digital platform operator "a significant interest in or control of TPS or its major

assets." (Agreement, Annex A, ¶ 25; Annex B, ¶ 1.3; Annex C, ¶ 3).

In 1999, MGM and TPS SNC negotiated an "Amendment to Agreement" (the

"**Amendment**") (Complaint, Ex. 2), which extended the output terms of the annexes for an

"Extended Term" running from January 1, 2002 to December 31, 2006. The Amendment

expanded MGM's rights in the event of a "Merger," providing that MGM would have the right

to extend the output terms of the Annexes "in the event (and only in such event) of a Merger. . .

between TPS and Canal+ which results in a unified holding. . . in the hands of a single entity or

group of shareholders," of the premium Pay TV and PPV "service[s]" of Canal+ and TPS.

(Amendment, ¶¶ I(2)(a), II(2)(a)). Nothing in the Amendment changed the extension option

rights granted under the Agreement that the parties entered into in 1996. (Complaint ¶¶ 36-37).

In January 2006, the owners of TPS SNC and of CANALSAT announced they had

agreed that the satellite television services of TPS and CANALSAT would be combined and

controlled by a Groupe Canal+ entity, with the shares of TPS SNC to be transferred to an entity

controlled by Groupe Canal+. (Complaint ¶ 40). On August 31, 2006, the French Ministry of

the Economy authorized the transaction. (*Id.* ¶ 41). The facts indicate that Groupe Canal+

assumed all or significant control over TPS SNC or its major assets, and possessed a unified

holding of both the TPS and CANALSAT services, before the formal consummation of the

transfer of TPS SNC stock to Groupe Canal+, and before December 31, 2006: a Groupe Canal+

employee took over primary management responsibility at TPS in September 2006; TPS SNC

began providing TPS subscribers with the most important CANALSAT programming as of

November 2006; and CANALSAT subscribers began receiving TF1 and M6 programming, previously only available to TPS SNC subscribers, as of December 2006. (*Id.* ¶¶ 44-45).

On August 31, 2006, Groupe Canal+'s Chairman of the Board announced that the transfer of TPS SNC's stock to Groupe Canal+'s control would be formally consummated in November 2006. (*Id.* ¶ 55). On September 28, 2006, MGM sent a notice to TPS SNC exercising its options pursuant to the Agreement. (*Id.* ¶ 47; Ex. 3). Groupe Canal+ had planned to use its new monopoly in French satellite television to compel U.S. movie studios to accept shorter and less lucrative contracts. By extending the output terms of the Annexes by five years with an increase in license fees, MGM undermined this plan. To try to frustrate MGM's contract rights, Groupe Canal+ caused TPS SNC to send letters denying MGM's right to exercise its options. (*Id.* ¶¶ 56-57). Moreover, Groupe Canal+ and TPS SNC decided to take the groundless position that MGM's option rights were conditioned on a prior formal consummation of a sale of the stock of TPS SNC to Groupe Canal+ before December 31, 2006. To this end, in November 2006, they deliberately postponed the formal consummation of TPS SNC stock until January 4, 2007. (*Id.* ¶¶ 58-59). MGM, without waiving the exercise of the options made on September 28, 2006, and to avoid doubt, re-exercised its options by a December 20, 2006 letter, based on all acts through the date of the letter demonstrating that conditions to exercise had been satisfied. (*Id.* ¶ 53, Ex. 9).

## ARGUMENT

### I

### THE COURT HAS PERSONAL JURISDICTION OVER ALL THE DEFENDANTS
#### A. Non-Signatories Can Be Bound By Contractual Forum Selection Clauses

The broad forum selection clause of the Agreement provides that each party "irrevocably and unconditionally submits itself and its property in any legal action or proceeding relating to

this Agreement (and any Definitive Agreements that are license agreements). . . to the exclusive

jurisdiction of the Courts of New York (whether State or Federal) or of the United States of

America." This constitutes a voluntary submission to personal jurisdiction in New York by any

entity bound by this clause.

The non-TPS SNC defendants argue that they are not bound because they did not sign

the Agreement. However, it is well-settled that "'a range of transaction participants, parties and

non-parties, should benefit from and be subject to forum selection clauses.'" *Weingrad v.

Telepathy, Inc.*, 05 Civ. 2024 (MBM), 2005 U.S. Dist. LEXIS 26952, at *15 (S.D.N.Y. Nov. 7,

2005) (non-signatory defendants held closely related to signatory defendant where plaintiff

alleged that "they acted in concert" to deprive him of a internet domain name, and the claims

against each defendant were substantially identical and arose out of the defendants' relationships

with one another) (*quoting Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp.

483, 485-86 (W.D.N.Y. 1997) ("*IPS*")). Non-signatories are bound to litigate in the selected

forum where they are "closely related" to a signatory, and the complaint alleges agreement and

joint action by the signatory and non-signatory to breach the contract or to commit torts against

the other party to the contract. *Weingrad*, 2005 U.S. Dist. LEXIS, at *16; *Novak v. Tucows, Inc.*,

No 06-CV-1909 (JFB), 2007 U.S. Dist. LEXIS 21269, at *45 (E.D.N.Y. Mar. 26, 2007).

