Monday 12, March 2007

(c) In 2006, Maroc Telecom entered into an agreement with the government of the Kingdom of Morocco pursuant to which Maroc Telecom committed to carrying out a capital expenditure program for a total amount of MAD 7.4 billion and to create 150 new jobs between 2006 and 2009. In return, the Moroccan government agreed to exempt Maroc Telecom from paying customs' duties on capex-related imports. As of December 31, 2006, approximately MAD 4.6 billion (€410 million, at this time) of the capital expenditure program had yet to be spent. If Maroc Telecom does not make these investments, it will have to pay the unpaid customs' duties plus interest for late payment.

## 29.2. Other given and received commitments relating to operations

| References | Nature of the commitment | Amount of the commitment | Expiry |
|---|---|---|---|
| | **Contingent liabilities** | | |
| | Credit line not used as of February 27, 2007 (given the amount of treasury bond issued on that day) | €4,288 million | 2011-2012 |
| (a) | SFR - UMTS license for France (assigned in August 2001) | 1% of revenues earned. | August 2021 |
| (a) | SFR - GSM license for France (renewed in March 2006) | 1% of revenues earned. | March 2021 |
| (b) | Maroc Telecom - Contribution to the provision of universal service | 2 % of Maroc Telecom annual revenues, net of interconnection costs | |
| (c) | Obligations related to the permission to use the Consolidated Global Profit System | - Creation of 600 jobs connected with the Group's businesses (449 jobs were created as of December 31, 2006) | End of 2007 |
| | | - Payment of €5 million annually for 5 years (€10 million already paid as at December 31,2006). | End of 2009 |
| | Individual entitlement to training to French employees | Approximately 437 000 hours as at December 31, 2006. | - |
| (d) | Obligations in connection with pension plans and post-retirement benefits | Please refer to note 20 "Employee benefits" | - |
| (e) | Various other miscellaneous guarantees given | €112 million | - |
| | **Contingent assets** | | |
| (a) | SFR - Licenses for SFR networks and for the supply of telecommunications services in France: GSM (March 2006 - March 2021) and UMTS (August 2001 - August 2021) | - | 2021 |
| (f) | Maroc Telecom - Licenses for networks and for the supply of telecommunications services in Morocco (2006 - 2031) | - | 2031 |
| | Various other miscellaneous guarantees received | €116 million | - |

(a) SFR holds licenses for its networks, and for the supply of its telecommunications services in France for a period of 15 years for GSM (March 2006-March 2021), and 20 years for UMTS (August 2001-August 2021). In March 2006, the French Government authorized SFR to continue using its GSM license over the next 15 years (between April 1, 2006 and March 31, 2021), for an annual payment comprised of a fixed portion in an amount of €25 million (capitalized over the period for its present value of €278 million, please refer to Note 11 "Other intangible assets" for more details) and a variable portion equal to 1% of the yearly revenues generated by the 2G technology. Since the variable portion cannot be reliably determined in order for it to be capitalized, it has not been recorded as a liability in the statement of financial position. Upon the acquisition of the UMTS license, the fixed amount paid, i.e. €619 million was recorded as an intangible asset (please refer to Note 11 "Other intangible assets" for more details). Since the variable part of the fee (equal to 1% of GSM revenues) cannot reliably be determined, it is not recorded in the statement of financial position. It is recorded as an expense when incurred.

(b) Maroc Telecom is required to contribute to the provision of universal service in the amount of 2% of its annual revenues, net of interconnection costs. This contribution to the universal service fund may be reduced by costs incurred directly by Maroc Telecom in this respect, subject to approval of the expenditure program by the Universal Service Management Committee of the ANRT (Moroccan National Telecommunications Regulatory Agency).

(c) Under the terms of the permission to use the Consolidated Global Profit Tax System, Vivendi has undertaken to create 600 jobs connected with the Group's businesses. Vivendi is committed to creating a minimum of 100 jobs by the end of 2005, 400 jobs by the end of 2006 and 600 jobs by the end of 2007. As of December 31, 2006, 449 jobs had been effectively created. In addition, Vivendi has undertaken to provide financial support for the creation of jobs not connected with the Group's businesses in regions in difficulty selected by the French State. Vivendi's financial commitment involves an annual payment of €5 million to specialist companies over a 5-year period commencing January 1, 2005. The objective is the creation of 1,000 jobs over 3 years and 1,500 jobs over 5 years. As of December 31, 2006, 806 jobs had been effectively created. The undertakings are regularly monitored by a National Monitoring and Orientation Committee comprising representatives of each of the parties concerned. As of December 31, 2006, Vivendi is in full compliance with its commitments and intends to continue to act in accordance with the terms of its undertaking.

(d) Vivendi has obligations in connection with pension plans and post-retirement benefits. As these obligations are not contractually fixed as to timing and amount, they have not been included in this disclosure.

(e) Including a guarantee capped at €19 million that would be reimbursed in approximately 3 years, if it were to be called. In addition, Vivendi grants guarantees in various forms to financial institutions on behalf of its subsidiaries in the pursuit of their operations.

Annual Financial Report and Audited Consolidated Financial Statements for the Year Ended December 31, 2006     Vivendi /151

(f) In July 2006, Maroc Telecom was awarded a 3G mobile license by the ANRT (the Moroccan National Telecommunications Regulatory Agency) for 25 years (July 2006 – July 2031) for a fixed fee of MAD 300 million (approximately €27 million, excluding tax, paid in the fourth quarter of 2006).

### 29.3. Share purchase and sale commitments

| References | Nature of the commitment | Amount of the commitment | Expiry |
|---|---|---|---|
| | **Contingent liabilities** | | |
| | Other | €4 million | - |
| | **Contingent assets** | | |
| (a) | NBC-Universal transaction (May 2004), amendments in June 2005 and December 2006 | Ability to sell NBC Universal shares on the market between November 2007 and November 2016 (up to $4 billion) | 2016 |
| | | Put option to General Electric under certain circumstances; | 2016 |
| | | General Electric call option exercisable from May 11, 2011 until May 11, 2017 | 2017 |
| (b) | Acquisition of BMG music publishing (BMGP) to Bertelsmann AG (transaction not completed as of December 31, 2006) | Commitment to deliver BMGP shares to UMG on approval of the competition authorities | - |
| | Other | € 5 million | 2008 |

(a) As part of the NBC-Universal transaction which was completed in May 2004, Vivendi received certain liquidity commitments and guarantees from General Electric (GE) which were subsequently amended. As part of the amended agreement that governs Vivendi's exit from NBCU, Vivendi is entitled to sell its stake in NBCU under mechanisms providing for exits at fair market value. Vivendi has the right to notify GE of its intent to sell in the public market between $1 billion and $4 billion of its NBCU shares in November of each year between 2007 and 2016, which could lead to the public offering of a portion of Vivendi's stake the following year. GE has the right to pre-empt any of Vivendi's sale to the market.