Such a close relationship exists where the non-signatory and signatory are related entities,

such as a parent or subsidiary. S*ee, e.g., Paramedics Electromedicina Comercial LTDA v. GE

Med. Sys. Info. Tech., Inc.*, 02 Civ. 9369 (DFE), 2003 U.S. Dist. LEXIS 2692, at *31-32

(S.D.N.Y. June 4, 2003), *aff'd*, 369 F.3d 645 (2d Cir. 2004) (company related to non-signatory

held bound where claims arose out of relationship between companies); *Direct Mail Production

Servs. Ltd. v. MBNA Corp.*, 99 Civ. 10550 (SHS), 2000 U.S. Dist. LEXIS 12945, at *8 (S.D.N.Y.

Sept. 7, 2000) (parent held bound by forum selection clause in subsidiary's contract); *Puerto Rico v. Airborne Groupe PLC*, 882 F. Supp. 1212, 1216 (D.P.R. 1995) (parent or sister company of signatory bound).

In determining whether a non-signatory should be bound by a forum selection clause, courts also consider whether that result would be reasonably foreseeable. *See, e.g., Novak,* 2007 U.S. Dist. LEXIS 21269, at * 45. *Weingrad*, 2005 U.S. Dist. LEXIS 26952, at *1; *Dogmoch Int'l Corp. v. Dresdner Bank AG*, 304 A.D.2d 396, 397, 757 N.Y.S.2d 557, 558 (1st Dep't 2003).[4] Foreseeability is not a chronological issue: a non-signatory can be bound by, and invoke, a forum selection clause even though it became related to the signatory only after the contract containing the clause was signed. *Triple Z Postal Services, Inc. v. United Parcel Serv., Inc.*, 13 Misc. 3d 1241A, 831 N.Y.S.2d 357, 2006 N.Y. Misc. LEXIS 3406 at *33-36 (Sup. Ct. N.Y. County 2006) (company acquiring franchisor was bound to forum selection clause in franchise agreement, even though acquisition occurred after agreement was signed, where there was a close relationship between the franchisor and the acquiring company, and complaint alleged that acquiring company exercised total control over the franchisor and interfered with the agreement).

Moreover, a related non-signatory defendant will be required to litigate tort claims in the chosen forum if such claims "ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the [ ] claims involve the same operative facts as a parallel claim for breach of contract" against a signatory. *Weingrad*, 2005 U.S. Dist. LEXIS, at *13 (citations omitted). Thus, a defendant on a

---

[4]    The New York standard for enforcement of forum selection clauses is "similar if not identical" to the federal law standard. *Jones v. Wiebrecht*, 901 F.2d 17, 19 n.1 (2d Cir. 1990).

7

claim for tortious interference with a contract may be required to defend the claim in the forum

chosen by the contract. *Triple Z Postal Serv., Inc.*, 2006 N.Y. Misc. LEXIS, at \*29.[5]

**B.    Defendants Other Than TPS SNC Are Bound By The Forum Selection Clause**

The Court should deny the non-SNC defendants' motion to dismiss for lack of personal

jurisdiction, because the Complaint alleges that there was and is a close relationship between

them and TPS SNC. At this stage, prior to discovery, this allegation is sufficient to require them

to defend against MGM's claims in New York under the forum selection clause. *IPS*, 975 F.

Supp. at 487 (motion to dismiss denied on basis of pleadings alone prior to discovery); *see also*

*IHR Assocs. v. C.E. Cabinets, Ltd.*, 06-CV-5965 (JFB), 2007 U.S. Dist LEXIS 34788, at \*17

(E.D.N.Y. May 11, 2007).

As a result of the acquisition of the stock of TPS SNC by Groupe Canal+, either TPS

Gestion or Canal+ France appear to be successors to the rights and obligations of TPS SNC

under the Agreement. (Complaint ¶¶ 11, 43(d), 62). In fact, defendants's ultimate parent has

publicly stated that Canal+ France now runs the Pay TV business of TPS SNC. *See infra* at 11.

---

[5]    The cases cited by defendants, in contrast, are either inapplicable or not the law in this Circuit. In *Yung v. Lee*, 00 Civ. 3965 (DAB), 2002 U.S. Dist. LEXIS 16655 (S.D.N.Y. Sept. 5, 2002), *aff'd*, 160 Fed. Appx. 37 (2d Cir. 2005), this Court correctly found that a non-signatory that merely prepared financial statements for a signatory company did not have a close relationship with the latter, and was thus not bound by the signatory's selection of forum. *APA Excelsior III LP v. Premiere Technologies*, 49 F. Supp. 2d 664 (S.D.N.Y. 1999), held only that the ability of the non-signatories to invoke a forum selection clause in that case was "unclear", and that in any event the court would transfer the action to Atlanta because other related actions were already pending there. The conclusion of a single Illinois judge (*Sparks Tune-Up Centers, Inc. v. Strong*, No. 92 C 5902, 1994 U.S. Dist. LEXIS 6246 (N.D. Ill. May 11, 1994) and *City of Peru v. Bouvier Hydropower, Inc*, No. 00 C 1179, 2000 U.S. Dist. LEXIS 19393 (N.D. Ill. Dec. 28, 2000)), that closely related non-signatories may invoke but avoid being bound by forum selection clauses, has been rejected by courts in New York and this District, which hold that mutuality and fairness require that non-signatories that can invoke a forum selection clause must also be bound by the clause. *Triple Z Postal Services, Inc.*, 2006 N.Y. Misc. LEXIS 3406 at \* (citing *Dogmoch Int'l Corp., supra*, and *Frietsch v. Refco, Inc.*, 56 F.3d 825, 827-28 (7th Cir. 1995)); *Direct Mail Production Services Ltd*, 2000 U.S. Dist. LEXIS 12945, at \*12-13. Finally, while the Third Circuit, in *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.2d 1287, 1296 (3d Cir. 1996), declined to follow a Ninth Circuit holding (*Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509 (9th Cir. 1988)) that closely related non-signatories are bound by a forum selection clause, courts in our Circuit view *Manetti-Farrow* as correctly decided and persuasive. *See, e.g., Novak*, 2007 U.S. Dist. LEXIS 21269, at \*45; *Weingrad*, 2005 U.S. Dist. LEXIS 26592, at \*15-16.