Under certain circumstances, if Vivendi exercises its right to sell its NBCU shares in the market and if GE does not exercise its preemptive right, Vivendi will be able to exercise a put option to GE for those shares. Lastly, for the period between May 11, 2011 and May 11, 2017, GE will have the right to call either (i) all of Vivendi's NBCU shares or (ii) $4 billion of Vivendi's NBCU shares, in each case at the greater of their market value at the time the call is exercised or their value as determined at the time of the NBC Universal transaction (i.e., $8.3 billion), which value is increased by the US Consumer Price Index annually beginning in May 2009. If GE calls $4 billion, but not all, of Vivendi's NBCU shares, GE must call the remaining NBCU shares held by Vivendi by the end of the 12-month period commencing on the date GE exercises its call option.

(b) On September 6, 2006, Universal Music Group (UMG) entered into an agreement with Bertelsmann AG to purchase 100% of BMG Music Publishing (BMGP). The gross purchase price is €1,639 million. A deposit representing the net amount was paid in cash on December 15, 2006 and included an adjustment for cash generated by BMGP during the period comprised between July 1, 2006 and that day and for interest capitalized over this period. The transaction price included an adjustment for cash generated by BMGP during the period comprised between December 16, 2006 and the closing date. This transaction is subject to the regulatory approvals of the competition authorities in the relevant countries. Such approval has been obtained in the United States. However, the European Commission announced on December 8, 2006 that the transaction will be subject to a Phase II inquiry. Until the closing date and the consolidation of BMGP by UMG, the cash outlay is recorded as a non current financial asset (please refer to Note 15 "Financial assets").

- **Commitments related to operations underway as of December 31, 2006**

A detailed description is provided in Note 2.1 with respect to the combination of Canal+ France and TPS pay-TV activities in France completed on January 4, 2007. In particular, TF1 and M6 were granted by Groupe Canal+ a put option on their shares in Canal+ France and Lagardère was granted a call option on a number of shares that would allow Lagardère to increase its ownership interest in Canal+ France to 34%, subject to certain conditions.

In addition, Vivendi was involved in the acquisition of various companies or assets, the completion of which is subject to the approval of competition authorities or to consultation with the relevant labor relations and employee representative committees. These companies or assets mainly include the fixed telephony and broadband activities of Télé2 France. On October 2, 2006, SFR signed an agreement with the Télé2 AB Group to acquire the fixed telephony and broadband activities of Télé2 France for an enterprise value of €375 million, which value could be adjusted following earn out clause as included in the agreement. This transaction is subject to the approval of antitrust authorities.

## 29.4. Contingent assets and liabilities subsequent to given or received commitments related to the divestiture or acquisition of shares

| Ref. | Nature of the commitment | Amount of the commitment | Expiry |
|---|---|---|---|
| | **Contingent liabilities** | | |
| (a) | NBC-Universal transaction (May 2004), amendments in June 2005 and December 2006 | - Breaches of obligations relating to retained businesses and liabilities, and the divestiture of certain businesses; | - |
| | | -Breaches of tax representations; | 2010 |
| | | - Obligation to cover the Most Favored Nation provisions limited to 50% of every dollar of loss up to $50 million and to 100% of all losses in excess for $50 million; | - |
| | | - Violation of environmental laws and remedial actions; indemnification of aggregate losses stemming from VUE operations. $325 million deductible ($10 million de minimis exclusion) capped at $2,088 million. | 2014 |
| (b) | Acquisition of the MEI stake in USHI (February 2006) | Adjustment to the purchase price in the event of a sale by Vivendi of its NBCU equity interest | 2008 |
| | Acquisition of Vale and GVM by UMG (October 2006) | Commitment capped at €22 million to pay wages upon conditions (€11 million of provisions corresponding to the present value were accrued as of December 31, 2006) | 2011 |
| (c) | Divestiture of PSG (June 2006) | Customary guarantees capped at €18 million given to Colfim. | 2008 |
| | | Specific guarantee. | 2018 |
| | Divestiture of UMG supply and distribution operations (May 2005) | Supply and distribution contracts signed with the buyer EDC. | 2015 |
| | Divestiture of UMG's UK manufacturing facilities (2002) | Supply contract signed with the buyer for €2 million | 2007 |
| | Commitment to the Royalty Services LLP starting in 2007 | Use of their services for the management of royalties to artists and repertoire owners for a seven-year period starting at the setting of the special purpose software | 2014 |
| | Acquisition of games companies | Commitment capped at €17 million to pay wages of certain game developpers (€2 million of provisions were accrued as of December 31, 2006) | 2009 |
| (d) | Divestiture of Canal+ Nordic (October 2003) | Specific guarantee capped at €50 million. | 2010 |
| | Divestitures of Canal+ Technologies (January 2003), Canal+ Belgique and Canal+ N.V. (December 2003) and Canal+ Pays-Bas (August 2004) | Customary and specific guarantees capped at a cumulated €21 million . €12 million provisioned. | 2016 |
| | Divestiture of the StudioExpand animation and entertainment operations, some of MultiThématiques assets (2004) and Régie Outremer (June 2005) | Customary guarantees capped at a cumulated €19 million. | 2014 |
| (e) | Divestiture of Sportfive (2004) | Guarantees renegociated to €17 million excluding tax guarantee. €1 million provisioned. | 2007 |
| (f) | Divestiture of NC Numéricâble (March 2005) | Specific guarantees capped at €241 million (including tax and social risks) counter-guaranteed by France Telecom up to €151 million. €13 million of provisions. | 2014 |
| (g) | Divestiture of Xfera (2003) | Counter-guarantee of €55 million to banks in connection with Spanish UMTS frequency spectrum fees (provisioned up to €74 million, including late interest payment). | - |
| (h) | Guarantees given by Veolia Environnement subsidiaries counter-guaranteed by Veolia Environnement | €13 million counter-guaranteed by Veolia Environnement. | - |
| | Divestiture of fixed-line telecommunications in Hungary (May 2003) | Guarantees of tax nature capped at €20 million | - |
| | Divestiture of Monaco Telecom (June 2004) | Specific guarantees capped at €20 million | 2009 |
| (i) | Divestiture of Houghton Mifflin (December 2002) | Guarantees relating to the environment, to tax and employee matters and to share ownership | 2007 |
| | Divestiture of 50% stake in Vizzavi (August 2002) | Customary guarantees | - |
| | Dismantling of MP3 operations (2003) | Guarantees to insurers | - |
| (j) | Divestiture of Sithe (December 2000) | Guarantees capped at $480 million | - |
| (k) | Sale of real estate assets (June 2002) | Vendor warranties | 2007 |
| | | Autonomous first demand guarantees capped at €150 million total | 2017 |
| (l) | Divestiture of UCI (October 2004, May and October 2005) | Customary guarantees capped at €135 million | 2007-2009 |
| | Other | €4 million | 2007 |
| | **Contingent assets** | | |
| (c) | Divestiture of the Paris Saint-Germain soccer club (June 2006) | Commitment to pay upon conditions additional consideration based on any possible transfers of the club's players | |
| | Divestiture of UMG supply and distribution operations (May 2005) | Future $17 million rebates granted by the buyer related to the US businesses; | 2009 |
| | | Future €12 million rebates granted by the buyer related to the European businesses. | 2014 |
| (f) | Guarantees on divestiture of NC Numéricâble (March 2005) | €151 million counter-guaranteed by France Telecom | 2014 |
| (f) | Divestiture of Ypso (20%) | Potential earn-out upon conditions | |
| | Acquisition of several companies within MultiThématiques and Expand | Guarantees from the sellers for approximately €7 million. | 2007 |
| | Various other miscellaneous contingent assets | €3 million | - |