Even if TPS SNC still exists as a shell corporation, this is irrelevant as there has apparently been a *de facto* merger, under which Canal+ France and/or TPS Gestion are now performing and are bound by TPS SNC's contractual obligations, including the forum selection clause of the Agreement.[6] *IHR Assocs.,* 2007 U.S. Dist. LEXIS 34788, at *17 ("Courts have denied motions to dismiss on the basis of the pleadings alone, where it was possible that a non-party to the contract containing the forum selection clause was the successor entity to the party to the contract.")

Groupe Canal+ is also bound by the forum selection clause. The Complaint alleges the requisite close relationship: Groupe Canal+ holds an indirect controlling interest in TPS SNC and actually directs and controls the business activities of TPS SNC (Complaint ¶¶ 11-13, 43-46). It also alleges "foreseeability," stating that Groupe Canal+ knew about the MGM-TPS Agreement and MGM's option rights before undertaking to cause TPS SNC to repudiate or breach that agreement. (*Id.* ¶ 70). When Groupe Canal+ induced TPS SNC to breach the Agreement, it was thus reasonably foreseeable that Groupe Canal+ would have to answer for its tortious conduct in a New York court. *See Direct Mail Production Services Ltd,* 2000 U.S. Dist. LEXIS 12945, at *12-13 (enforcement of forum selection was "foreseeable" by virtue of non-signatory's close relationship with the signatory).

Moreover, Groupe Canal+ is bound by the forum selection clause because it is sued for tortious interference with the contract that contains that clause. The tortious interference claim involves essentially the same facts as MGM's claim for breach of contract and will also require

---

[6]     Regardless of whether MGM properly exercised its extension options, the parties' rights and obligations under the MGM – TPS SNC Agreement did not end on December 31, 2006. The successors to TPS SNC still possess the right to broadcast MGM motion pictures and series that were made available to TPS SNC prior to that date until the end of the relevant Pay TV and PPV "windows" later in 2007 (*see* Complaint ¶¶ 21, 22, 62) , and still have the obligation to pay license fees to MGM  until the "windows" end.

the Court to interpret the Agreement and Amendment. *See Weingrad*, 2005 U.S. Dist. LEXIS, at

*13; *Triple Z Postal Serv., Inc.*, 2006 N.Y. Misc. LEXIS, at *29-30.

### C. Alternatively, the Court Should Permit Jurisdictional Discovery

At a minimum, facts in the public record show a substantial issue as to personal

jurisdiction over these defendants, and MGM should be permitted to take jurisdictional discovery

to supplement those facts. *See* accompanying Declaration of Micheline Donjacour ("**Donjacour**

**Decl.**"). Jurisdictional discovery is permitted where a plaintiff first shows facts that would

"arguably" support jurisdiction. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208

(2d Cir. 2003) (reversing and remanding for jurisdictional discovery). A "prima facie case" for

jurisdiction has not been required. *See, e.g, Klein v. The Hongkong and Shanghai Hotels, Ltd.*,

06 Civ. 377 (DAB), 2007 U.S. Dist. LEXIS 27340, at *11-12 (S.D.N.Y. Apr. 9, 2007) (this

Court allowed jurisdictional discovery where there was a "substantial issue" as to jurisdiction

over defendant and defendant's website suggested that it was operating in New York); *Ayyash v.

Bank Al-Medina*, 04 Civ. 9201 (GEL), 2006 U.S. Dist. LEXIS 9677 (S.D.N.Y. Mar. 9, 2006) at

*5 ("sufficient showing" of jurisdictional facts); *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153

F.R.D. 535, 547-48 (S.D.N.Y. 1994) (plaintiffs's position on jurisdiction is not "frivolous" and

made a "sufficient start" toward showing jurisdiction); *Daval Steel Prods. v. M.V. Juraj

Dalmatinac*, 718 F. Supp. 159, 162 (S.D.N.Y. 1989) (plaintiff showed "that there is some basis

for the assertion of jurisdiction. . . facts that would support a colorable claim of jurisdiction.").[7]

Defendants themselves have held Canal France+ out as the successor to TPS SNC.