The accompanying notes are an integral part of the contingent assets and liabilities described above.

(a) As part of the NBC-Universal transaction which occurred in May 2004, Vivendi and General Electric (GE) gave certain reciprocal commitments customary for this type of transaction and Vivendi retained certain liabilities relating to taxes and excluded assets. Vivendi and GE undertook to indemnify each other against losses stemming from among other things any breach of their respective representations, warranties and covenants.

Neither party will have any indemnification obligations for losses arising as a result of any breach of representations and warranties (i) for any individual item where the loss is less than $10 million and (ii) in respect of each individual item where the loss is equal to or greater than $10 million except where the aggregate amount of all losses exceeds $325 million. In that event, the liable party will be required to pay the amount of losses which exceeds $325 million, but in no event will the aggregate indemnification payable exceed $2,088 million.

In addition, Vivendi will have indemnification liabilities for 50% of every U.S. dollar of loss up to $50 million and for all losses in excess for $50 million relating to liabilities arising out of the most favored nation provisions set forth in certain contracts.

As part of the unwinding of IACI's interest in VUE on June 7, 2005, Vivendi's commitments with regard to environmental matters were amended and Vivendi's liability is now subject to a de minimis exception of $10 million and a payment basket of $325 million.

The representations and warranties other than those regarding authorization, capitalization and tax representations terminated on August 11, 2005. Notices of claims for indemnity for environmental matters must be made by May 11, 2009, except for remediation claims which must be brought by May 11, 2014. Other claims, including those related to taxes, will be subject to applicable statutes of limitations.

(b) In connection with the purchase of the approximate 7.7% stake held by Matsushita Electric Industrial Co, Ltd (MEI) in Universal Studios Holding I Corp. on February 7, 2006, if Vivendi were to sell any of its NBCU interests, Vivendi agreed to pay MEI a pro rata share of the proceeds exceeding $7 billion as follows: if the divestiture of NBCU shares occurs in 2007, Vivendi shall pay to MEI 66.66% of its share of the sale proceeds exceeding $7 billion; this share shall be reduced to 33.33% if the divestiture occurs in 2008.

(c) As part of the divestiture of the Paris Saint-Germain soccer club, finalized on June 20, 2006, Canal+ Group granted to the buyer, Colfilm, customary warranties capped at €18 million which will expire on June 30, 2008, and specific variable warranties with an unlimited amount. The Canal+ Group paid €2 million to the buyer in the second half of 2006 with respect to the specific warranties. The buyer agreed to pay additional consideration to Canal+ Group based on any possible transfers of the club's players.

(d) In connection with the divestiture of Canal+ Nordic in October 2003, Vivendi granted certain customary guarantees to the acquirers up to €22 million, which expired in 2005. A specific guarantee was also granted up to €50 million, expiring in April 2010. Its application could be extended under certain conditions. Two guarantees given to American studios on output deals retained by Canal+ Group, amounting to a maximum of €20 million and $15 million, respectively, over the life of the contracts. These guarantees are covered by a back-to-back agreement by the buyers. The Canal+ Group has also retained distribution guarantees in favor of Canal Digital and Telenor Broadcast Holding on behalf of its former subsidiary. These guarantees are covered by a back-to-back agreement by the buyers.

(e) In connection with the divestiture of Sportfive in 2004, both sellers, i.e., RTL Group and Canal+, granted customary guarantees and specific guarantees related to the collection of certain receivables as well as several litigations, expiring on December 31, 2006. The guarantees are capped at €100 million for the sellers (€7 million threshold), i.e., €50 million for Canal+ Group. The sellers also granted customary tax guarantees with no limit as to amount. As of December 31, 2006, as a result of an additional transaction with the buyers, the amount of the commitment of the Canal+ Group which expires in 2007, was reduced to €17 million (for which €1 million of provisions were accrued as of December 31, 2006).

(f) As part of the divestiture of NC Numéricâble on March 31, 2005, the Canal+ Group granted specific guarantees with a €241 million cap (including tax and social risks), for which €13 million of provisions were accrued as of December 31, 2006. Specific risks related to cable networks used by NC Numéricâble are included in this maximum amount and are counter-guaranteed by France Telecom up to €151 million. In addition, Canal+ Group received in January 2006, as part of the final divestiture of its 20% stake in Ypso, a potential earn-out, that was not valued in the off-balance sheet accounts.

(g) Following the unfavorable decision of the Spanish constitutional court concerning the payment by Xfera of UMTS frequency spectrum fees in Spain, which decision is open to appeal, Vivendi recognized an additional provision of €54 million in respect of guarantees granted following the sale of its stake in Xfera in 2003. The provision stands at €74 million as of December 31, 2006 (including late payment interest), compared to €20 million as of December 31, 2005.