Vivendi S.A., the parent of defendant Groupe Canal+ and ultimate parent of all the defendants in

---

[7]    *Jazini v. Nissan Motor Corp.*, 148 F.3d 181 (2d Cir. 1998) and *Best Van Lines, Inc. v. Walker*, 2007 U.S.
App. 15152 (2d Cir. June 26, 2007), do not create a categorical rule that a plaintiff must make out a prima facie case
of jurisdiction before a district court may authorize jurisdictional discovery. *See Ayyash*, 2006 U.S. Dist. LEXIS
9677 at * 18 n.7.

this case, has announced on its website that "[T]he pay TV businesses of Canal+ Group *and TPS* were *combined into Canal+ France*," (Donjacour Decl., Ex. 2), and that "Canal+, CanalSat *and the former TPS* ([have been] regrouped under *a new entity, Canal+ France*)." (*Id.*, Ex. 3). (Emphases added).  These admissions raise a substantial issue as to Canal+ France's status as TPS SNC's successor, and therefore whether it is bound by the forum selection clause of the agreement.  MGM should be permitted jurisdictional discovery into this issue.  *See Impulse Marketing Group, Inc. v. National Small Business Alliance, Inc.*, No. 05-CV-7776 (KMK), 2007 U.S. Dist. LEXIS 42725, at * 14-20 (S.D.N.Y. June 12, 2007) (jurisdictional discovery into successor liability permitted); *IPS*, 975 F. Supp. at 486-87 (same).

Public record facts also raise an issue as to whether Groupe Canal+ is "doing business" in New York, and is therefore subject to personal jurisdiction under N.Y. CPLR §301.  The central issue under § 301, which is "fact sensitive because each case is dependent upon its own particular circumstances," *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990), is whether the defendant, although not physically present here, conducts business in New York "with a fair degree of permanence and continuity," *Tauza v. Susquehanna Coal Corp.*, 220 N.Y. 259, 267 (1917).  In addition, a defendant may be found to be doing business in New York through a subsidiary that is the parent's "mere department"; this requires consideration of whether the subsidiary is financially dependent on the parent, the parent "interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities…[and] the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F. 2d 117, 120-22 (2d Cir. 1984).

The public record shows that "Canal+" or "Canal Plus," as well as Studio Canal, a subsidiary of Groupe Canal+, has produced or co-produced numerous motion pictures that have used New York as a filming location. (Donjacour Decl. ¶¶8, 12 ; Exs. 3, 7). Canal Plus regularly licenses rights from the New York-based National Basketball Association. (*Id.* ¶ 9, Ex. 5). Studio Canal has also promoted and marketed its films at the New York Film Festival and has licensed its films for Broadway plays and musicals. (*Id.* ¶¶ 13-14; Exs. 8-9). Studio Canal appears to be a "mere department" of Groupe Canal+, whose New York business should be attributed to the parent. It is financially dependent: it does not have stock outstanding; its financial statements are consolidated with its ultimate parent, Vivendi; and it does not appear to have separate banking relationships.[8] (*Id.* ¶¶ 15-16; Exs. 2, 10). Groupe Canal+ has interfered in the selection and assignment of Studio Canal's personnel; in fact, the companies share a single chairman, and the General Secretary and General Counsel of Groupe Canal+ concurrently served as president of Studio Canal while negotiating the TPS SNC acquisition for Groupe Canal+. (*Id.* ¶¶ 18-18; Exs. 11-13). Groupe Canal+ tells investors and the public that Studio Canal is merely a branch of its overall business, and acknowledges that it directly controls Studio Canal's operational policies and strategy. (*Id.* ¶ 19: Ex. 11). Even industry publications such as *Variety* regard Studio Canal as a division of Groupe Canal+. (*Id.* ¶ 20; Ex. 14).

These facts indicate that Groupe Canal+ has deliberately and repeatedly "take[n] advantage of New York's unique resources in the entertainment industry, [and] has purposefully availed itself of the benefits of conducting business in the State." *Courtroom Television Network v. Focus Media, Inc*, 264 A.D.2d 351, 354,  695 N.Y.S.2d 17, 19 (1st Dep't 1999).  Having

---

[8]    *See Beech Aircraft Corp.*, 751 F.2d at 120-21; *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 101, 256 N.Y.S.2d 129, 131 (1965) (such facts evidence financial dependency).  A parent may also be present in New York through a subsidiary which is an agent, if the subsidiary "does all the business which

shown a substantial issue as to jurisdiction, MGM should be permitted to take discovery into Groupe Canal+'s New York contacts before the Court decides the 12(b)(2) branch of the motion to dismiss.

## II

### THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT

### A.    The Standards on a Rule 12(b)(6) Motion

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint should be read "generously" and the Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec. v. City of N.Y.,* 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted). The only question to be decided is whether the complaint is legally sufficient; the Court is not to weigh evidence that may be presented at trial. *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996) (internal quotes omitted).[9]

---

[the foreign corporation] could do were it here by its own officials." *Frummer v. Hilton Hotels, Inc.,* 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41,45 (1967) and is under the parent's control.

[9]    *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007) has not materially increased the pleading standards of the Federal Rules of Civil Procedure or the burden that must be borne by the opponent of a motion to dismiss under Rule 12(b)(6). The Second Circuit, in *Iqbal v. Hasty,* 2007 U.S. App. LEXIS 13911 (2d Cir. June 14, 2007), concluded that *Bell Atlantic* "is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Id.* at *35. It held only that "to survive a motion to dismiss under the plausibility standard of Bell Atlantic, a conclusory allegation concerning some elements of a plaintiff's claims might need to be fleshed out by a plaintiff's response to a defendant's motion for a more definite statement. *See* Fed. R. Civ. P. 12(e)." *Id.* at *37. Otherwise, all principles favoring non-movants on motions to dismiss remain unchanged. *Roth v. Jennings,* 2007 U.S. App. LEXIS 13035 at *29 (2d Cir. June 6, 2007) at *29 (post-*Bell Atlantic,* courts must still "'accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally.'") MGM's claims against the defendants easily clear the hurdle of plausibility and are more than specific enough to meet the requirements of federal pleading standards as interpreted in *Bell Atlantic.*