(h) As of December 31, 2006, Vivendi continued to guarantee commitments given by Veolia Environnement subsidiaries for a total amount of approximately €13 million, mainly relating to performance guarantees given to local authorities (New Bedford). All of these commitments are being progressively transferred to Veolia Environnement and have been counter-guaranteed by the latter.

(i) Under the terms of the agreement governing the sale of Houghton-Mifflin shares in December 2002, all the guarantees granted by Vivendi expired on June 30, 2004, except those relating to intellectual property which expired at the end of December 2005, guarantees relating to the environment which expire in December 2007, guarantees relating to tax and employee matters subject to statutes of limitation and guarantees relating to share ownership which are unlimited in time.

(j) In connection with the sale of its 49.9% interest in Sithe to Exelon in December 2000, Vivendi granted guarantees on its own representations and those of Sithe. Claims, other than those made in relation to foreign subsidiary commitments, are capped at $480

million. In addition, claims must exceed $15 million, except if they relate to foreign subsidiaries or the divestiture of certain electrical stations to Reliant in February 2000. Some of these guarantees expired on December 18, 2005.

(k) As part of the sale of real estate assets in June 2002 to Nexity, Vivendi granted two autonomous first demand guarantees, one for €40 million and one for €110 million to several subsidiaries of Nexity (SAS Nexim 1 to 6). The guarantees are effective until June 30, 2017. These autonomous guarantees are in addition to the vendor warranties granted by Sig 35, Vivendi's subsidiary, to SAS Nexim 1 to 6 in connection with guarantee contracts dated June 28, 2002. The vendor warranties are valid for a period of 5 years, from June 28, 2002, except those relating to litigation (valid until the end of the proceedings), tax, custom, and employee related liabilities (statute of limitations plus 3 months) and the decennial guarantee applicable to real estate.

(l) In connection with the divestiture of its 50% stake in UCI in October 2004, Vivendi granted customary guarantees to the buyer capped at €135 million. These guarantees expired on April 28, 2006, except for guarantees relating to environmental matters which expire on April 28, 2007 and guarantees relating to tax matters which expire at the end of the applicable statute of limitations period. Vivendi continues to provide guarantees in respect of UCI rent commitments to owners of cinema theaters in Germany of approximately €107 million as of December 31, 2006. It received counter-guarantees in this respect from the purchaser of its 50% stake. In addition, as part of the separate disposal of the group's 50% stake in UCI Brazil in October 2005, Vivendi granted guarantees covering lease and operational matters similar to those described above capped at $14 million and expiring October 12, 2008.

Several guarantees issued in 2006 and in prior years in connection with asset acquisitions or disposals have expired. The statute of limitations of certain guarantees relating to employee and tax liabilities or linked to share ownership has not yet run out. To the best of our knowledge no material claims have been made to date.

- ***Relevant commitments closed in 2006***

**Early redemption of rental guarantees of the Berlin building Quartier 207 in June 2006.** An annual rental guarantee which amounted to €240 million as of December 31, 2005, was granted by Vivendi to the buyer of the Berlin building Quartier 207 in 1996. In June 2006, Vivendi terminated the residual guarantee by paying €52 million resulting in a decrease in off balance sheet commitments of €240 million following the termination of the rental guarantee without any impact on net income. The building and the debt used for its acquisition were not consolidated by Vivendi in accordance with SIC interpretation 12.

### 29.5. Shareholder agreements

Under existing shareholder agreements (including SFR, Maroc Telecom, CanalSatellite, as well as Canal+ France (since January 4, 2007)), Vivendi has obtained certain rights (such as preemptive rights and priority rights) which enable it to control the capital structure of consolidated companies owned partially by other shareholders. Conversely, Vivendi has granted similar rights to the other shareholders in the event that it sells its interests to third parties.

In addition, pursuant to other shareholder agreements or provisions of the bylaws of consolidated entities, equity affiliates or unconsolidated interests (including NBC Universal, Elektrim Telekomunikacja, Neuf Cegetel and Amp'd), Vivendi has given or received certain rights (preemptive and other rights) enabling it to protect its shareholder's rights.

The Canal+ Group and Lagardère shareholders' agreement entered into on July 11, 2000 (following Lagardère's investment in the share capital of CanalSatellite), as amended on November 21, 2000, grants the Canal+ Group or Lagardère the right to exercise contingent call or put options on their respective stakes in CanalSatellite under certain conditions (including in the event of a deadlock or a change of control) which rights terminated following the strategic alliance entered into on January 4, 2007 by Vivendi, Groupe Canal+, Lagardère and Lagardère Active to create Canal+ France. Please refer to Note 2.1.

On September 13, 2006, SFR and Louis Dreyfus signed a new shareholders' agreement. This agreement came into effect on October 24, 2006, date of the initial public offering of Neuf Cegetel, and has an initial term of six years, renewable automatically for periods of three years in the absence of a decision to the contrary by the parties. The agreement provides notably for pre-emptive rights in favor of each of the parties in the event of the transfer of their Neuf Cegetel shares to a third party, subject to certain exceptions. The provisions of this new shareholders' agreement do not impact the governance of Neuf Cegetel and do not call into question the equity accounting of Neuf Cegetel by SFR. Please refer to Note 2.3.

Pursuant to Article L.225-100-3 of the French Commercial Code, some rights and obligations of Vivendi resulting from shareholders' agreements (SFR, Maroc Telecom, NBC Universal and Cyfra+) could be amended or terminated in the event of a change of control of Vivendi or a tender offer being made on Vivendi. These shareholders' agreements are subject to confidentiality provisions.

### 29.6. Collaterals and pledges as of December 31, 2006 and December 31, 2005

| Nature of assets collaterized or pledged | Note | Inception Date | Maturity | December 31, 2006 | | | December 31, 2005 |
|---|---|---|---|---|---|---|---|
| | | | | Amount of asset pledged | Total recorded in the Consolidated Statement of Financial Position | Corresponding percentage | Ammount of asset pledged |
| | | | | (In million of euros) | | | (In million of euros) |
| **Given** | | | | | | | |
| On financial assets | | | | | | | |
| - Pledges on other financial assets | 15 | 1997 | 2016 | € 50 | € 3,164 | 2% | € 49 |
| Onn cash and cash equivalents | | | | | | | |
| - Miscellaneous cash collaterals | | 2004 | nd* | 1 | 2,400 | ns** | 1 |
| **Total** | | | | 51 | na*** | na*** | 50 |
| **Received** | | | | | | | |
| On financial assets | | | | | | | |
| - Receivable on UGC shares held by family shareholders(a) | 15 | 2005 | 2008 | 29 | 3,997 | 1% | 35 |
| On other assets | | nd* | nd* | 13 | na*** | na*** | 12 |
| **Total** | | | | 42 | na*** | na*** | 47 |

*nd: not determined; **ns: not significant; ***na: not applicable.