On a motion to dismiss a claim for breach of contract, a court must "strive to resolve any contractual ambiguities" in the non-movant's favor. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). An "ambiguous term is one that is reasonably susceptible to more than one reading, or one as to which reasonable minds can differ." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005). Unless the Court can conclude that the movant's interpretation of a contract is the only reasonable one, it cannot dismiss a claim for breach of contract for failure to state a claim. *See Peregrine Fixed Income Ltd. v. JP Morgan Chase Bank*, 05 Civ. 4351 (RMB), 2006 U.S. Dist. LEXIS 8766 at *6 (S.D.N.Y. Jan. 26, 2006); *DKR Capital, Inc. v. AIG Int'l W. Broadway Fund Ltd.*, 03 Civ. 1568 (JGK), 2003 U.S. Dist LEXIS 17498 at *6 (S.D.N.Y. Oct. 1, 2003). *See also Lucente v. IBM*, 310 F.3d 243, 257 (2d Cir. 2002) (same standard applied on summary judgment motion).

**B.    The Complaint States A Claim for Breach of Contract**

1.    Canal+ France and TPS Gestion Are Subject To Successor Liability

Even though Canal+ France or TPS Gestion did not sign the Agreement, they are alleged to be the successors-in-interest to TPS SNC, and would therefore be liable for its breach of the Agreement under the doctrine of successor liability. *See supra* at 8-9. The pleading of this fact is is sufficient to defeat the motion to dismiss MGM's breach of contract claim, because successor liability is "subject to the lenient pleading requirements of Rule 8(a)," *Old Republic Ins. Co. v. Hansa World Cargo Serv.*, 170 F.R.D. 361, 376 (S.D.N.Y. 1997); *see also IPS*, 975 F. Supp. at 486. Moreover, as shown above, defendants themselves acknowledge that TPS and CANALSAT have been "combined into Canal+ France." *See supra* at 11.

2.    The Contractual Conditions to Exercise Of MGM's Options Were Fulfilled

Defendants contend that the contractual conditions precedent to MGM's exercising its extension options was never satisfied. This argument is fatally flawed. Under any reasonable construction of the Agreement and Amendment – indeed, even under defendants' extreme reading that requires a prior "unified holding" of the TPS and CANALSAT services before MGM could exercise its options – any contractual precondition was unquestionably satisfied before MGM exercised its options.

First, defendants use the word "merger" (with a lower case "m") throughout their argument, misleadingly suggesting that only a formal, consummated corporate merger would allow MGM to exercise its options. In fact, the Agreement and Amendment both use the capitalized term "Merger," which is intentionally defined in the Agreement in the broadest possible terms (a definition that remains unmodified in the Amendment). A "Merger" that triggers MGM's right to exercise its options is not only a corporate merger, but also "any joint venture. . . licensing arrangement, joint marketing or cooperative arrangement or other agreement that has the effect of directly or indirectly transferring from [TPS] to [another digital television platform operator] all or a significant interest in or control of TPS or its major assets." (Agreement, Annex A ¶ 25). A "Merger" is thus *any* agreement or arrangement, tacit or explicit, under which TPS SNC gives significant control of the operations of TPS to another digital satellite company. A "Merger" does not have to be an agreement (much less a consummated agreement) for TPS SNC to formally merge with or have its stock acquired by that other company. This broad definition is consistent with MGM's reason for requiring the options: in order to protect itself against the possibility that TPS SNC would come under the control of a

competitor and MGM would be frozen out of a future output relationship in French satellite television. (Complaint ¶ 32).

Defendants contend that only the language of the Amendment governs MGM's options to extend the term of the Agreement. They claim that before MGM can exercise its options, a Merger must have occurred "between TPS SNC and a Canal+ entity that results in a unified holding of their respective Pay TV Services." Defs. Br. at 16. Even assuming that this strained reading is the only contractual interpretation that reasonable minds could reach (it is not; *see infra* at 17-19), the facts show that the "unified holding" precondition was satisfied before MGM exercised its options.

The "unified holding" referenced in the Amendment is of the Pay TV and PPV "*service[s]*" (emphasis added) of Canal+ and TPS, not their stock. (Amendment ¶¶ I(2), II(2)). Services can come under the control of an entity or person without a formal transfer of title or execution of documents of title such as stock certificates or bills of sale, or, indeed, without any formal agreement. Given the broad contractual definition of "Merger" applicable to the Amendment, which includes any "cooperative arrangement or other agreement that has the effect of directly or indirectly transferring from [TPS] to [another digital television platform operator] all or a significant interest in or *control* of TPS or *its major assets*" (emphasis added), the only reasonable interpretation of a "unified holding. . . of. . .service[s] " means an event giving significant *control* over CANALSAT and TPS's Pay TV and PPV services to a single company or group of shareholders, regardless of whether that control is given by a formal transfer of stock, an ordinary agreement, or an informal "arrangement."