(a) Vivendi has a first rank security on UGC shares held by family shareholders to guarantee the payment of its loan to the latter following the divestiture of its 37.8% stake in UGC in December 2005

# Note 30.   Litigations

Vivendi is subject to various litigations, arbitrations or administrative proceedings in the normal course of its business.

The expenses which may result from these proceedings are only recognized as a provision when they become likely and when their amount can either be quantified or estimated on a reasonable basis. In the last case, the amount of the provision represents Vivendi's best estimate of the risk. The amount of the provision recognized is calculated based on an appraisal of the level of the risk, bearing in mind that the occurrence of an ongoing event may lead, at any time, to a reappraisal of the risk. As of December 31, 2006, provisions recorded by Vivendi for all claims and litigations amounted to €230 million.

To the Company's knowledge, there are no legal or arbitration proceedings or any facts of an exceptional nature which may have or have had in the recent past a significant effect on the company and on its group's financial position, profit, business and property.

The situation of proceedings disclosed hereunder is described as of February 27, 2007, day of the Management Board meeting held to approve Vivendi's financial statements for the year ended December 31, 2006.

- **COB/AMF investigation opened in July 2002**

On September 12, 2003, following the investigation opened by *Autorités des Marchés Financiers* (AMF) (formerly the *Commission des Opérations de Bourse* (COB)) on July 4, 2002, the AMF notified Vivendi of facts which, in its view, could result in an administrative penalty for non-compliance with sections 1, 2, 3 and 4 of COB Regulation 98-07.

The charges complained of took place prior to the changes made in the management of Vivendi in July 2002. First, they related to the financial information derived from the methods of consolidation of Cegetel, Maroc Telecom and Elektrim Telekomunikacja in accordance with French accounting standards, and second, to other items of financial information.

Vivendi challenged these allegations, taking the view, shared by its auditors, that the method of consolidation of these companies, which had been applied over the period subject to the COB's investigation, were in accordance with the applicable accounting regulations.

Pursuant to a decision of the AMF Sanction Commission, notified to Vivendi on December 7, 2004, Vivendi was ordered to pay a financial penalty of €1 million. On February 4, 2005, Vivendi appealed the decision of the AMF Sanctions Commission before the Paris Court of Appeal. On June 28, 2005, the Paris Court of Appeal partially overturned the decision of the AMF's Sanctions Commission, validated Vivendi' accounting treatment and reduced the amount of Vivendi's penalty from €1 million to €300,000.

On August 25, 2005, the AMF appealed against this decision before the French Supreme Court (*Cour de Cassation*).

On December 19, 2006, the Commercial Chamber of the French Supreme Court (*Cour de Cassation*) partially reversed the Paris Court of Appeal's decision. In its decision, the Commercial Chamber of the French Supreme Court ruled that the statements made orally by Jean-Marie Messier regarding Vivendi's financial condition at the Company's 2002 Annual Shareholders Meeting were binding on Vivendi, regardless of whether such statements were accurate or complete, due to the fact that he made the statements while performing his duties as the Company's chief executive officer.

However, the French Supreme Court confirmed the accuracy and appropriateness of the method applied by Vivendi for the consolidation of Elektrim Telekomunikacja. The case has been remanded to the Paris Court of Appeal in a different composition.

- **AMF investigation of the company's share repurchases opened in May 2002**

On May 4, 2004, the AMF commenced an investigation into Vivendi's purchase of its own shares between September 1, 2001 and December 31, 2001. The AMF's investigation report has not been submitted to the *"Commission des sanctions"*. However, on June 6, 2005 the AMF submitted this report to the *Parquet de Paris* (the public prosecutor's office) which led to additional prosecution's charges joined to the investigation already underway by the financial department of the *Parquet de Paris* (see below).

- **AMF investigation in connection with the issuance of mandatorily redeemable notes (ORA) in November 2002**

On January 18, 2005, Vivendi was served with a notice of complaint issued by the AMF following the inquiry made into observed movements in the Vivendi share price at the time of the issuance of notes mandatorily redeemable for new shares of Vivendi in November 2002.

Vivendi challenged the allegations before the Sanctions Commission of the AMF (Commission des Sanctions). .

- **Investigation by the Financial Department of the Parquet de Paris**

The investigation initiated in July 2002 by the financial department of the *Parquet de Paris* for the publication of false or misleading information regarding the financial situation or forecasts of Vivendi, as well as the publication of untrue or inaccurate financial statements (for financial years 2000, and 2001) is ongoing. The application for Vivendi to be joined as a civil party was definitively granted by an order of the Court of Appeal dated June 25, 2003.

- **PSG Transfers**

An investigation entrusted to a Judge has been opened in connection with the terms of transfer of PSG football players and the remuneration of intermediaries between 1998 and 2002.

- **DuPont tax litigation**

At the beginning of June 2006, Vivendi reached an agreement with the United States Internal Revenue Service (IRS) ending their dispute concerning the amount of tax due on the redemption of DuPont shares from Seagram in April 1995. The agreement reached with the IRS provided for Vivendi to pay a total of approximately $671 million (€521 million), including tax $284 million and interest of $387 million, to settled this dispute.

Subsequently, at the end of June 2006, in accordance with the agreement with the IRS, Vivendi sold all of the 16.4 million freely transferable DuPont shares that it had held since its merger with Seagram for a total amount of 671 million dollars (534 million euros).

- **Securities class action in the United States**

Since July 18, 2002, sixteen claims have been filed against Vivendi, Messrs. Jean-Marie Messier and Guillaume Hannezo in the United States District Court for the Southern District of New York and in the United States District Court for the Central District of California. On September 30, 2002, the New York court decided to consolidate these claims in a single action under its jurisdiction entitled *In re Vivendi Universal S.A. Securities Litigation*. The plaintiffs allege that, between October 30, 2000 and August 14, 2002, the defendants violated certain provisions of the US Securities Act of 1933 and US Securities Exchange Act of 1934. On January 7, 2003, they filed a consolidated class action suit that may benefit potential groups of shareholders. Damages of unspecified amount are claimed. Vivendi contests these allegations.
The proceedings are currently in the stage of discovery in which the plaintiffs have to prove a violation that caused a loss to the shareholders.
In parallel with these proceedings, the procedure for certification of the potential claimants as a class with standing to act on behalf of all shareholders ("class certification") is ongoing. The judgment on the class certification is expected in the course of 2007.