Accordingly, any agreement or arrangement, formal or tacit, by which the existing owners of TPS SNC (M6 and TF1) transferred to Groupe Canal+ management significant control

over the programming and operations of TPS, would satisfy the extension options conditions of the Amendment. There would be a "Merger" (a "cooperative arrangement" transferring from TPS SNC to Groupe Canal+ "a significant . ... control of TPS or its major assets"), resulting in a "unified holding " (*i.e.*, control) in the hands of a single entity (Groupe Canal+) of the Pay TV and PPV services of both TPS and CANALSAT. Once such control was acquired, any alleged condition precedent would be satisfied. MGM could exercise its options even if the owners of TPS SNC never sold their stock to Groupe Canal+.

This is precisely what the Complaint alleges occurred prior to MGM exercising its extension options: before January 1, 2007, and well before the formal consummation of any stock transfer, Groupe Canal+ actually "acquired all or a significant . . . .control of TPS or its major assets" (*id.* ¶ 42). Groupe Canal+, which owned CANALSAT, exercised unified control over the services of both CANALSAT and TPS by, among other things, appointing one of its own employees to direct the operations of TPS (*id.* ¶ 44), and causing TPS to begin carrying CANALSAT programming, and CANALSAT to carry TF1 and M6 programming; previously, when TPS and CANALSAT were under separate control, one service's subscribers could not receive the other service's programming. (*Id.* ¶ 45(a)). The Complaint also alleges that MGM re-exercised its extension options on December 20, 2006, after Groupe Canal+ assumed this unified control over the services of both networks. (*Id.* ¶¶ 47, 53, Exs. 3, 9). Thus, MGM's exercise was effective even under defendants' "unified holding" theory.

Furthermore, the "unified holding" theory is *not* the only reasonable reading of the contractual language. Defendants acknowledge that if the extension options in Paragraphs 9(c) of Annex A and 7(e) of Annex B of the Agreement were still in force when MGM sent its letters exercising its options, the agreement of TPS SNC's owners to have TPS SNC's assets or stock

17

acquired by Groupe Canal+ at a future date (which defendants also admit was signed in early 2006) would have satisfied the contractual conditions and MGM's exercise of its options would have been timely and effective.   Defs. Br. at  18.

Contrary to defendants' contention  (Defs. Br. at 19), Paragraphs 9(c) of Annex A and 7(e) of Annex B of the Agreement were not nullified by Paragraphs I(2) and II(2) of the Amendment.   Under New York law, "modifications do not necessarily abrogate the original contract entirely; indeed, the terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms." *Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 878 F.2d 41, 46 (2d Cir. 1989) (internal quotes omitted). *See also United States v. Agnello*, 344 F. Supp. 2d 360, 368 (E.D.N.Y. 2003) (modification to a contract "leaves intact those provisions of the original agreement that are not directly inconsistent.").

Paragraphs I(2) and II(2) of the Amendment do not even mention, much less expressly revoke or limit, Paragraphs 9(c) of Annex A and 7(e) of Annex B of the Agreement.   In contrast, virtually all the other provisions of the Amendment specify the provisions of the Agreement that were being modified and in what respects they were modified.[10]  Nor is there any direct inconsistency between the two groups of provisions. This shows that MGM and TPS SNC intended to keep Paragraphs 9(c) of Annex A and 7(e) of Annex B of the Agreement in existence and supplement them with a second path to extension of the output terms.   A "reasonably intelligent person who has examined the context of the entire integrated agreement" can interpret the relationship between the two extension provisions as cumulative, not exclusive. *Lucente*, 310

---

[10]      *See, e.g.*, Amendment ¶ I(1) (specifying that "the Initial Term at Paragraph 9 of Annex A" shall be extended); II(B) (same extension for "the Initial Term set forth in Paragraph 7 of Annex B"); ¶ I(3) (changing the "Territory set forth in Paragraph 3 of Annex A" to include other countries on a non-exclusive basis); ¶ II(3) (same for Annex B); ¶ I(5) (changing "Most Favored Nations Terms set forth at Paragraph 23 of Annex A"); ¶ I(6) (changing license fee for "Back Window" as set forth in ¶ 13 of Annex A).

F.3d at 247 (internal quotations omitted).  Given defendants' admission that MGM's exercise was effective under the terms of the Agreement, the motion to dismiss must be denied.

There is no material difference in language between Paragraphs 9(c) of Annex A and 7(e) of Annex B of the Agreement (which allows MGM to exercise its options if TPS SNC becomes the subject of a Merger "regardless whether such Merger is consummated during or after the Initial Term") and Paragraphs I(2) and II(2) of the Amendment (which gives MGM extension rights "in the event (but only in such event) of a Merger….between TPS and Canal+ which results in a unified holding" of the TPS and CANALSAT services).  Neither provision conditions MGM's rights on another digital operator acquiring TPS SNC's stock before the end of the existing term of the Annexes.  Thus, both provisions are consistent with the purpose of the extension options: to induce MGM to enter into and renew its output contract with TPS SNC by giving it economic protection if the TPS service later came under the effective control of another digital television operator.  (Complaint ¶ 32).

In contrast, defendants' reading of the contract ignores both the language and purpose of these provisions.  They contend that MGM willingly gave up the Agreement's broad contractual protection for an illusory right that could be frustrated by Groupe Canal+ obtaining actual control over the TPS service immediately, but deliberately postponing its formal acquisition of TPS SNC stock until a few days after the end of the Agreement's existing output terms.  Defs. Br. at 19. The Court should reject this unreasonable construction, and deny the motion to dismiss.