- **Elektrim Telekomunikacja**

Since the purchase on December 12, 2005 of 2% of the companies Elektrim Telekomunikajca Sp. Z o.o (Telco) and Carcom Warszawa (Carcom) held by Ymer, Vivendi is a 51% shareholder in each of Telco and Carcom, companies organized and existing under the laws of Poland which own, either directly or indirectly, 51% of the capital of Polska Telefonia Cyfrowa Sp. z o.o (PTC), one of the primary mobile telephone operators in Poland. These shareholdings are the subject of several litigation proceedings the most important of which are described below.

*Arbitral Award Rendered in Vienna on 26 November 2004 (the "Vienna Award")*
In December 2000, Deutsche Telekom (DT) initiated arbitration proceedings in Vienna against Elektrim S.A. ("Elektrim") and Telco in order to challenge the validity of the contribution of 48% of the capital of PTC made in 1999 by Elektrim to Telco.
In the Vienna Award, notified to the parties on December 13, 2004, it was held that:

- The Telco transfer is ineffective and the PTC shares which were the subject of this transfer remained Elektrim's property at all material times;
- The transfer of the PTC shares to Telco by Elektrim does not as such qualify as a Material Breach under Article 16.1 of the Shareholders Agreement, but it would do so if Elektrim did not recover the shares from Telco within two months from the notification of the award;
- DT's Economic Impairment Claim is dismissed; and
- the arbitral tribunal has no jurisdiction over Telco and DT's claims against Telco cannot be entertained in this Arbitration;

On August 3, 2005, the Vienna arbitral tribunal rendered its final award with respect to costs, thereby concluding these proceedings. Telco was not submitted to any costs and was granted reimbursement of its costs.
Since the arbitral tribunal held that it had no jurisdiction over Telco, Vivendi considers that that the Vienna Award is not enforceable against Telco.

*Exequatur Proceedings of the Vienna Award before Polish Courts*
On February 2, 2005, Elektrim and DT obtained from the Warsaw Court (Regional Court-Civil Division) a partial *exequatur* of the first three points of the Vienna Award's provisions, excluding the point on the lack of jurisdiction of the arbitral tribunal over Telco. Telco appealed this partial *exequatur* decision for having violated the terms of the New York Convention of June 10, 1958 on the recognition and execution of foreign arbitral awards and its right to a fair hearing. On March 29, 2006, the Warsaw Court of Appeal confirmed the partial *exequatur* obtained on February 2, 2005, ruling that the Vienna Award was enforceable against Telco. On January 18, 2007, following the appeal filed by Telco, the Polish Supreme Court overturned the Warsaw Court of Appeal's decision for procedural reasons without examining the merits of the case, and ordered that the case be reheard by the court of first instance.

*Declaratory Proceedings before the Polish Courts*
In December 2004, following the Vienna Award, Telco initiated proceedings on the merits with the intention of obtaining a declaratory judgment confirming that it is the rightful owner of the PTC shares.

*Proceedings before the Trade and Companies Registry of Warsaw*
Following the decision of March 29, 2006 of the Warsaw Court of Appeal (see above), the Warsaw court responsible for the Trade and Companies Registry (KRS) re-registered Elektrim as shareholder of PTC on July 13, 2006. Telco has appealed this decision.

*Proceedings for the annulment of the Vienna Award before the Austrian Courts*
On December 20, 2005, the Vienna Commercial Court at Telco's request annulled the first sub-paragraph of the Vienna Award which deemed that the contribution of the PTC shares made by Elektrim to Telco in 1999 had been ineffective and that the PTC shares which are the subject of the said transfer had never left Elektrim's ownership. All the other rulings of the Vienna Award were left unchanged, including the ruling which referred to the absence of jurisdiction of the arbitral tribunal with respect to Telco. The Vienna Commercial Court in particular considered that the arbitral tribunal, after having declared non-jurisdiction with respect to Telco, had contradicted itself by rendering a decision which was likely to affect Telco's rights.
On October 10, 2006, the Vienna Court of Appeal overturned the December 20, 2005 decision on the basis that Telco had no legal right to request the annulment of the Vienna Award since such award could not have any binding effect on Telco. This decision confirms Vivendi's interpretation of the Vienna Award.
On December 18, 2006, the Austrian Supreme Court confirmed that Telco was not a party to the arbitration held in Vienna between DT and Elektrim and that the Vienna Award could therefore have no effect on Telco's rights regarding the PTC shares.

*DT's Call Option*
On June 6, 2006 and October 2, 2006, an arbitral tribunal in Vienna rendered two partial awards deciding that DT had exercised a call option over the shares that Elektrim owns in PTC. Neither Vivendi nor Telco are parties to this arbitration proceeding which is between Elektrim and DT. In its decisions, the arbitral tribunal further ruled that the price of the call option would be the current book value of the PTC shares plus an additional an amount to be determined by the tribunal at a later date. The tribunal has nonetheless recognized that uncertainty continues to exist as to the number of PTC shares owned by Elektrim.

*Arbitration Proceedings before the London Court of International Arbitration (LCIA)*
On August 22, 2003, Vivendi and Vivendi Telecom International (VTI) lodged an arbitration claim with an arbitration court under the auspices of the London Court of International Arbitration (LCIA) against Elektrim, Telco and Carcom. This request for arbitration relates to the *Third*

*Amended and Restated Investment Agreement* of September 3, 2001, entered into by and among Elektrim, Telco, Carcom, Vivendi and VTI (the "TIA"). The purpose of the TIA, amongst other things, is to govern relations between Vivendi and Elektrim within Telco. The subject matter of the dispute mainly relates to the validity of the TIA (contested by Elektrim) and alleged breaches of the TIA by Vivendi and Elektrim.

On May 22, 2006, the LCIA Arbitral Tribunal, in a partial award, confirmed the validity of the TIA. The next hearings on the alleged breaches of the TIA are scheduled for March 2007.