### C.    Alternatively, Any Unfulfilled Condition Precedent To MGM's Option Exercise Was Excused By TPS SNC's Frustration of That Condition

Finally, even if the Amendment alone applied and required a formal consummation of the stock sale of TPS SNC to Groupe Canal+ before MGM could exercise its options, the breach of contract claim may not be dismissed.  TPS SNC still owed a implied contractual duty of fair

19

dealing and good faith not to do anything that would prevent MGM from exercising its option rights. The Complaint shows that TPS SNC violated this obligation of fair dealing and good faith, and waived the asserted condition precedent, by agreeing with Groupe Canal+ to postpone the formal closing of the sale of TPS SNC stock from November 2006 until four days into 2007, in order to prevent MGM from exercising its option rights.

Parties to contracts have an "implied obligation to exercise good faith not to frustrate the contracts into which they have entered." *Grad v. Roberts*, 14 N.Y.2d 70, 75, 248 N.Y.2d 633, 637 (1964); accord, *Kooleraire Serv. & Installation Corp. v. Board of Educ.*, 28 N.Y.2d 101, 105, 320 N.Y.S.2d 46, 48 (1971); *Amies v. Wesnofske*, 255 N.Y. 156, 163 (1931). Consequently, "'a party cannot insist upon a condition precedent, when its non-performance has been caused by himself.'" *Cross & Cross Properties v. Everett Allied Co.*, 886 F.2d 497, 501 (2d Cir. 1989) (*quoting Young v. Hunter*, 6 N.Y.203, 207 (1852)). This is often called the "prevention doctrine." *See In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 737 n.9 (S.D.N.Y. 1989).

This prevention doctrine is fully applicable to option contracts. Where A gives B an option right, which may only be exercised if a particular event occurs first, and A prevents the event from occurring, the condition precedent is waived and B may exercise the option even though the condition has not occurred. *See TP Group, Inc. v. Wilson*, No. 89 Civ. 2227 (KMW), 1990 U.S. Dist. LEXIS 4367, at *6-7 (S.D.N.Y. April 16, 1990); *Douchkess v. Campbell*, 64 N.Y.S.2d 554, 559 (Sup. Ct. N.Y. County 1946), *aff'd*, 272 A.D.795, 71 N.Y.S.2d 915 (1st Dep't 1947).

The Complaint alleges such prevention and waiver. In January 2006, the owners of TPS and Groupe Canal+'s parent, Vivendi, announced that an agreement had been signed under

which the shares of TPS SNC would be transferred to a Groupe Canal+-controlled entity (Complaint ¶ 40), and that the only condition precedent to closing of this transaction was approval by the French Ministry of the Economy (*id.*). The Ministry of the Economy gave its approval on August 31, 2006, and there were no other preconditions preventing the transaction from being closed before January 1, 2007. (*Id.* ¶ 41). The parties actually scheduled a formal consummation of the stock acquisition in November 2006, as announced by the Chairman of Groupe Canal+ in August 2006. (*Id.* ¶ 55). However, after MGM, on September 28, 2006, announced that it was exercising its option rights, TPS SNC and Groupe Canal+, in an effort to frustrate those rights, postponed the agreed closing date of the acquisition until after December 31, 2006 (*id.* ¶¶ 58-59), and in fact did not formally consummate the transfer of TPS SNC stock until January 4, 2007. (*Id.* ¶ 59).

Taking these detailed allegations as true, they would unquestionably establish that TPS SNC intentionally prevented the claimed condition precedent to MGM's exercise of its option rights from occurring. As a matter of law, this waived the alleged condition. MGM thus effectively re-exercised its option rights by letter dated December 20, 2006, *after* the alleged condition precedent had been waived by TPS SNC's conduct (Complaint ¶ 53, Ex. 9). The motion to dismiss should therefore be denied.

## IV

### THE COMPLAINT STATES A CLAIM FOR SPECIFIC PERFORMANCE

Defendants claim that MGM is not entitled to the remedy of specific performance and that specific performance would be barred by laches. The simple response is that both these issues depend on determinations of fact that may not be made at the stage of a motion to dismiss for failure to state a claim.

21

The Complaint alleges breach of contract by TPS SNC and that MGM was and is ready, willing, and able to perform under the extended output terms of the breached contract. (Complaint ¶ 62). New York law requires no more to state a valid claim for specific performance. *Sammarco Garden Ctr., Inc. v. Sammarco*, 173 A.D.2d 456, 570 N.Y.S.2d 80. 81 (2d Dept. 1991). MGM is not required to prove or even allege in its Complaint that damages are an inadequate remedy for breach; that issue is not reached until after discovery and, often, only at trial. *Center v. Hampton Affiliates*, 66 N.Y.2d 782, 786, 497 N.Y.S.2d 898, 901 (1985) (reversing grant of summary judgment); *Town of Austerlitz v. Dugwest Assocs.*, 24 A.D.3d 847, 804 N.Y.S.2d 859, 860 (3d Dep't 2005) (refusing to dismiss claim for specific performance).

Similarly, the affirmative defense of laches may not be resolved at the stage of a motion to dismiss. A complaint may only be dismissed on the basis of an affirmative defense if that defense clearly appears on the face of the complaint. *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003). However, the plaintiff does not have to negate the existence of affirmative defenses in its complaint. *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003).