### *Vivendi's case against the Polish State*

On August 10, 2006, Vivendi and VTI served the Republic of Poland with a request for arbitration on the basis of the treaty signed on February 14, 1989, between France and Poland relating to the reciprocal encouragement and protection of investments. In its request, Vivendi claimed that the Republic of Poland failed to comply with its obligations to protect and fairly treat foreign investors under such treaty.

### *Proceedings against DT before the Paris Commercial Court*

In April 2005, Vivendi summoned DT before the Paris Commercial Court for wrongfull termination of negotiations. In September 2004, DT ended, without prior notice and without legitimate justification, tri-party negotiations with Elektrim and Vivendi which had begun one year earlier in relation to the transfer of 51% of PTC to DT. Vivendi considers that this abrupt withdrawal was motivated by DT's wish to appropriate the PTC shareholding at a lower cost by maneuvers which Vivendi considers to be illegal. Vivendi is claiming compensation from DT, corresponding to the harm suffered as a result of DT's acts.

### *Arbitral proceedings in Geneva (Switzerland) under the aegis of the International Chamber of Commerce*

Intensive discussions took place in February and March 2006, between Vivendi, Elektrim and DT as a result of which the parties agreed to settle all pending litigation on the ownership of the PTC shares and to put in place a new joint-venture between Vivendi and DT concerning PTC. This agreement could not be implemented because DT, following the announcement of the decision of the Warsaw Court of Appeal of March 29, 2006, abruptly decided not to sign the relevant documents. Vivendi believes that the agreement, which is subject to Swiss law, had been validly concluded by the parties and, therefore, on April 13, 2006, it initiated arbitration proceedings in Geneva under the aegis of the International Chamber of Commerce against DT and Elektrim to enforce its rights thereunder. The next hearings will take place in September 2008.

### *Proceedings against DT before the federal court in the State of Washington (USA)*

On October 23, 2006, Vivendi filed a civil Racketeer Influenced and Corrupt Organizations Act (RICO) complaint in federal court in the State of Washington, claiming that T-Mobile had illegally appropriated Vivendi's investment in PTC through a pattern of fraud and racketeering. Named in the complaint are T-Mobile USA, Inc., T-Mobile Deutschland GmbH Deutsche Telekom AG and Mr. Zygmunt Solorz-Zak, Elektrim's main shareholder.

### *Tort Claim against Vivendi before the Warsaw District Court*

Elektrim started a tort action against Vivendi before the Warsaw District Court on October 4, 2006, claiming that Vivendi prevented Elektrim from recovering the PTC shares following the Vienna Award. Elektrim claims compensation for approximately €2.2 billion corresponding to the difference between the fair market value of 48% of PTC and the price paid by DT to Elektrim as a result of the exercise of its call option.

### *Vienna arbitration between DT and Elektrim Autoinvest*

On January 10, 2007, DT lodged an arbitration claim against Elektrim Autoinvest, a 51% indirect subsidiary of Vivendi which owns 1.1% of the share capital of PTC. DT alleges that it has a call option on Elektrim Autoinvest's stake in PTC, which call option results from the breach of the PTC shareholders agreement by Elektrim Autoinvest.

- **French Competition Council – mobile telephone market**

On December 1, 2005, the French Competition Council issued an order against French mobile telephone operators in respect of the operation of the mobile telephone market, principally during the period 2000-2002. The resulting fine paid by SFR, amounted to €220 million and wasentered in SFR's accounts as an expense and was paid during the 2005 fiscal year. On February 9, 2006, SFR appealed this order. The hearings before the Court of Appeal were held on September 12, 2006. On December 12, 2006, the Paris Court of Appeal confirmed the French Competition Council's order and dismissed the claim brought by the UFC-QUE CHOISIR association's to have the case submitted to the Public Prosecutor. On January 11, 2007, SFR, as well as Bouygues Telecom and Orange, appealed this decision before the French Supreme Court (*Cour de Cassation*).

SFR is involved in contentious proceedings connected with this order brought by customers and consumer associations before the Commercial Court of Paris. Since SFR is challenging the merits of these proceedings, it is not in a position to determine the potential impact of their outcome.

Furthermore, SFR is involved in other contentious proceedings commenced in connection with competition law, proceedings which are often common with other telephone operators. The management of SFR is not in a position to determine the potential impact of the outcome of these proceedings and, consequently, has made no provision in its accounts in this respect.

- **Universal Music Group**

*Investigations into prices in the online music distribution market*

In December 2005, the New York State Attorney General opened an investigation into matters concerning the pricing of digital downloads. In February 2006, the United Stated Justice Department commenced a similar investigation. In connection with those inquiries, both the New York State Attorney General and the Department of Justice served subpoenas on the four major record companies. UMG is currently in the process of responding to those subpoenas.

*Brazilian Tax Dispute*

The State of Sao Paolo, Brazil Tax Authority filed an action disputing certain deductions taken by a UMG company in Brazil for sales tax payments on account of copyright and neighbouring rights payments for domestic Brazilian repertoire.

## Note 31. Major consolidated entities as of December 31, 2006 and December 31, 2005

As of December 31, 2006, approximately 400 entities were consolidated or accounted for using the equity method.