A laches defense may not be decided on a motion to dismiss where it would "necessarily involve a fact-intensive analysis and balancing of equities that would require the Court to consider matters outside of the pleading that are in dispute." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999); *Karlan v. N.Y. Univ.*, 464 F. Supp. 704, 708 (S.D.N.Y. 1979) (laches should only be raised by answer, not in a motion to dismiss). Clearly, the defense proposed by defendants (which requires a determination of whether MGM unduly delayed and whether defendants were prejudiced thereby) requires such an analysis and balancing, and presents questions of fact that may not be resolved on a motion to dismiss.

22

V

## THE COMPLAINT STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT

The elements of tortious interference with contract are "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95, 595 N.Y.S.2d 931, 934 (1993). The Complaint meets this test: it alleges a valid contract between TPS SNC and MGM containing the option rights at issue, and facts indicating all the other required elements: knowledge of the contract and option rights by Groupe Canal+ prior to breach (Complaint ¶¶ 57, 70), inducement by Groupe Canal+ of TPS SNC's breach of the contract (*Id.* ¶¶ 57-58, 71), and damages to MGM (*id.* ¶ 72).

The fact that some of these allegations are made on information and belief does not warrant dismissal. Groupe Canal+'s inducement of TPS SNC's breaches took place behind closed doors, but the reasonable inferences that MGM has drawn from the known facts easily meet the test of "plausibility" announced in *Bell Atlantic Corp.*[11] MGM is not pleading "mere labels and conclusions" or a "formulaic recitation of the elements of a cause of action," but "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.*, 127 S. Ct. at 1965, 1974. *See also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (*per curiam*) (under pleading standards of Fed. R. Civ. P. 8(a)(2), "specific facts are not necessary" in a complaint). The Federal Rules require no more at this stage of the proceedings.

---

[11] *E.g.*, Groupe Canal+'s announced intention to exploit its monopoly position in French satellite television by forcing some American motion picture studios to accept unfavorable terms and deny others the right to supply content to the monopoly (*id.* ¶ 56); the parties' announced intention to close their merger in November 2006, which changed only when MGM exercised its options (*id.* ¶ 58); and the likelihood that MGM's five-year extension of its

23

Groupe Canal+ also asserts the "economic interest" defense to tortious interference, but the Court should reject this argument. In fact, under defendants' theory of the case, Groupe Canal+ is foreclosed from raising this defense as a matter of law. The economic interest defense can only be raised where the defendant had "a legal or financial stake in the breaching party's business." *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426, 835 N.Y.S.2d 530 (2007). Defendants effectively assert that Groupe Canal+ did *not* have a "legal or financial stake" in the business of TPS SNC when it is alleged to have induced the breach. They claim that Groupe Canal+ did not acquire that stake in TPS SNC until the date that it acquired TPS's stock at the formal closing of the transaction in January 2007 – well after the alleged breach and inducement of breach took place. (Defs. Br. at 17). Under defendants' own argument, Groupe Canal+ was a stranger to TPS SNC (in fact, its competitor) at the time of the alleged inducement, having neither legal nor financial rights "in the breaching party's business," and therefore lacking any legal justification for causing TPS SNC to breach its contract with MGM. *White Plains Coat & Apron Co.*, 8 N.Y.3d at 426, 835 N.Y.S.2d at 533 (mere competitor may not raise defense); *Stern v. MDS Acquisition Corp.*, 87 Civ. 4505 (RJW), 1991 U.S. Dist. LEXIS 11088 (S.D.N.Y. Aug. 8. 1991) (holding that jury could find for plaintiff on tortious interference claim if inducement to breach occurred before defendant acquired interest in breaching party).

In any event, the issue of economic interest privilege is not appropriate for decision on a motion to dismiss. The economic interest privilege requires the defendant to prove that it acted in the good faith pursuit of a legally-protected interest. *See Int'l Mining Co. v. Allen & Co.,* No. 80 Civ. 3750 (RWS), 1981 U.S. Dist. LEXIS 16710 at *3 (S.D.N.Y. Dec. 15, 1981). The economic interest defense can be overcome by a showing that the defendant acted with malice,

---

contract rights would impair Groupe Canal+'s ability to force its terms upon other American motion picture studios and be a motivating factor for Groupe Canal+'s acts (*id.* ¶ 57).

*Foster v. Churchill*, 87 N.Y.2d 744, 750, 642 N.Y.S 2d 583, 587 (1996) or employed "wrongful means," *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 624, 641 N.Y.S.2d 581, 585(1996), which may include "some degrees of economic pressure."

The Complaint pleads that Groupe Canal+'s tortious interference and intentional breach of contract was motivated by a desire to abuse newfound monopoly power and, in particular, to make an example of MGM because its renewal of its contract rights stood in the way of the defendant's effort to extort favorable terms from other studios (Complaint ¶ 57). These facts, if proven, would show both malice toward MGM and the use of improper "economic pressure." Accordingly, the economic interest defense cannot be resolved on this Rule 12(b)(6) motion. *See New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 331 (S.D.N.Y. 2000) (denying motion to dismiss tortious interference claim); *International Mining Co.* (material question of fact on privilege issue precludes motion to dismiss).

## CONCLUSION

For the reasons stated above, the Court should deny the motion to dismiss in its entirety.


Dated: New York, New York
        July 13, 2007


                                    DLA PIPER US LLP

                                    By: *[signature]*
                                    Andrew L. Deutsch (AD 5782)
                                    1251 Avenue of the Americas
                                    New York, NY 10020
                                    (212) 335-4880

                                    *Attorneys for Plaintiff Metro-Goldwyn-Mayer
                                    Studios Inc.*

25