| | Note | Country | December 31, 2006 | | | December 31, 2005 | | |
|---|---|---|---|---|---|---|---|---|
| | | | Accounting Method | Voting Interest | Ownership Interest | Accounting Method | Voting Interest | Ownership Interest |
| **Vivendi S.A.** | | France | Parent company | | | Parent company | | |
| **Universal Music Group** | 2.2 | | | | | | | |
| Universal Studios Holding I Corp. (a) | | USA | - | - | - | C | 92% | 92% |
| PolyGram Holding, Inc. | | USA | C | 100% | 100% | C | 100% | 92% |
| Universal Music Group, Inc. | | USA | C | 100% | 100% | C | 100% | 92% |
| UMG Recordings, Inc. | | USA | C | 100% | 100% | C | 100% | 92% |
| Centenary Holding B.V. | | Netherlands | C | 100% | 100% | C | 100% | 92% |
| Universal International Music B.V. | | Netherlands | C | 100% | 100% | C | 100% | 92% |
| Universal Entertainment GmbH | | Germany | C | 100% | 100% | C | 100% | 92% |
| Universal Music K.K. | | Japan | C | 100% | 100% | C | 100% | 92% |
| Universal Music France S.A.S. | | France | C | 100% | 100% | C | 100% | 92% |
| Centenary Music Holdings Limited | | UK | C | 100% | 100% | C | 100% | 92% |
| Universal Music (UK) Holdings Limited | | UK | C | 100% | 100% | C | 100% | 92% |
| **Vivendi Games** | 2.2 | USA | C | 100% | 100% | C | 100% | 99% |
| Blizzard Entertainment, Inc | | USA | C | 100% | 100% | C | 100% | 99% |
| **Canal+ Group** | | | | | | | | |
| Groupe Canal+ SA | | France | C | 100% | 100% | C | 100% | 100% |
| Canal+ France (b) | 2.1 | France | C | 90% | 90% | - | - | - |
| Canal+ SA (c) | | France | C | 49% | 44% | C | 49% | 49% |
| CanalSatellite SA | | France | C | 66% | 59% | C | 66% | 66% |
| MultiThématiques | | France | C | 100% | 90% | C | 100% | 100% |
| Media Overseas | | France | C | 100% | 90% | C | 100% | 100% |
| StudioCanal SA | | France | C | 100% | 100% | C | 100% | 100% |
| Cyfra+ | | Poland | C | 75% | 75% | C | 75% | 75% |
| **SFR** | | | | | | | | |
| SFR (d) | | France | C | 56% | 56% | C | 56% | 56% |
| Neuf Cegetel SA | 2.3 | France | E | 40% | 23% | E | 28% | 16% |
| Cegetel SAS | | France | - | - | - | - | - | - |
| **Maroc Telecom S.A.** | | Morocco | C | 51% | 51% | C | 51% | 51% |
| Mauritel | | Mauritania | C | 51% | 21% | C | 51% | 21% |
| **NBC Universal** | 2.2 | | | | | | | |
| Universal Studios Holding I Corp. (a) | | USA | - | - | - | C | 92% | 92% |
| NBC Universal | | USA | E | 20% | 20% | E | 20% | 18% |
| **Other** | | | | | | | | |
| Vivendi Telecom International SA | | France | C | 100% | 100% | C | 100% | 100% |
| Elektrim Telekomunikacja | 2.4 | Poland | C | 51% | 51% | C | 51% | 51% |
| Polska Telefonica Cyfrowa (e) | 2.4 | Poland | - | - | - | NC | 51% | 26% |
| Vivendi Universal Publishing SA | | France | C | 100% | 100% | C | 100% | 100% |

C: Consolidated; E: Equity; NC: Not Consolidated.

(a) Following the acquisition of the minority interests held by Matsushita Electric Industrial (MEI) in Universal Studios Holding I Corp., Vivendi was able to simplify its North American corporate structure and consequently, this company was liquidated. Please refer to note 2.2 "Purchase of the 7.7% stake held by Matsushita Electric Industrial Co, Ltd (MEI) in Universal Studios Holding I Corp.".

(b) During the fourth quarter, the Canal+ Group transferred to Canal+ France (100% held) its pay-TV publishing and service distribution activities (including overseas departments and territories) in France and other Francophone countries. On December 19, 2006, in satisfaction of a condition precedent to the combination of Canal+ and TPS, Groupe Canal+ transferred 9.82% of the share capital of Canal+ France to Lagardère Active. As of December 31, 2006, the Canal+ Group held 90% of Canal+ France. Following the combination of Canal+ and TPS on January 4, 2007, the Canal+ Group held 65% in Canal+ France. Please refer to Note 2.1. "Combination of Canal+ and TPS pay-TV activities in France".

(c) This company is consolidated because Vivendi (i) has majority control over the board of directors, (ii) no other shareholder or shareholder group is in a position to exercise substantive participating rights that would allow them to veto or block decisions taken by Vivendi and (iii) it assumes the majority of risks and benefits pursuant to an agreement between Canal+ S.A. and Canal+ Distribution, a

wholly-owned subsidiary of Vivendi. Under the terms of this agreement, Canal+ Distribution guarantees Canal+ S.A. results in return for exclusive commercial rights to the Canal+ S.A. subscriber base.

(d)   SFR is 56% owned by Vivendi and 44% owned by Vodafone. Under the terms of the shareholders' agreement, Vivendi has management control of SFR, majority control over the board of directors and appoints the chairman and CEO, has majority control over shareholders' general meetings, and no other shareholder or shareholder group is in a position to exercise substantive participating rights that would allow them to veto or block decisions taken by Vivendi.

(e)   Due to the legal disputes surrounding the ownership of Telco's stake in PTC which prevents Telco/Carcom from exercising joint control over PTC, as provided in the bylaws of PTC, Vivendi has not consolidated its stake in PTC (please refer to Note 2.4 "Stake in PTC").

## Note 32.   Subsequent events

The main events that occurred since December 31, 2006, were as follows:

- **Combination of the Canal+ France and TPS pay-TV activities in France on January 4, 2007.** Please refer to section 2.1 for further details.

- **Voluntary redundancy plan at the Canal+ Group level.** In March 2006, management and trade union representatives of UES Canal+ signed a procedural agreement defining the Works Council information/consultation phases and setting out a strict timetable for the implementation of the plan. After the UES Canal+ Works Council issued its opinion on October 24, 2006 on the legal aspects of the Canal+ and TPS merger, followed on December 21, 2006, by its opinion on the initial focus of the functional reorganization plan for the new group, management and trade union representatives of UES Canal+ and TPS signed a method agreement on January 12, 2007, framing the Works Council information/consultation phases for the reorganization of the new group and its employee-related consequences (Books IV and III of the French Employment Code). Elected representatives were informed in mid-January of the management's reorganization plan, which involves the elimination of 364 jobs. Given the existence of a number of vacant positions within Canal+ and TPS, the plan could result in 171 employees leaving the company. Pursuant to the method agreement, the Works Council will issue its opinion no later than April 6, 2007.

- **New satellite capacity contract.** The Canal+ Group decided, following a bidding process, to retain Astra as the future sole operator carrying its television by satellite services in France. This decision provides the Canal+ Group with long-term access to the satellite capacity it requires, with favorable price conditions, to expand the number of channels it offers and accelerate the roll-out of High Definition by satellite in France. This new contract represents an additional overall commitment of €230 million over 10 years. TPS subscribers will continue to receive their channels via Eutelsat before being invited to migrate to Astra. This transfer will take place progressively commencing in the second half of 2007.

- **On February 9, 2007, Maroc Telecom acquired a 51% stake in Gabon Telecom SA,** the incumbent telecommunications operator of Gabon, for an amount of €61 million.